# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ANGELA D'ANNA, | |
| **Relator,** | CIVIL ACTION FILE NO. 2:14-CV-437-FtM-38CM |
| vs. | |
| LEE MEMORIAL HEALTH SYSTEM d/b/a LEE HEALTH, d/b/a LEE MEMORIAL HOSPITAL, a/k/a HEALTHPARK MEDICAL CENTER, a/k/a GULF COAST MEDICAL CENTER, a/k/a CAPE CORAL HOSPITAL, a/k/a LEE PHYSICIAN GROUP, | <u>FILED UNDER SEAL</u> PURSUANT TO 31 U.S.C. §3730(b)(2) [FALSE CLAIMS ACT –*QUI TAM*] |
| **Defendant.** | |



## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

ANGELA D'ANNA ("Relator"), by and through her counsel of record, brings this action on behalf of the United States of America against LEE MEMORIAL HEALTH SYSTEM d/b/a LEE HEALTH, d/b/a LEE MEMORIAL HOSPITAL, a/k/a HEALTHPARK MEDICAL CENTER, a/k/a GULF COAST MEDICAL CENTER, a/k/a CAPE CORAL HOSPITAL, a/k/a LEE PHYSICIAN GROUP (hereinafter collectively referred to as "Lee Memorial" and/or "Defendant") pursuant to the q*ui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et. seq*.

## NATURE OF THIS ACTION

1.     This FCA action relates to Lee Memorial's knowing submission, from 2005 to at least 2014, of false claims to Medicaid and Medicare. The false claims in this case are predicated on violations of the federal physician self-referral law commonly referred to as the "Stark Law" (42 U.S.C. § 1395nn; 42 C.F.R. § 411.351).



2.    The Stark Law prohibits hospitals from paying compensation to physicians that is in excess of fair market value and/or is commercially unreasonable in the absence of referrals. The purpose of the Stark Law is to prevent the overutilization of health services through the payment of referral fees by one medical provider to another.  The Stark Law is Congress' response to pay-to-play schemes such as Defendant's arrangements with certain medical specialists that may lead to overutilization of federal healthcare services, increase costs to federal healthcare programs, and corrupt medical decision-making by physicians who stand to profit from referring patients to facilities or entities in which they have a financial interest.

3.    Lee Memorial violates the Stark Law by paying physicians illegal referral fees under compensation arrangements that (i) exceed fair market value, and (ii) are commercially unreasonable in the absence of referrals.  Lee Memorial pays certain physicians a combination of financial incentives including: (1) compensation for personally performed services based on rates per work Relative Value Unit ("wRVU") that increase as the annual total of wRVUs credited to each physician increases; (2) compensation for services performed by hospital-employed physician assistants and nurse practitioners (both of which are hereinafter referred to as "extenders") that are credited and paid to the physicians at the physicians' wRVU rates which do not reflect the lower cost of using physician extenders; (3) bonus pools that are based on production of physician extenders to the extent such production was not already added to the physicians wRVUs and paid at the physicians' wRVU rates; (4) payments for on-call coverage in addition to payments to the physicians for professional services rendered while on-call; and (5) payments for medical directorships.  In this case, the combination of all these financial incentives resulted in Lee Memorial paying certain medical specialists total compensation that exceeds fair market value and is commercially unreasonable in the absence of referrals.  The more procedures referred by

the physicians that are performed at Lee Memorial, the greater the financial compensation received by the physicians from Lee Memorial.  This conduct is a well-orchestrated pay-to-play scheme that violates the Stark Law.

4.     As set forth in detail below, Lee Memorial pays excessive compensation to neurosurgeons, cardiologists and pulmonologists and then knowingly submits false claims to government payers related to referrals from such specialists in violation of the FCA.

5.     None of the exceptions to the Stark Law is applicable here, including the so-called "*bona fide* employment" and "personal service arrangement exceptions."

6.     The "*bona fide* employment" exception excludes amounts paid pursuant to a *bona fide* employment relationship if the compensation is (i) consistent with fair market value; and (ii) "not determined in a manner that takes into account (directly or indirectly), the volume or value of any referrals by the referring physician" [42 U.S.C. § 1395nn(e)(2)(B)], and (iii) "commercially reasonable even if no referrals were made by the employer." [42 U.S.C. § 1395nn(e)(2)(C)].

7.     The total compensation paid to certain physicians by Lee Memorial is not protected by the *bona fide* employment for two separate and distinct reasons: (1) it is not consistent with fair market value; and (2) it is not commercially reasonable.

8.     Outside of an employment relationship, the Stark Law also expressly excludes compensation paid pursuant to a personal service arrangement if the arrangement is set out in writing; the arrangement covers all the services to be provided by the physician; the aggregate services contracted for do not exceed those that are reasonable and necessary for the legitimate business purpose of the arrangement; the compensation does not exceed market value; and the compensation is "not determined in a manner that takes into account the volume or value of any referrals or the business generated between the parties." 42 U.S.C. § 1395nn(e)(3).

9.      The compensation by Lee Memorial does not come within the terms of the personal service arrangement exception for four different and separately dispositive reasons:   (1) the arrangement has not always been set out in writing or the arrangement has been inconsistent with the writing; (2) the aggregate services contracted for exceed those that are reasonable and necessary for the legitimate business purpose of the arrangement; (3) the compensation exceeds fair market value; and (4) compensation paid to a physician for marketing services is determined in a manner that takes into account the volume and value of any referrals or other business generated between the parties.

10.     Lee Memorial knowingly submitted false claims for reimbursement to Medicaid and Medicare after certifying compliance with the Stark Law, while knowing that it was not in compliance with the Stark Law.

11.     The Government would not have paid Defendant's false claims had it known of Defendant's violations of the Stark Law because such payment is statutorily prohibited for the myriad reasons set forth herein.

12.     Defendant also improperly and knowingly retained payments received on the false claims it submitted in violation of the Stark Law.   Defendant was required to pay back such "overpayments," but knowingly did not do so.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345 and 1367(a).   This Court has jurisdiction to entertain a *qui tam* action pursuant to 31 U.S.C. § 3730(b).   Relator is an "original source" and is otherwise authorized to maintain this action in the name of the United States as contemplated by the False Claims Act, 31 U.S.C. § §3729-33.

4

14.     This Court may exercise personal jurisdiction over Defendant pursuant to 31 U.S.C.

§ 3732(a) and because Defendant resides and transacts business in the Middle District of Florida.

15.     Venue is proper in the Middle District of Florida under 31 U.S.C. § 3732(a) and 28

U.S.C. § 1391(b) and (c) because Defendant can be found in, resides in, and/or transacts business

in this judicial district.

16.     Relator made voluntary and significant disclosures to the United States

Government prior to the filing of this lawsuit as required by 31 U.S.C. § 3730(b)(2).

## THE PARTIES

**A.     Plaintiffs: Relator and the United States**

17.     Relator-Plaintiff Angela D'Anna was employed by Lee Memorial as the System

Director of Internal Audit for over ten (10) years from October 2003 until her voluntary resignation

effective June 26, 2014.  She reported directly to the top executives at Lee Memorial and was the

classic corporate insider who became aware of the fraud but did not have the authority or power

to stop the fraudulent conduct within the organization.  Relator is a highly trained and educated

professional.  She is a Certified Public Accountant, a Certified Internal Auditor, a Certified Fraud

Examiner, and is certified in Healthcare Compliance.  She brings this *qui tam* action based upon

direct personal knowledge gained during her employment for a decade as a corporate insider and

executive with Lee Memorial.  Relator resided in the State of Florida at all relevant times and

during her entire employment with Lee Memorial.  Relator audited physician compensation issues

at Lee Memorial for over ten (10) years and appropriately reported compliance deficiencies of

increasing severity to senior management throughout her tenure.  Senior management deliberately

ignored and recklessly disregarded Relator's and others' audit reports, and knowingly allowed the

identified illegal physician compensation schemes to continue for many years.

18.     The United States is the real party in interest in this action.

**B.     Defendant**

19.     Defendant Lee Memorial is a special purpose unit of local government created by the Florida Legislature to operate, control and maintain a public hospital and other hospital facilities in Lee County, Florida pursuant to Chapter 63-1552, Laws of Florida (1963), as amended by Chapter 2000-439, Laws of Florida (2000). Lee Memorial is governed by a ten-member Board of Directors who are elected by the voters of Lee County. Chapter 2000-439, § 6, Laws of Florida (2000). Lee Memorial is a large health system that owns and operates four acute care hospitals and two specialty hospitals with a total of 1,423 acute care beds, as well as other healthcare facilities, and receives over one million patient contacts each year. Lee Memorial maintains its principal place of business in Lee County, Florida. Lee Memorial seeks and receives tens of millions of dollars from Medicare and Medicaid reimbursements each year. To be eligible to receive those funds, Lee Memorial must certify to the Government its compliance with the Stark Law and despite its systemic violations has done so for every year relevant to this case.

20.     When this Court unseals this Complaint, Lee Memorial may be served at its executive office located at 2780 Cleveland Avenue, Suite 459, Fort Myers, Florida 33901.

## STATUTORY AND REGULATORY PROVISIONS

**A.     The False Claims Act**

21.     The FCA provides for the award of treble damages and civil penalties for, *inter alia*, knowingly causing the submission of false or fraudulent claims for payment to the United States government. 31 U.S.C. § 3729(a)(1).[1] Claims to government payers for reimbursement for

---

[1]     The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009. Defendant's fraudulent scheme includes false claims made prior to and after that date. The three pre-amendment subsections relevant to this action are 31 U.S.C. §§ 3729(a)(1), (a)(2), and (a)(7).

healthcare services rendered to patients referred by physicians in violation of the Stark Law (as hereinafter described) are material false claims actionable under the FCA.

      22.     The FCA provides, in pertinent part, that a person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

(a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains. . . .

31 U.S.C. § 3729. For purposes of the False Claims Act,

the term "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and require no proof of specific intent to defraud.

31 U.S.C. § 3729(b)(1). For purposes of the False Claims Act, the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

**B.**    **The Stark Law**

      23.     Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Law"), the Stark Law prohibits a hospital from submitting claims for "designated health services" [as defined in 42 U.S.C. § 1395nn(h)(6)] to Medicare or Medicaid if

---

The post-amendment sections relevant here are 3729(a)(1)(A), 3729(a)(1)(B) and 3729(a)(1)(G). Post-amendment section 3729(a)(1)(B) is applicable to all claims in this case by virtue of Section 4(f) of FERA, which makes the changes to that section applicable to all claims for payment pending on or after June 7, 2008.

such claims resulted from referrals from physicians having a "financial relationship" (as defined in the Stark Law) with the hospital. The Stark Law explicitly prohibits reimbursement for such tainted services.

24.     The Stark Law was enacted to address overutilization of services, increased costs and corrupted medical decisions by physicians who stood to profit from referring patients to facilities or entities in which they had financial interests.

25.     The Stark Law explicitly states that an entity "may not present or cause to be presented a claim. . . for designated health services furnished pursuant to or referral prohibited under subparagraph (A) [of this act]." 42 U.S.C. § 1395nn(a)(1)(b). Neither Medicare nor Medicaid may pay for any designated health service provided in violation of the Stark Law. *See* 42 U.S.C. § 1395nn(g)(1); 42 U.S.C. § 1396(s). The regulations implementing the Stark Law expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353(d) (2006).

26.     Compliance with the Stark Law is material to Medicare's and Medicaid's payment decisions because payment of Stark-tainted claims is statutorily prohibited and the financial relationships with physicians present a risk to federal healthcare programs and program beneficiaries of questionable or improper utilization of designated health services. Medicare and Medicaid would not and could not legally pay for any designated health service provided in violation of the Stark Law. 42 U.S.C. § 1395nn(g)(1); 42 U.S.C. § 1396b(s).

**C.      The Medicare Program**

27.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of healthcare services for certain individuals. The United States Department of Health and Human Services ("HHS") is responsible for the administration

and supervision of the Medicare program, which it does through the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.

28.      Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for institutional care (including hospital, skilled nursing facility and home health care). *See* 42 U.S.C. §§ 1395c-1395i-4. Part B of the Medicare program primarily covers physician and other ancillary services. *See* 42 U.S.C. § 1395k.

29.      Medicare Administrative Contractors ("MACs") act on behalf of CMS to process and pay Part A and Part B claims and perform administrative functions on a regional level. *See* 42 § C.F.R. 421.5(b).

30.      In Florida, First Coast Service Options, Inc. ("First Coast") acts as the MAC for the Florida region.

31.      Providers who wish to be eligible to participate in Medicare Part A must periodically sign an application to participate in the program. The application, which must be signed by an authorized representative of the provider, contains an express certification that states: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (*including but not limited to, the Federal anti-kickback statute and the Stark Law*), and on the provider's compliance with all applicable conditions of participation in Medicare." (emphasis added.)

32.      Under the Medicare program, CMS makes payments after the services are rendered to hospitals for inpatient and outpatient services.

33.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits Medicare Part A claims for interim reimbursement for inpatient and outpatient items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a Form UB-92 or UB-04.

34.     As detailed below, at all relevant times, Lee Memorial was enrolled as a Medicare and Medicaid provider and submitted or caused to be submitted claims to Medicare and Medicaid for both (i) specific inpatient and outpatient services provided to individual beneficiaries and (ii) general and administrative costs incurred in treating Medicare and Medicaid beneficiaries.

35.     As a prerequisite to payment under Medicare Part A, CMS requires hospitals to submit annually a CMS-2552 form, more commonly known as the hospital cost report. Cost reports are the final claim that a provider submits to the fiscal intermediary or MAC for items and services rendered to Medicare beneficiaries.

36.     After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary or MAC, stating the amount of Part A reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.F.R. § 405.1801(b)(1). Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. *See* 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

37.     Lee Memorial was, at all times relevant to this case, required to submit annual hospital cost reports to First Coast.

38.     During the relevant time period, Medicare Part A payments for hospital services were determined by the claims submitted by the provider for particular patient discharges

(specifically listed on government forms UB-92 and UB-04) during the course of the fiscal year. On the hospital cost report, the Medicare Part A payments due to the hospital for services are totaled and compared with any Medicare Part A liabilities owed to Medicare from the hospital to determine whether Medicare or the hospital owes the other any funds related to treatment of Medicare Part A beneficiary patients during the course of a fiscal year.

39.     Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator. For all relevant years, Lee Memorial was required to expressly certify, and did certify, in relevant part:

> to the best of my knowledge and belief, it [the hospital cost report] is a true,
> correct and complete statement prepared from the books and records of the
> provider in accordance with applicable instructions, except as noted.
> I further certify that I am familiar with the laws and regulations regarding the
> provision of health care services, and that the services identified in this cost report
> were provided in compliance with such laws and regulations.

40.     For the entire period at issue, the hospital cost report certification page also included the following notice:

> Misrepresentation or falsification of any information contained in this report
> may be punishable by criminal, civil and administrative action, fine and/or
> imprisonment under federal law. Furthermore, if services identified in this report
> were provided or procured through the payment directly or indirectly of a
> kickback or where otherwise illegal, criminal, civil and administrative action,
> fines and/or imprisonment may result.

41.     Thus, a provider is required to certify that the filed hospital cost report is (1) truthful, i.e., that the cost information contained in the report is true and accurate; (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete (i.e., that the hospital cost report is based upon all information known to the provider); and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the Stark Law.

42.     For each of the years at issue, Lee Memorial submitted cost reports to First Coast attesting, among other things, to the certification quoted above.  That certification was false and Lee Memorial knew it was false.

43.     A hospital is required to disclose all known errors and omissions in its claims for Medicare Part A reimbursement (including its cost reports) to its fiscal intermediary or MAC.

44.     In addition to Part A claims, hospitals, doctors or other providers submit Medicare Part B claims to the carrier or MAC for payment.

45.     Under Part B, Medicare will generally pay eighty percent (80%) of the "reasonable" charge for medically necessary items and services provided to beneficiaries.  *See* 42 U.S.C. §§ 1395l(a)(1), 1395y(a)(1).  For most services, the reasonable charge has been defined as the lowest of (a) the actual billed charge, (b) the provider's customary charge, or (c) the prevailing charge for the service in the locality. *See* 42 C.F.R. §§ 405.502-504.

46.     A substantial portion of Lee Memorial's revenues are derived from Medicare.

47.     During the relevant time period, Medicare Part B payments for professional services were determined by the claims submitted by the provider for professional services on CMS Form 1500.  Lee Memorial was required to certify, and did certify, on each claim submitted on CMS Form 1500:

> this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law).

**D.     The Medicaid Program**

48.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal involvement in Medicaid is largely

limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

49.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called "federal financial participation" (FFP). 42 U.S.C. §§ 1396 et seq.

50.     In order to qualify for FFP, each state's Medicaid program must meet certain minimum requirements, including the provision of hospital services to Medicaid beneficiaries. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

51.     In the State of Florida, provider hospitals participating in the Medicaid program submit claims for hospital services rendered to beneficiaries to the Florida Agency for Health Care Administration ("AHCA") for payment.

52.     In addition, AHCA requires hospitals participating in the Medicaid program to file a copy of their Medicare cost report with AHCA.

53.     AHCA uses Medicaid patient data and the Medicare cost report to determine the reimbursement to which the facility is entitled based in part on the number of Medicaid patients treated at the facility.

54.     A substantial portion of Lee Memorial's revenues are derived from Medicaid.

55.     During the relevant time period, Medicaid payments for professional services were determined by the claims submitted by the provider for professional services on CMS Form 1500. Lee Memorial was required to certify, and did certify, on each claim submitted on CMS Form 1500:

> this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law).

E.    **Medicare Reimbursement and Relative Value Units ("RVUs")**

56.    Medicare pays for a physician's services based on submission of a claim using one or more specific Current Procedural Terminology (CPT®) codes. Each CPT® code has a Relative Value Unit (RVU) assigned to it by Medicare which, when multiplied by the Medicare payment conversion factor (CF) and a geographical adjustment (GPCI), creates the total Medicare compensation level for a particular service. As detailed below, some of the components of financial incentives that resulted in Lee Memorial paying total compensation above fair market value were based on RVUs worked by physicians and extenders, including: (1) compensation for personally performed services based on rates per wRVU that increase with the annual total of work RVUs credited to each physician; (2) compensation for services performed by hospital-employed extenders (i.e., not personally performed by the physicians) but credited and paid to the physicians at the physicians' wRVU rates which do not reflect the lower cost of using physician extenders; (3) bonus pools based on production of physician extenders to the extent such production was not already added to the physicians wRVUs and paid at the physicians' wRVU rates. In this case, when the various RVU-based financial incentives were combined with additional compensation for on-call coverage and medical directorships, the total compensation of certain specialists exceeded fair market value, and was not commercially reasonable in the absence of referrals. As a result, the compensation arrangements violate the Stark Law.

## THE SPECIFIC COMPONENTS OF DEFENDANT'S FRAUDULENT SCHEME

57.    Beginning October 1, 2005 and continuing at least until June 26, 2014, Lee Memorial devised and implemented a fraudulent scheme for several groups of physicians as set forth below that violated the Stark Law.

A.    **Neurosurgeons**

58.    Lee Memorial violated the Stark Law and committed fraud with regard to the compensation paid to neurosurgeons because it paid: (1) compensation for personally performed services based on rates per wRVU that steeply increase with the annual total of wRVUs credited to each neurosurgeon; (2) compensation for services performed by hospital-employed extenders (i.e., not personally performed by the neurosurgeons) but credited and paid to the neurosurgeons at the neurosurgeons' wRVU rates which do not reflect the lower cost of using physician extenders; (3) 100% shares of bonus pools based on production of physician extenders to the extent such production was not already added to the neurosurgeons' wRVUs and paid at the neurosurgeons' wRVU rates; and (4) lucrative payments for on-call coverage in addition to the payments to the neurosurgeons for professional services rendered while on-call.  By paying the neurosurgeons excessive total compensation, Lee Memorial gave the neurosurgeons significant and improper financial incentives to make more referrals to Lee Memorial for surgeries, especially spinal fusions, in violation of the Stark Law.

59.    For the period from at least 2005 to 2014, Lee Memorial paid four neurosurgeons under compensation arrangements that included financial incentives for RVUs worked by neurosurgeons and extenders.  The resulting total compensation was in excess of fair market value ("FMV") and was not commercially reasonable in the absence of the referrals.  Beginning in 2005, Lee Memorial had compensation arrangements with three neurosurgeons: Dr. Jeffrey S. Henn, Dr. Sam P. Javedan and Dr. John J. Dusseau.

60.    Lee Memorial began a compensation arrangement with Dr. Dean D. Lin beginning in 2007 (Drs. Henn, Javedan, Dusseau and Lin are hereinafter referred to collectively as the "Neurosurgeons").  As a result of these illegal compensation arrangements, the total compensation

15

payable by Lee Memorial to the Neurosurgeons grossly exceeded fair market value and was not commercially reasonable in the absence of referrals.  Further, such payments did not fit within any exception to the Stark Law.

61.    For example, for the fiscal years 2008 and 2009, the Neurosurgeons earned the following:

| Neurosurgeon Cash Compensation | | |
|---|---|---|
| **Neurosurgeon** | **FY 2008** | **FY 2009** |
| Dr. Jeffrey S. Henn | $1,352,261 | $1,313,518 |
| Dr. Dean D. Lin | $400,000 | $1,143,612 |
| Dr. Sam P. Javedan | $1,121,772 | $1,095,759 |
| Dr. John J. Dusseau | $505,028 | $446,968 |

62.    For the fiscal years 2010, 2011, 2012 and 2013, the Neurosurgeons earned the following:

| Neurosurgeon Cash Compensation | | | | |
|---|---|---|---|---|
| **Neurosurgeon** | **CY 2010** | **CY 2011** | **CY 2012** | **CY 2013** |
| Dr. Jeffrey S. Henn | $1,499,618 | $1,449,963 | Not available | $1,606,396 |
| Dr. Dean D. Lin | $1,463,317 | $1,544,935 | Not available | $1,526,947 |
| Dr. Sam P. Javedan | $1,111,633 | $1,066,875 | Not available | $835,347 |
| Dr. John J. Dusseau | $641,291 | $738,175 | Not available | $647,614 |

63.    The 2005 Employment Agreements with Drs. Henn, Javedan and Dusseau and the 2007 Employment Agreement with Dr. Lin, specifically provided that "work RVUs for physician

assistance or advanced nurse practitioners will be added to the RVUs of the supervising physician," thus, memorializing in writing one component of the financial incentives that was not based on the Neurosurgeons' personally performed services.

64.    Lee Memorial's contracts with the Neurosurgeons also provided that they would be paid in an amount "determined by the medical director of trauma" for coverage related to on-call services for trauma patients. Significantly, Lee Memorial still gave the Neurosurgeons full credit for work RVUs relating to their personally performed professional services during time for which they were also being paid to be on-call.

65.    Lee Memorial unequivocally knew that the total compensation paid to the Neurosurgeons exceeded FMV and was illegal. However, the hospital made so much money from the illegal compensation scheme that it made sense – at least from a purely financial standpoint – to do whatever it took to continue obtaining more referrals from the top-referring physician specialists.

66.    Lee Memorial's contracts with the Neurosurgeons also instituted an unusual and perverse sliding valuation scale whereby the amount paid per RVU for the Neurosurgeons' personally performed services steeply increased as the annual total number of RVUs increased for each physician. This scheme made the pay-for-play scheme more lucrative for key referring physicians such as the Neurosurgeons. This method of payment was not only unusual but resulted in payments to the Neurosurgeons that was above fair market value and not commercially reasonable in the absence of referrals. In a normal arm's length transaction, the price paid per RVU should *decrease* as the number of RVUs for each physician increases since fixed costs remain the same and only marginal costs change.

67. In March 2009, Price Waterhouse Coopers, LLP ("PWC"), the independent certified public accounting firm that served as Lee Memorial's external auditors, prepared a draft report to Lee Memorial's senior management entitled, "Neurosurgery Compensation Contract Enhancement, March 2009" (the "Draft Report"). See PWC Contract Enhancement DRAFT 3-9-09 attached hereto as Exhibit 1. In the Draft Report, the independent auditors confirmed for Lee Memorial that it was paying the Neurosurgeons more than fair market value (FMV). PWC recommended to Lee Memorial that neurosurgery RVU compensation rates be lowered "due to FMV" and "capped at 110% of revised RVU target system compensation." Ex. 1 at 6.

68. In July 2009, Lee Memorial's independent auditors prepared a revised report to Lee Memorial's senior management entitled, "Neurosurgery Compensation Contract Enhancement, July 2009" (the "Revised Report"). See PWC Contract Enhancement Updated 7-27-09 attached hereto as Exhibit 2. The Revised Report further illuminated the need to change the Neurosurgeons' compensation to comply with the Stark Law. It recommended that neurosurgery RVU compensation rates be lowered. Ex. 2, pp. 2-3. This recommendation was received by top Lee Memorial executives and decision-makers.

69. Effective January 1, 2010, Lee Memorial entered into a new written Compensation Amendment to Employment Agreement with each Neurosurgeon, amending the 2005 Neurosurgery Employment Agreements and the 2007 Neurosurgery Employment Agreement. (the "2010 Compensation Amendments"). The 2010 Compensation Amendments are attached hereto as Exhibits 3, 4, 5 and 6.

70. In the 2010 Compensation Amendments, Lee Memorial retained the RVU-based compensation model, and modified the RVU formulas slightly, but retained the system by which the Neurosurgeons were compensated based upon a scale in which the rate at which RVUs were

18

paid increased proportionately as the annual total number of each physician's RVUs increased. As noted above, this method of compensation is commercially unreasonable and contributed to Lee Memorial paying the Neurosurgeons total compensation in excess of fair market value. The more you play (more referrals) – the higher the pay (to the doctors).

71.     Lee Memorial demonstrated its knowledge that the prior compensation arrangements with the Neurosurgeons resulted in total compensation in excess of FMV, due in part because the Neurosurgeons were paid at the Neurosurgeons' wRVU rate for work performed by the physician extenders.  In the 2010 Compensation Amendments, Lee Memorial deleted the prior provisions in the Employment Agreement allowing wRVUs for physician extenders to be treated as if they were the wRVUs attributable to the personally performed services of the supervising physician (and payable at the physician rate) and added the statement, "Productivity-Based Compensation for any year shall be equal to the number of wRVUs *personally performed by the Physician*, with no minimum, during such year multiplied by the corresponding wRVU Conversion Factor as set forth below." (emphasis added).  Exhibits 3 through 6 (Exhibit A-1 to each Compensation Amendment, p.1).

72.     This agreement was a sham and the practice of including extender production in physician compensation did not change after the 2010 Compensation Amendments.  Lee Memorial continued to credit and pay the Neurosurgeons at their physician wRVU rates for wRVUs performed by physician extenders.  Not only did the Neurosurgeons get credit for wRVUs for services performed by extenders (i.e., not personally performed by the physicians), but Lee Memorial inflated the Neurosurgery bonus pool by only allocating a portion of Lee Memorial's expenses related to employing the physician extenders, so the physicians were receiving more funds than if they had employed the extenders themselves.  The referring doctors could not have

profited in this way based upon the work of extenders if they had been in private practice.   In
private practice, the physicians do not get to retain the benefits of work done by extenders while
passing the employment costs for the extenders to third parties.   The inclusion of extender
production in the Neurosurgeons' compensation contributed, in part, to Lee Memorial paying total
compensation to the Neurosurgeons in excess of FMV.

73.     The written 2010 Compensation Amendment also provided for on-call base
coverage of $2,000 per shift, in addition to the work RVU-based compensation for any
professional services rendered while on-call. *Lee Memorial thereby paid the physicians twice for
services performed during on-call coverage*.     Exhibits 3 through 6 (Exhibit A-1 to each
Compensation Amendment, p. 2).   This financial incentive for on-call coverage, when added to
the other RVU-based financial incentives, resulted in overall compensation that exceeded FMV
and was commercially unreasonable in the absence of referrals.

74.     In 2014, Lee Memorial conducted an analysis of the compensation paid to certain
key physicians, including the Neurosurgeons, and found significant and redundant FMV problems.
The 2014 analysis specifically determined that Lee Memorial paid total compensation to Dr. Henn
and Dr. Lin in 2013 that exceeded fair market value.   See Compensation and Production Analysis
for Dr. Henn and Dr. Lin attached hereto as Exhibits 7 and 8.   Brian Owens, Director of Physician
Compensation and Practice Acquisitions at Lee Memorial, performed the physician compensation
and production analysis for Lee Memorial.   See Exhibits 7 and 8. This analysis applied industry
standard FMV criteria to the Neurosurgeons' compensation and determined that it exceeded FMV.
This shows fraudulent *scienter*. Mr. Owens' analysis referenced industry FMV standards.  *Id.*  In
assessing FMV criteria, Mr. Owens used Kaufman Hall data, MGMA survey data, as well as
various graphics that tracked physician RVUs and collections against national data. *Id.*  Owens

confirmed to Relator that he advised Dr. Javedan, Medical Director of Neurosurgery, to reduce total compensation to the Neurosurgeons so that total compensation did not exceed FMV, but Dr. Javedan and Lee Memorial resisted the change.

75.     Further in 2014, as a part of her regular job duties as the System Director, Internal Audit, Relator was asked to perform an audit to assess the adequacy of internal controls surrounding certain employed physician arrangements. See "Audit Report re: Compensation for Employed Physicians" ("2014 Audit Report") attached as Exhibit 9 at 1. A secondary purpose was to ascertain compliance with Lee Memorial physician contracting policies and procedures. *Id.* As a part of the audit and within the express scope of her job duties, Relator performed a detailed review of arrangements involving neurosurgeons, cardiologists and pulmonologists. *Id.,* at 5-13. The stated objective of the audit report was to determine whether the physician payments were made in accordance with the contract terms and were supported by documentation. *Id.,* at 1. Additionally, the 2014 Audit Report was designed to determine whether the employment contracts were structured to comply with the Stark Law and federal Anti-Kickback Statute. *Id.* The 2014 Audit Report is a separate and distinct analysis from the physician compensation analysis performed by Brian Owens for Lee Memorial. Like the other reports discussed above, the 2014 Audit Report notified Lee Memorial, again, that physician compensation in each of the physician practice disciplines referenced herein was in excess of fair market value. It also exposed the sham nature of the written contracts. For example, the conversion factor tiers in the Neurosurgeons' contracts were not applied in accordance with the contracts when computing the pay rates: The physicians with the highest RVUs were "paid all production of wRVUs at the highest conversion factor resulting in increased compensation for the most productive physicians." *Id.,* at 6. Moreover, the 2014 internal audit noted that documentation supporting the Neurosurgeons'

compensation was deficient and/or missing. *Id.* Their pay rate calculations could not be located for 2000 – 2009 or the years prior to that. *Id.* From the documents that could be located, the 2014 Audit Report noted that "procedures performed by the extenders and billed by the physicians were added to the wRVU productivity of the physicians for compensation purposes" and warned that "[p]roviding wRVUs to the physicians for services performed by extenders creates compliance risk since the services were not personally performed by the physicians as stated in the contracts." *Id.,* at 5-6.   The 2014 Audit Report recommended an examination of the compensation arrangements in consultation with Legal Services to determine necessary "remediation actions". *Id.,* at 6.

76.     Given that one or more of the Neurosurgeons was paid total compensation that exceeded fair market value, Lee Memorial could not reasonably have concluded that the compensation arrangements in those contracts met fair market value for the Neurosurgeons' services or were commercially reasonable. Lee Memorial knew it was in violation of the Stark Law yet knowingly submitted tainted illegal claims for reimbursement to the government in violation of the FCA for the designated health services furnished by Lee Memorial pursuant to prohibited referrals from the Neurosurgeons.

77.     Relator has personal knowledge relating to the scienter of Lee Memorial because she discussed the previously referenced problems related to the Neurosurgeons' compensation arrangements prior to the effective date of her resignation with Lee Memorial senior management and staff responsible for physician contracting.   Even though the audit report was not totally finalized by the date of Relator's last date of employment at Lee Memorial, the underlying conclusions of the audit report had been documented and communicated to Lee Memorial senior management and responsible staff.

78.    In June 2014, Relator discussed the finding of the 2014 Audit Report in a meeting with Lee Memorial's Chief Administrative Officer and other physician services management and staff. The findings of the audit were also discussed in a separate meeting with the Director, Physician Compensation and Practice Acquisition. A draft of the 2014 Audit Report was provided to the Chief Compliance Officer. Relator was told that a copy would be provided to Scott Nygaard, M.D. (Chief Medical Officer, Physician Services). The physician compensation problems outlined in the 2014 Audit Report relating to the neurosurgeons and the other physician groups discussed hereafter were specifically disclosed and made known to the aforementioned executives of Lee Memorial. Lee Memorial knew that it was illegally and expressly paying key referring physicians. Reducing physician compensation could reduce hospital profits because the physician referrals could go down. Lee Memorial was not willing to take that risk.

79.    Lee Memorial billed Medicare and Medicaid tens of millions of dollars for designated health services (including inpatient and outpatient hospital services and procedures) referred by the Neurosurgeons to Lee Memorial while Lee Memorial paid the Neurosurgeons total compensation that exceeded FMV and was commercially unreasonable in the absence of referrals in violation of the Stark Law. All these claims are false claims under the FCA.

80.    For example, in fiscal year 2012 alone, Lee Memorial billed Medicare for inpatient facility fees for approximately 273 spine fusion surgeries under DRG 460 for a total receipt of approximately $5.478 Million dollars. See Exhibit 10 attached hereto.

81.    A sample of actual Medicare claims made by Lee Memorial on prohibited referrals from the Neurosurgeons is attached hereto as Exhibit 11 (patient information redacted).

82.    All these payments were made possible by Lee Memorial's false and express certifications that it had complied with the Stark Law. All the claims were materially false because

federal law prohibits payment of any claims for Medicare or Medicaid services provided in violation of the Stark Law.

**B.      Cardiologists**

83.      Lee Memorial paid cardiologists compensation that violated the Stark Law because it paid: (i) compensation for personally performed services based on rates per wRVU that increase as the annual total of wRVUs credited to each cardiologist increases; (ii) compensation for services performed by hospital-employed extenders (i.e., not personally performed by the cardiologists) but credited and paid to the cardiologists at the cardiologists' wRVU rates which do not reflect the lower cost of using physician extenders; (iii) financial incentives based on production of physician extenders to the extent such production was not already added to the cardiologists' wRVUs and paid at the cardiologists' wRVU rates, in arrangements where the cardiologists were allocated 50% or less of the associated costs of extenders; and (iv) compensation for on-call coverage in addition to the payments to the cardiologists for professional services rendered while on-call.  By paying the cardiologists excessive total compensation, Lee Memorial gave the cardiologists significant and improper financial incentives to make more referrals to Lee Memorial for cardiac procedures and surgeries in violation of the Stark Law.

84.      Effective October 1, 2010, Lee Memorial entered into written Employment Agreements (the "2010 Cardiologist Employment Agreements") with four cardiologists – Dr. Murali M. Muppala, Dr. Vladimir Ilic, Dr. Brian K. Arcement and Dr. James F. Butler.  See Exhibits 12, 13, 14 and 15 attached hereto.  Prior to October 1, 2010, those cardiologists were in private practice and not employed by Lee Memorial.  Lee Memorial had similar financial arrangements that violated the Stark Law with other cardiologists including, without limitation, Dr. Robert M. Grohowski, Dr. Brian C. Taschner, Dr. Steven T. Lee, Dr. Subhash Kshetrapal, Dr.

James A. Conrad, Dr. Lynne C. Einbinder, Dr. Erick M. Burton, Dr. Michael A. Corbellini, Dr. Roshan K Vatthyam, Dr. Richard A. Chazal, Dr. Michael D. Danzig and Dr. Edward A. Palank (these cardiologists and Drs. Muppala, Ilic, Arcement and Butler are collectively referred to herein as the "Cardiologists"). See EPIC All Groups Summary – Service Provider Procedures Quantity – May 2014 attached hereto as Exhibit 16.

85.     While knowing that the Cardiologists were being paid in violation of the Stark Law, Lee Memorial included sham provisions that were not enforced in each of the 2010 Cardiologist Employment Agreements: "Physician's compensation paid pursuant to this Agreement shall be consistent with fair market value at all times. Physician's compensation pursuant to this amendment [sic] will be reviewed and possibly adjusted annually after the Initial Term [36 months] to comply with fair market value determination and to ensure compliance with applicable state and federal laws and regulations governing physician compensation." Ex. 12 at 5-6. In fact, the compensation payable under the 2010 Cardiologist Employment Agreements substantially exceeded fair market value and was not commercially reasonable. Moreover, the compensation was not reviewed annually to ensure compliance with state and federal laws and regulations governing physician compensation. Contractual terms in the employment agreements to the contrary were ignored.

86.     Lee Memorial credited the Cardiologists for work RVUs actually performed by extenders in cardiac procedures at Lee Memorial. The inclusion of extender production in the Cardiologists' compensation contributed, in part, to Lee Memorial paying total compensation to the Cardiologists in excess of FMV. Not only did the Cardiologists get credit at the physicians' wRVU rates for wRVUs performed by extenders (i.e., not personally performed by the physicians), but Lee Memorial inflated the Cardiology bonus pool by only allocating a portion of Lee

Memorial's expenses related to employing the physician extenders, so the physicians were receiving more funds than if they had employed the extenders themselves. This cost-shift to the hospital increased the profitability of the pay-to-play scheme for the referring physicians, and was commercially unreasonable in the absence of referrals.

87.    Additionally, Lee Memorial provided to the Cardiologists at least one extender, nurse practitioner ("NP") Vicki Hayes, **at no cost** to the Cardiologists. See attached Exhibit 17 at 7. The inclusion of Vicki Hayes' production in the Cardiologists' compensation contributed, in part, to Lee Memorial paying total compensation to the Cardiologists in excess of FMV. Lee Memorial paying all of the costs associated with Vicki Hayes while paying the Cardiologists compensation relating to Vicki Hayes' production was commercially unreasonable in the absence of referrals.

88.    Many of the Cardiology NPs' services were billed to Medicare as "incident to" a physician service with the physician identified as the "Bill Provider." Although the physician was identified as the Bill Provider (and no other service provider was identified when the services were billed to Medicare on an "incident to" basis), in many instances the physician was not the actual service provider because the service was performed solely by the NP. Ex. 16. Lee Memorial employed the Cardiology NPs and was the entity entitled to reimbursement from the Government for the services actually performed by the NPs employed by the hospital. However, Lee Memorial was paying the Cardiologists as the "Bill Provider" for services actually performed by the NPs and not personally performed by the physicians. Ex. 16. Given the compensation scheme, the amounts paid to the Cardiologists were up to $53.00 per work RVU for services actually performed by the NPs. Exhibits 12 through 15 (Exhibit A thereto). The inclusion of extender production in the Cardiologists' compensation at the Cardiologists' wRVU rates did not reflect the lower cost of

extender production and contributed, in part, to Lee Memorial paying total compensation to the Cardiologists in excess of FMV.

89.     In the course of the 2014 audit, Relator obtained spreadsheets (Exhibits 16 and 18) that analyze Cardiology Clinical Activity and categorically distinguish between Service Provider and Bill Provider for the month of May 2014.  The summary spreadsheet shows unequivocally that Lee Memorial paid the Cardiologists for services actually performed by PAs and NPs who were Lee Memorial employees. Ex. 34.  For example, Lee Memorial included all wRVUs for services actually performed by hospital-employed nurse practitioner Vicki Hayes in the Cardiologists' compensation, and paid the physicians compensation for those extender-performed wRVUs at the physicians' wRVU rates.  The summary spreadsheet calculates that NP Vicki Hayes actually performed 412 procedures in May 2014, but fully 362 of these procedures were billed under and credited to a Cardiologist who did not personally perform the procedure, thereby increasing the physicians' wRVUs and ultimately the compensation paid to them.  *Id.,* at 1.  The spreadsheet also shows that Dr. Muppala billed and received wRVU compensation credit for 289 procedures in May 2014 that he did not personally perform; rather, the procedures were personally performed by the Cardiology NPs.  *Id.*  The inclusion of extender production in the Cardiologists' compensation contributed, in part, to Lee Memorial paying total compensation to the Cardiologists in excess of FMV.

90.     A temporal comparison between the work RVUs of four of the Cardiologists before Lee Memorial hired them, and after Lee Memorial hired them, demonstrates the effect on the Cardiologists' wRVUs.  After the Cardiologists became employed by Lee Memorial in October 2010, the work RVUs reported by each Cardiologist dramatically increased far above and beyond

what the Cardiologists had reported while working in private practice. The dramatic increase in
RVU production for the Cardiologists was quantified by Lee Memorial as follows:

| **Cardiologist Work RVUs** | | | | |
|---|---|---|---|---|
| **Cardiologist** | **CY 2009** <br><br> Private Practice | **FYE Oct. 2010** <br><br> Private Practice | **FYE Oct. 2011** <br><br> Hosp. Employed | **FYE Oct. 2012** <br><br> Hosp. Employed |
| Dr. Muppala | 15,088 | 17,477 | 27,195 | 26,906 |
| Dr. Ilic | 12,589 | 13,246 | 20,423 | 23,718 |
| Dr. Arcement | 12,001 | 12,459 | 19,633 | 22,400 |
| Dr. Butler | 11,292 | 12,434 | 18,541 | 22,858 |

Dr. Arcement's, Dr. Ilic's and Dr. Muppala's wRVUs all went up 64% in the first year
after Lee Memorial hired them. Dr. Butler's wRVUs went up even more, 67%. Obviously, these
four cardiologists did not all simultaneously increase their productivity by 64% or more just
because Lee Memorial hired them. When Lee Memorial paid the Cardiologists compensation at
the rate of $53.00 per wRVU on these dramatically increased wRVU totals, the Cardiologists' total
compensation exceeded FMV.

91.     Lee Memorial knew the scheme was working and that it was paying Cardiologists
total compensation exceeding FMV in violation of the Stark Law and then submitting false claims
to the Government related to referrals by the Cardiologists. As System Director for Internal Audit
at Lee Memorial, part of the Relator's job was to review physician compensation arrangements
with Cardiologists Muppala, Ilic, Arcement, and Butler. The 2014 Audit Report pointed out to
Lee Memorial that procedures performed by physician extenders and auxiliary staff were added to
the wRVU productivity of the Cardiologists for compensation purposes. Ex. 9 at 7. This fact was

highlighted and flagged to Lee Memorial management as creating a "compliance risk" since the services were not personally performed by the physicians as required per the contracts [the 2010 Cardiologist Employment Agreements]." *Id.*

92.     The 2014 Audit Report to management raised yet an additional compliance risk: Lee Memorial was only allocating to the physician compensation pool 50% of Lee Memorial's costs (salaries and benefits) for the three physician extenders assisting the Cardiologists despite the fact that nurse practitioner Vicki Hayes was being provided to the physicians at no cost at all. *Id.* These facts were referenced as an additional "compliance risk" because the reduced extender cost and providing an extender at no cost represented revenues that were derived from the physicians' referrals of DHS to Lee Memorial.  *Id.*  The Report recommended that these compensation arrangements be reviewed with Legal Services. *Id.*

93.     Lee Memorial's total compensation paid to the referring cardiologists was grossly in excess of fair market value.  By way of example, Lee Memorial paid each of four Cardiologists total cash compensation for the calendar year 2013 as follows:

| Cardiologist Cash Compensation | |
|---|---|
| **Cardiologist** | **CY 2013** |
| Dr. Murali M. Muppala | $1,420,721 |
| Dr. Vladimir Ilic | $1,526,947 |
| Dr. Brian K. Arcement | $1,201,474 |
| Dr. James F. Butler | $1,184,533 |

Source:  Employee paystubs and Form W-2's for 2013.

94.     In 2014, Lee Memorial conducted an analysis of the total compensation paid to those four Cardiologists in the same fashion applicable to the Neurosurgeons discussed above. Brian Owens, Director of Physician Compensation and Practice Acquisitions at Lee Memorial, determined that Lee Memorial paid total compensation to each of four Cardiologists in 2013 (Muppala, Ilic, Arcement and Butler) that exceeded fair market value compensation and was outside acceptable tolerances.   See Lee Memorial's Compensation and Production Analyses attached as Exhibits 19, 20, 21 and 22. Importantly, Lee Memorial took **no** steps to reduce the compensation of those cardiologists (or any of the Cardiologists) in order to comply with the Stark Law. Lee Memorial continued submitting false claims to the Government for inpatient cardiology procedures conducted by the Cardiologists because said procedures were so lucrative to the hospital (and to the Cardiologists).

95.     Lee Memorial billed Medicare and Medicaid tens of millions of dollars for designated health services (including inpatient and outpatient hospital services and procedures) referred by the Cardiologists to Lee Memorial while Lee Memorial paid the Cardiologists total compensation that exceeded FMV and was commercially unreasonable in the absence of referrals in violation of the Stark Law.  All these claims are false claims under the FCA.

96.     As an example, in fiscal year 2014, Lee Memorial received $3.624 Million dollars from Medicare for facility fees relating to stent insertions under DRG 247. Exhibit 23.  The value of the facility fee on an inpatient stent insertion was much greater than the associated professional fees, providing Lee Memorial with a strong financial incentive to reward the Cardiologists for referrals.

97.     All these payments were made pursuant to false and express certifications submitted by Lee Memorial to the effect that it complied with the Stark Law.  All the claims were

materially false because federal law prohibits payment of any claims from Medicare or Medicaid services provided in violation of the Stark Law.

**C.     Pulmonologists**

98.     Lee Memorial's pulmonology compensation arrangements also violated the Stark Law because Lee Memorial paid:  (1) compensation for personally performed services based on rates per wRVU that vary with the annual total of wRVUs credited to each pulmonologist; (2) compensation for services performed by hospital-employed extenders (i.e., not personally performed by the pulmonologists) but credited and paid to the pulmonologists at the pulmonologists' wRVU rates which do not reflect the lower cost of using physician extenders; (3) 50% shares of bonus pools based on production of physician extenders to the extent such production was not already added to the pulmonologists' wRVUs and paid at the pulmonologists' wRVU rates; (4) $12,000 per year per physician allegedly to supervise extenders; and (5) compensation for unnecessary and duplicative medical directorships.   By paying the pulmonologists excessive total compensation, Lee Memorial gave the pulmonologists significant and improper financial incentives to make more referrals to Lee Memorial for pulmonary services and procedures in violation of the Stark Law.

99.     Lee Memorial entered into a written Employment Agreement with pulmonologist Dr. Rich Juda effective July 23, 2007.  Such Employment Agreement provided: "While physician is on the productivity based comp plan, office-based physician extender salary and benefit costs (net of collections) will be factored into RVU/salary calculations between the physicians that utilize or supervise their care and *receive RVU value for their work*." *Id.  (*emphasis added.)  Thus Lee Memorial was crediting Dr. Juda with the extenders' work RVUs and paying him for work

that he did not personally perform. Dr. Juda also received compensation for call coverage under the ICU Night Pilot Program, in addition to his wRVU-based compensation.

100.    Relator prepared an audit report dated March 29, 2011 reviewing physician compensation of certain pulmonary critical care physicians at a Lee Memorial hospital known as Gulf Coast Medical Center (the "2011 Audit Report"), a copy of which is attached as Exhibit 24. In the 2011 Audit Report, focusing on Dr. Juda's compensation arrangements, Relator warned Lee Memorial that the cumulative compensation (including extender production and call coverage) "may potentially exceed fair market." Ex. 24 at 2.

101.    In 2012, Lee Memorial entered into written Employment Agreements with three additional pulmonologists, Dr. Razak A. Dosani, Dr. Abusayeed M. Feroz, and Dr. Sagar K. Naik (the "Pulmonologists"), each effective as of March 26, 2012 (the "2012 Pulmonary Employment Agreements"). Exhibits 25, 26 and 27.

102.    Each of the 2012 Pulmonary Employment Agreements expressly provided that "When the physicians are on the productivity based compensation plan, any impact of Physician extender salary and benefit cost net of their collections will be split between the number of physicians utilizing the extender and will be factored into RVU/salary calculations. When the collections attributable to the midlevel are more than the expenses attributable to the midlevel, the difference will be split between the employed physicians who oversee the midlevel and LMHS equally (50% each)." Ex. 25 at 12. Thus, each of the 2012 Pulmonary Employment Agreements split the profits Lee Memorial made on using extenders with the Pulmonologists.   The inclusion of a 50% share of extender production in the Pulmonologists' compensation contributed, in part, to Lee Memorial paying total compensation to the Pulmonologists in excess of FMV.

32

103.   In addition to the 50/50 split of hospital profit made on using extenders, Lee Memorial entered into an Addendum with each Pulmonologist providing $12,000 per year, per physician, "to train, mentor and supervise critical care advanced providers so that they can properly perform medical procedures." See Addendum to Employment Agreement for Drs. Dosani, Feroz and Naik attached as Exhibits 28, 29 and 30.

104.   Lee Memorial also entered into various Addenda with Dr. Dosani and Dr. Feroz providing for hourly-based compensation for various medical directorships, including duplicative and unnecessary agreements with both Dr. Dosani and Dr. Feroz to serve as the Medical Director of the Intensive Care Unit. See Addendum to Employment Agreement for Drs. Dosani and Feroz attached as Exhibits 31 and 32.

105.   Each of the 2012 Pulmonary Employment Agreements specified that "Physician's compensation paid pursuant to this Agreement shall be consistent with fair market value at all times. Physician's compensation pursuant to this amendment [sic] will be reviewed and amended annually to ensure compliance with applicable state and federal laws and regulations governing physician compensation." Ex. 25 at 11 (page 2 of Exhibit A). In fact, the total compensation paid by Lee Memorial to the Pulmonologists exceeded fair market value and was not reviewed annually to ensure compliance with state and federal laws and regulations governing physician compensation. These contractual terms were conveniently ignored by Lee Memorial.

106.   Indeed, after the Pulmonologists became employed by Lee Memorial in March 2012, the work RVUs reported by and attributable to each Pulmonologist was substantially greater than the work RVUs previously documented in the 2011 Audit Report. See Exhibits 24 and 33 for previously documented work RVUs. The post-employment work RVUs for fiscal year ended February 2013 were as follows: Dr. Razak A. Dosani, 20,200; Dr. Abusayeed Feroz, 22,122; Dr.

Sagar Naik, 14,476.  See Exhibits 34, 35 and 36.  When Lee Memorial paid the Pulmonologists

compensation at the rate of $45.00 per wRVU on these dramatically increased wRVU totals, the

Pulmonologists' total compensation exceeded FMV.

107.    Lee Memorial paid the Pulmonologists additional compensation based on services

actually performed by the following PAs and NPs: Janice M. Kirk, Eric A. Jordan, Ira Saunders,

Dolan K. Abu Aouf and Debra L. Berry.   The inclusion of extender production in the

Pulmonologists' wRVUs at the physicians' wRVU rates contributed, in part, to Lee Memorial

paying total compensation to the Pulmonologists in excess of FMV.

108.    Lee Memorial paid each Pulmonologist total cash compensation in excess of FMV

for the calendar year 2013 as follows:

| Pulmonologist Cash Compensation | |
| --- | --- |
| **Pulmonologist** | **CY 2013** |
| Dr. Razak A. Dosani | $  991,189 |
| Dr. Abusayeed M. Feroz | $1,014,997 |
| Dr. Sagar K. Naik | $  630,361 |

Source:  Employee paystubs and Form W-2's for 2013.

109.    In the 2011 Audit Report, Relator warned Lee Memorial's management as follows:

Although the individual compensation arrangements may be at fair market value, the
cumulative compensation paid to the physicians may potentially exceed fair market given
that the physicians are (1) high productivity physicians and (2) each individual
compensation arrangement is at the high end of the market survey data.

Additionally, the high number of hours worked by these physicians on a consistent basis
creates the potential for patient safety and quality issues.

Ex. 24 at 2.

110.    Moreover, in the course of an audit conducted by Relator on behalf of the hospital in 2014, Relator obtained spreadsheets that analyze Pulmonary Clinical Activity that show unequivocally that Lee Memorial included extender production in the wRVUs of the Pulmonologists, contributing in part to Lee Memorial paying total compensation to the Pulmonologists in excess of FMV. Ex. 16 at 2-3.  The 2014 audit report contained a preliminary report of audit findings regarding the Stark Law problems with the Pulmonologists' compensation arrangements. Ex. 9 at 13. The report documented that extenders were regularly and improperly documenting certain work as if the physicians were the service providers.  "The procedures performed by the extenders and billed by the physicians were added to the wRVU production of the physicians for compensation purposes."  *Id.*  As was the case with the neurosurgeons and cardiologists, the audit report recommended that, "Management should examine the compensation arrangements and consult with Legal Services to determine necessary remediation actions." *Id.*

111.    Additionally, in 2014, Brian Owens, Director of Physician Compensation and Practice Acquisitions at Lee Memorial personally conducted an analysis of the compensation paid to the Pulmonologists and determined that Lee Memorial paid total compensation to each of Dr. Dosani and Dr. Feroz in 2013 that exceeded fair market value and was outside acceptable tolerances.  See Compensation and Production Analysis for Drs. Dosani and Feroz attached as Exhibits 37 and 38.  Lee Memorial took no remedial action to modify or reduce the compensation.

112.    Relator discussed the internal compensation analysis relating to excessive pulmonology compensation and the findings of the 2014 Audit Report with key Lee Memorial executives and Brian Owens in June 2014.  Lee Memorial knew it was violating the Stark Law but was willing to do so because of the great profits to be made from these Pulmonologists' referrals.

113.    Lee Memorial billed Medicare and Medicaid millions of dollars for designated health services (including inpatient and outpatient hospital services and procedures) referred by the Pulmonologists to Lee Memorial while Lee Memorial paid the Pulmonologists total compensation that exceeded FMV and was commercially unreasonable in the absence of referrals in violation of the Stark Law.  All these claims are false claims under the FCA

114.    As an example, in fiscal year 2014, Lee Memorial received $2.284 Million dollars for facility fees relating to respiratory system diagnosis with ventilator support under DRG 208. Exhibit 39.  The value of the facility fee under DRG 208 was much greater than the associated professional fees, providing Lee Memorial with a strong incentive to reward the Pulmonologists for referrals.

115.    All these payments were made pursuant to false certifications submitted by Lee Memorial to the effect that it had complied with all applicable laws, including the Stark Law.  All claims for services submitted pursuant to referrals from the physicians being paid compensation that violated the Stark Law were materially false because federal law prohibits payment of any claims from Medicare or Medicaid services provided in violation of the Stark Law.

**D.      Medical Directorships**

116.    Excessive directorship fees are another way that Lee Memorial paid illegal, excessive compensation to physicians in violation of the Stark Law.  In addition to illegally incentivizing employed physicians as described above, Lee Memorial violated the Stark Law with lucrative compensation arrangements with physicians it did not employ.

117.    Lee Memorial entered into an agreement for medical director services beginning January 1, 2004 with Dr. James W. Orr, Jr., a gynecologic oncologist in private practice with 21st Century Oncology, to act as Medical Director of the Lee Cancer Care Program (the "Orr Director

Agreement"). The Agreement for Medical Director Services was renewed effective January 1,

2009, and that agreement is attached as Exhibit 40. The Orr Director Agreement provides for an

annual fee of $450,000 that is increased annually by the greater of 2% or the published increase in

the Consumer Price Index. *Id.,* at 2. During the term of this Agreement, Dr. Orr has maintained

and actively operated his private medical practice separate and distinct from Lee Memorial. He

made referrals to Lee Memorial for the provision of designated health services, including without

limitation the administration of cancer drugs and the facility fees relating to inpatient and

outpatient hospital services such as endoscopies.

118.    Lee Memorial and Dr. Orr amended the Orr Director Agreement to as of January

1, 2013 to add the following provision:

> Physician agrees to provide a minimum of thirty (30) hours of service per week. Should
> Physician provide less than the required minimum of hours, Physician's compensation will
> be adjusted to a prorated amount based upon the hours during which Physician actually
> provided services. Physician's hours will be reviewed on a monthly basis and a monthly
> average will be utilized in calculating whether Physician has provided the minimum
> number of hours of service.

*See* First Amendment to Agreement for Medical Director Services attached as Exhibit 41, p. 1.

The aggregate services contracted for under the Orr Director Agreement, as amended, exceed those

that are reasonable and necessary for the legitimate business purpose of the arrangement and the

compensation exceeds fair market value in violation of the Stark Law.

119.    Relator reviewed supporting documentation for services rendered by Dr. Orr and

other physicians receiving compensation from Lee Memorial for medical directorships. Relator

prepared and issued an audit report dated November 6, 2013 with the results of this review. See

Audit Report re: Supporting Documentation for Services Rendered by Medical Directors attached

as Exhibit 42. The report recommended "immediate attention" to Dr. Orr's medical directorship

and challenged the value of the marketing services supposedly performed by Dr. Orr. *Id.,* at 2-3.

Relator had also repeatedly reported medical directorship compliance issues to the former Chief Compliance Officer, Charles Swain. Lee Memorial deliberately ignored and recklessly disregarded the medical directorship compliance issues, just as Lee Memorial deliberately ignored and recklessly disregarded the many other compliance issues that Relator identified and reported during her 10-year tenure. See, for example, Exhibits 9, 24 and 42.

120.    The audit report found 453 hours of Dr. Orr documented time related to marketing services, such as "letters to community physicians who are treating these patients (i.e. Obstetrics/Gynecology, Internal Medicine) to remind them of the various Lee Cancer programs." The report estimated that Lee Memorial had paid Dr. Orr $128,000 for such marketing services, rather than for the administrative services described and specified in the Agreement. Ex. 42 at 3. The compensation paid to Dr. Orr for marketing services was determined in a manner that took into account the volume and value of referrals or other business generated by Dr. Orr to Lee Memorial in violation of the Stark Law.

121.    Given that Dr. Orr was paid total compensation that exceeded fair market value for the services described in his Agreement, Lee Memorial could not reasonably have concluded that the compensation arrangements in that contract were fair market value for Dr. Orr's services as described in the Orr Director Agreement or were reasonable and necessary for the legitimate business purpose of the arrangement. Lee Memorial knew it was in violation of the Stark Law and knowingly submitted tainted illegal claims for reimbursement to the government in violation of the FCA.

122.    Given that Dr. Orr received compensation that took into account his services in marketing to other physicians to induce referrals to Lee Memorial, and therefore the compensation was determined in a manner that took into account the volume or value of referrals or other

business generated by the referring physician, Lee Memorial could not reasonably have concluded that Dr. Orr's compensation arrangements did not violate the Stark Law.  Lee Memorial knew it was in violation of the Stark Law and knowingly submitted tainted illegal claims for reimbursement to the government in violation of the FCA.

123.    Based on the contractual and actual financial relationships between Dr. Orr and Lee Memorial, the Stark Law was violated because Dr. Orr made referrals to Lee Memorial for the provision of designated health services, Lee Memorial had a compensation arrangement with Dr. Orr and none of the statutory or regulatory exceptions to the Stark Law apply.   Lee Memorial violated the FCA because Lee Memorial knowingly presented false claims and made false statements to Medicare and retained overpayments for designated health services furnished pursuant to referrals by Dr. Orr in violation of the Stark Law.

## LEGAL CLAIMS FOR RELIEF

### COUNT ONE

### (False Claims Act: Presentation of False Claims)

### (31 U.S.C. § 3729(a)(1) now § 3729(a)(1)(A))

124.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

125.    Lee Memorial knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States, including those claims for reimbursement identified above, for designated health services furnished pursuant to referrals prohibited by the Stark Law.

126.    Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were true.

39

127.    Lee Memorial's noncompliance with the Stark Law was material to the United States' decision to pay the false claims submitted by Lee Memorial discussed above and material to the United States' ultimate legal authority to make payments to Lee Memorial for those designated health services because the financial relationships with physicians present a risk of federal healthcare programs and program beneficiaries of questionable or improper utilization of designated health care services.

## COUNT TWO

### (False Claims Act: Using False Statements to Get False Claims Paid)

### (31 U.S.C. § 3729(a)(2), now § 3729(a)(1)(B))

128.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

129.    Lee Memorial made, used, and caused to be made or used, false records or statements regarding compliance with the Stark Law to get false or fraudulent claims paid and approved by the United States. The false records or statements include the false certifications and representations made and caused to be made by Lee Memorial when initially submitting the false claims for payments and the false certifications made by Lee Memorial in submitting the cost reports.

130.    Lee Memorial's false certifications and representations were made for the purpose of getting false or fraudulent claims paid and payment of the false or fraudulent claims was a reasonable and foreseeable consequence of Lee Memorial's statements and actions.

131.    The false certifications and representations regarding compliance with the Stark Law made and caused to be made by Lee Memorial were material to the United States' payment of the false claims because such payment is prohibited by statute due to the Congressional decision

that these financial relationships with physicians present a risk of federal healthcare programs and program beneficiaries of questionable or improper utilization of designated health care services.

132.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## COUNT THREE

### (False Claims Act: False Record Material to Obligation to Pay)

### (31 U.S.C. § 3729(a)(7), now § (a)(1)(G))

133.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

134.    Lee Memorial made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

135.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

136.    Lee Memorial's noncompliance with the Stark Law was material to the United States' decision to pay the false claims submitted by Lee Memorial discussed above and refrain from recovering overpayments and material to the United States' ultimate legal authority to make payments to Lee Memorial for those designated health services because such payments are prohibited by statute due to the Congressional decision that these financial relationships with physicians present a risk to federal healthcare programs and program beneficiaries of questionable or improper utilization of designated health care services.

## PRAYER

**WHEREFORE**, Relator prays for judgment against Lee Memorial as follows:

(a)      On Count One under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper; and

(b)      On Count Two under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper; and

(c)      On Count Three under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper; and

(d)      That Relator be awarded the maximum Relator share amount permissible according to 31 U.S.C. § 3730(d); and

(e)      That judgment be granted for Relator against Defendant for any costs, including, but not limited to, court costs, expert fees, and all attorneys' fees incurred by Relator in the prosecution of this case, including, but not limited to, all attorney fees and costs available pursuant to 31 U.S.C. § 3730(d); and

(f)      That the United States and Relator be granted such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator-Plaintiff hereby demands trial by jury on all claims alleged herein.

Dated: July 28, 2017

ATTORNEYS FOR RELATOR-PLAINTIFF

By: _Karen C Dyer_

Karen C. Dyer
Florida Bar No. 716324
Boies Schiller Flexner LLP
121 South Orange Avenue
Suite 840N
Orlando, FL 32801
Ph: (407) 425-7118
Fax: (407) 425-7047
kdyer@bsfllp.com

George F. Carpinello
New York Bar No. 1652684
(Subject to *Pro Hac Vice* Admission)
Teresa A. Monroe
New York Bar No. 4427779
(Subject to *Pro Hac Vice* Admission)
Boies Schiller Flexner LLP
30 South Pearl Street, 11th Floor
Albany, NY 12207
Ph: (518) 434-0600
Fax: (518) 434-0665
gcarpinello@bsfllp.com
tmonroe@bsfllp.com

Marlan B. Wilbanks
Georgia Bar No. 758223
(Admitted *Pro Hac Vice*)
Susan S. Gouinlock
Georgia Bar No. 303217
(Admitted *Pro Hac Vice*)
Wilbanks & Gouinlock, LLP
3414 Peachtree Road, NE
Suite 725
Atlanta, GA 30326
Ph: (404) 842-1075
Fax: (404) 842-0559
mbw@wilbanksgouinlock.com
ssg@wilbanksgouinlock.com

Scott C. Withrow
Georgia Bar No. 772330
(Admitted *Pro Hac Vice*)
Withrow, Mcquade & Olsen, LLP
3379 Peachtree Road, NE
Suite 970
Atlanta, GA 30326
Ph: (404) 814-0200
Fax: (404) 814-0009
swithrow@wmolaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing has this 28th

day of July 2017 been furnished by Certified Mail, Return Receipt Requested to the following:

The Honorable Jefferson B. Sessions, III
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Civil Process Clerk
United States Attorney's Office
Middle District of Florida
400 North Tampa Street
Suite 3200
Tampa, FL 33602

Civil Process
United States Attorney's Office
Middle District of Florida
2110 First Street
Suite 3-137
Fort Myers, FL 32902

_____
Karen C. Dyer