# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ANGELA D'ANNA, | |
| | |
| Relator, | CIVIL ACTION FILE |
| vs. | NO. 2:14-CV-437-FtM-38CM |
| | |
| LEE MEMORIAL HEALTH SYSTEM d/b/a LEE HEALTH, LEE MEMORIAL HOSPITAL, HEALTHPARK MEDICAL CENTER, GULF COAST MEDICAL CENTER, CAPE CORAL HOSPITAL, LEE PHYSICIAN GROUP; and | [FALSE CLAIMS ACT –*QUI TAM*] |
| | |
| CAPE MEMORIAL HOSPITAL, INC. d/b/a CAPE CORAL HOSPITAL, | |
| | |
| Defendants. | |

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Angela D'Anna ("Relator"), by and through her counsel of record, brings this action on

behalf of the United States of America against Lee Memorial Health System d/b/a Lee Health,

Lee Memorial Hospital, Healthpark Medical Center, Gulf Coast Medical Center, Cape Coral

Hospital, Lee Physician Group (hereinafter collectively referred to as "Lee Memorial Health

System") and Cape Memorial Hospital, Inc d/b/a Cape Coral Hospital ("Cape Coral") pursuant to

the q*ui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*. Lee Memorial

Health System and Cape Memorial Hospital, Inc. d/b/a Cape Coral Hospital collectively do

business as, and are collectively referred to herein as, "Lee Health." Lee Memorial Health System

and Cape Memorial Hospital, Inc. d/b/a Cape Coral Hospital are separate legal entities, but are

collectively referred to herein as "Defendants." Beginning on or about 2005, Lee Health entered

into various compensation agreements with employed physicians that included compensation based on the volume or value of physician referrals, other business generated by the physicians, profit-sharing incentives or pooled compensation, in violation of federal law.  By knowingly submitting claims or causing claims to be submitted for reimbursement based on referrals generated by physicians who received compensation based on these terms, Defendants violated the FCA.

## NATURE OF THIS ACTION

1.      This FCA action is based on Defendants' knowingly submitting or causing to be submitted false claims to Medicaid and Medicare from 2005 to at least 2014.  The claims at issue are false because they are for healthcare services referred to Lee Health by physicians Lee Health was compensating  in violation of the federal physician self-referral law commonly referred to as the "Stark Law" (42 U.S.C. § 1395nn; 42 C.F.R. § 411.351).   Lee Health knew it was submitting or causing to be submitted false claims for reimbursement to Medicare and Medicaid (collectively, the "Government") and did so to increase its revenue at the expense of the United States, in violation of the FCA. This is a well-trod basis for liability under the FCA that is commonly relied on by the United States to recover funds lost to fraud grounded in charging the Government for services referred by unlawfully incentivized physicians.

2.      Lee Health knowingly submitted or caused to be submitted false claims for reimbursement to the Government while falsely certifying compliance with the Stark Law.

3.      As set forth in detail below, Lee Health knowingly submitted or caused to be submitted false claims to the Government in violation of the FCA for services referred to Lee Health by specific neurosurgeons, cardiologists and pulmonologists to whom Lee Health was paying illegal compensation.   Relator has insider knowledge of Lee Health's physician

compensation arrangements, the referral practices of the specific physicians at issue here and Lee Health's billing processes that resulted in the submission of false claims to the Government. Relator provides herein representative examples of actual false claims submitted by Lee Health to Medicare.

4.      The Government could not have lawfully paid Lee Health's false claims had it known of Lee Health's violations of the Stark Law because such payment is statutorily prohibited. 42 U.S.C. § 1395nn(g)(1); 42 U.S.C. § 1396(s).  As a result, Lee Health's violations of the Stark Law were material to the Government's decisions to pay Lee Health's false claims.

5.      In addition to submitting false claims and causing the Government to suffer damages therefrom, another basis of FCA liability present in this case is Lee Health's improper retention of payments it received on its false claims.  Lee Health was required to pay back such "overpayments," but knowingly did not do so.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345 and 1367(a).  This Court has jurisdiction to entertain a *qui tam* action pursuant to 31 U.S.C. § 3730(b).  Relator is an "original source" and is otherwise authorized to maintain this action in the name of the United States as contemplated by the False Claims Act, 31 U.S.C. § §3729-33.

7.      This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) and because each Defendant resides and transacts business in the Middle District of Florida.

8.      Venue is proper in the Middle District of Florida under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c) because each Defendant can be found in, resides in, and/or transacts business in this judicial district.

9.      Relator made voluntary and significant disclosures to the United States Government prior to the filing of this lawsuit as required by 31 U.S.C. § 3730(b)(2).

## THE PARTIES

### A.      Plaintiffs: Relator and the United States

10.      Relator-Plaintiff Angela D'Anna is an expert in physician compensation issues and hospital billing processes, having audited those hospital functions for over 16 years.  Relator is a highly trained and educated professional.  She is a Certified Public Accountant, a Certified Internal Auditor, a Certified Fraud Examiner, Certified Information Systems Auditor, and is certified in Healthcare Compliance.  Prior to joining Lee Health, Relator worked in Internal Audit for almost seven years at Bon Secours Health System, a health system based in Baltimore, Maryland with more than 20 hospitals in multiple states.  At Bon Secours, she audited physician billing and coding processes, hospital billing and coding processes, and was the subject matter expert for physician contracting audits throughout that hospital system.  Relator joined Lee Health as its System Director of Internal Audit in October 2003 and remained in that position until her voluntary resignation effective June 26, 2014.  In her role as head of Internal Audit at Lee Health, for ten years Relator audited all critical processes of Lee Health's healthcare system, including physician compensation, physician billing and coding, and hospital billing and coding. Relator reported directly to the Chief Compliance Officer at Lee Health and participated in frequent meetings with senior management to address issues raised by her Internal Audit Department.  Moreover, Relator

performed follow-up reviews on audit recommendations previously identified and reported on the status of these recommendations to senior management.

11.     Relator is a corporate insider who learned of Lee Health's unlawful compensation to physicians and related submissions of false claims in the regular course of her job duties.  She reported this unlawful conduct to senior Lee Health leaders, but Lee Health did not put a stop to it.  She brings this *qui tam* action based upon direct personal knowledge she gained during her employment for a decade as a corporate insider and executive with Lee Health.  Relator resided in the State of Florida at all relevant times and during her entire employment with Lee Health. Senior management deliberately ignored and recklessly disregarded audit reports that reported the Stark Law issues, and knowingly allowed the identified illegal physician compensation schemes and related submissions of false claims to continue for many years.

12.     The United States is the real party in interest in this action.

**B.      Defendants**

13.     Defendant Lee Memorial Health System is a special purpose unit of local government created by the Florida Legislature to operate, control and maintain a public hospital and other hospital facilities in Lee County, Florida pursuant to Chapter 63-1552, Laws of Florida (1963), as amended by Chapter 2000-439, Laws of Florida (2000).  Lee Memorial Health System is governed by a ten-member Board of Directors who are elected by the voters of Lee County. Chapter 2000-439, § 6, Laws of Florida (2000).  Lee Memorial Health System is a large health system that owns and operates four acute care hospitals and two specialty hospitals with a total of 1,423 acute care beds, as well as other healthcare facilities, and receives over one million patient contacts each year.  Lee Memorial Health System maintains its principal place of business in Lee County, Florida.  Lee Memorial Health System seeks and receives tens of millions of dollars from

Medicare and Medicaid reimbursements each year.  To be eligible to receive those funds, Lee Memorial Health System must certify to the Government its compliance with the Stark Law and despite its systemic violations has done so falsely for every year relevant to this case.

14.     Lee Memorial Health System may be served at its executive office located at 2776 Cleveland Avenue, Suite 459, Fort Myers, Florida 33901.

15.     Cape Memorial Hospital, Inc. d/b/a Cape Coral Hospital is a Florida not-for-profit corporation created by Lee Memorial Health System's Board of Directors to receive and hold the assets purchased from Cape Coral Medical Center, Inc. on July 1, 1996, upon acquisition of Cape Coral Hospital.  Its Board of Directors consists of the ten members of Lee Memorial Health System's Board of Directors.  Cape Memorial Hospital, Inc. d/b/a Cape Coral Hospital is presented as a blended component unit in Lee Memorial Health System's audited financial statements. All net cash generated by Cape Memorial Hospital, Inc. flows into Lee Memorial Health System's accounts at year end.  Cape Memorial Hospital, Inc. maintains its principal place of business in Lee County, Florida.

16.     Cape Memorial Hospital, Inc. may be served at its executive office located at 2776 Cleveland Avenue, Suite 459, Fort Myers, Florida 33901.

**C.     Relator's Knowledge of Defendants' Billing Processes and Submission of False Claims to the Government**

17.     As the Director of Lee Health's Internal Audit Department for more than ten years, Relator had direct and extensive knowledge of Lee Health's billing processes.  Throughout her ten-year-plus tenure with Lee Health, she spent countless hours auditing Lee Health's physician and hospital billing and coding processes.  She reviewed and discussed actual claims submitted to Medicare and Medicaid from Lee Health for inpatient and outpatient hospital services (designated health services) referred to Lee Health by physicians who Relator learned were being unlawfully

compensated by Lee Health.  Relator and the billing consultants she retained to assist her in billing

and coding audits had direct and unfettered access to Lee Health's billing systems, documents and

claims data, including electronic hospital and physician claims submitted to Medicare and

Medicaid.  Relator investigated Lee Health's billing systems and specific claims data on a regular

basis as part of her day in and day out job duties.

18.    Throughout her tenure at Lee Health, Relator issued numerous audit reports about

Lee Health's billing, coding and claims submission processes, including without limitation the

following that are discussed in detail below:

| **Date of Audit Report** | **Description of Audit Report** | **Second Amended Complaint Exhibit Reference** |
|---|---|---|
| September 30, 2004 | Examination of the Inpatient Medical Records Coding Process at Lee Health | 43 |
| January 28, 2005 | Examination of the Central Business Office of Lee Health (central billing functions) | 49 |
| July 19, 2005 | Examination of the Denials Management Process at Lee Health | 50 |
| August 25, 2005 | Examination of the Outpatient Coding and Billing Process at Lee Health | 51 |
| June 1, 2007 | Examination of Lee Health's Organizational and Governance Practices | 52 |
| November 20, 2007 | Examination of Outpatient Coding and Billing at Lee Health | 53 |
| October 9, 2012 | Examination of E & M Services Coding for Neurosurgery | 56 |
| October 29, 2012 | Examination of Inpatient Medical Records Coding for Neurosurgery | 57 |

19.    By way of specific example, in 2004, Relator led her Internal Audit Department in

examining Lee Health's inpatient medical records coding process.  Coding is the hospital's

application of one or more numerical codes to healthcare services for purposes of seeking

reimbursement for those services from the Government.  Relator worked directly in preparing and

issuing an Audit Report dated September 30, 2004 to Lee Health's System Director for Health Information Management, Stanley Padfield, and provided copies to other senior management at Lee Health, including the President. See Examination of the Inpatient Medical Records Coding Process at Lee Health, attached hereto as Exhibit 43. Relator met with members of senior management to discuss her specific audit recommendations and management's responsive action plan. *Id.* As part of her audit, Relator contacted and engaged MPA Consulting, a specialized coding audit firm, to perform the review of actual medical records. The consultants Relator engaged conducted the review onsite with access to Lee Health's billing systems. In fact, under Relator's direction, the consultants reviewed 73 patient medical records from Lee Memorial Hospital, 41 patient medical records from Health Park Hospital and 79 patient medical records from Cape Coral Hospital, and reported their findings to Relator and department management at Lee Health. Exhibit 44.

20.     Shortly after completing the audit of Lee's inpatient medical records coding process (see Exhibit 43), Relator and her staff began work on an audit of Lee Health's Central Business Office, which office handled all billing (including to Medicare and Medicaid) for Lee Health's hospitals, including but not limited to Cape Coral Hospital. On October 4, 2004, Relator and her staff met with Lee Health's Business Operations Trainer, Shirley Guinn, at Lee Health's Central Business Office located on Santa Barbara Boulevard in Cape Coral, Florida, to discuss Lee Health's protocols and processes for Medicare/Medicaid billing. Based on the information gained in that meeting, Relator and her staff prepared a narrative of the discussion to document that Medicare/Medicaid billing process. See narrative, attached hereto as Exhibit 45. At that time, October 2004, Lee Health used three different provider numbers to bill Medicare and Medicaid,

one for Lee Memorial Hospital (including HealthPark), one for Cape Coral Hospital, and one for Rehabilitation. *Id.*, at 3.

21.     Relator and her Internal Audit team conducted other work for the Central Business Office audit:  Relator and her team interviewed other Lee Health billing personnel and wrote narratives documenting processes specific to billing the Government  – Medicare & Medicaid, Commercial Billings and Customer Services for patient accounts with balances after commercial insurance, and balances after Medicare payments and for self-pay accounts.  See narrative, attached hereto as Exhibit 46.  In doing the work evidenced in Exhibits 45 and 46, Relator gained extensive knowledge of exactly how Lee Health billed Medicare and Medicaid.  For example, Relator learned that Lee Health submitted Medicare bills for hospital services electronically in batches after a four-day hold period for both inpatient and outpatient claims to enable all hospital charges to be posted to the billing system. *Id.*, at 2. Relator and her audit team met with Jeanette Doss, Lee Health's Manager of Insurance/Compliance, who was responsible for Medicare and Medicaid billings in the Central Business Office.   Relator and her audit team also met with Billie Jo Debolt, Lee Health's Systems Director for Business Operations Systems, who was responsible for automation of the Central Business Office.  Relator thereby gained firsthand knowledge that Lee Health submitted its Medicare and Medicaid claims electronically using ANSI ASC X12N 837 formats.  See narrative, attached hereto as Exhibit 47.  Relator and her audit team prepared a flowchart to depict the billing processes in the Central Business Office.  See Exhibit 48 hereto. Relator has firsthand knowledge that these billing processes were used daily by Lee Health to bill Medicare and Medicaid.

22.     Relator gave her Audit Report dated January 28, 2005 that covered her examination of the Central Business Office to Lee Health's Corporate Director of Business Operations, Neal

Sword, and provided copies to other senior management at Lee Health, including the President. Exhibit 49.  Relator met with members of senior management to discuss her recommendations from that audit and Lee Health management's responsive action plan.  This Audit Report unequivocally establishes Relator's direct and thorough personal knowledge of Lee Health's Medicare and Medicaid billing processes.  See Report, Exhibit 49.

23.     In 2005, Relator led the Internal Audit Department in auditing other aspects of Lee Health's billing and coding processes.  Relator issued an Audit Report dated July 19, 2005 on the examination of the Denials Management Process at Lee Health, including Medicare Rejections/Denials and Medicaid Denials. Exhibit 50.   Relator thereby added to her personal knowledge of Lee Health's billing and coding for Medicare and Medicaid claims.  Also in 2005, Relator issued an Audit Report dated August 25, 2005 entitled "Preliminary Report: Examination of the Outpatient Coding and Billing Process at Lee Memorial Health System," which included an analysis of the impact of Medicare's outpatient prospective payment system for hospital outpatient services.  Exhibit 51.  This is still more evidence that much of Relator's activities during her tenure at Lee Health were focused on Lee Health's preparation (coding) and submission of claims to Medicare and Medicaid.

24.     In 2007, Relator led the Internal Audit Department in an Examination of Lee Health's Organizational and Governance Practices using the IRS Compliance Check Questionnaire for Tax Exempt Hospitals that included billing and collection practices.  Relator issued the Audit Report dated June 1, 2007 on this examination to Lee Health's President and Chief Executive Officer, Jim Nathan, and provided copies to other senior management personnel at Lee Health. Moreover, Relator met with members of senior management to discuss her audit recommendations from this audit and management's responsive action plan.  Exhibit 52.  By this

time, Relator had several years of experience as an insider within Lee Health regarding Lee's preparation (coding) and submission of claims to Medicare/Medicaid.

25.     Also in 2007, Relator led the Internal Audit Department in an examination of Lee's coding and submission of claims to Medicare for outpatient services. Relator engaged Provider Consulting Solutions, a specialized coding and billing firm, to perform the review of paid Medicare outpatient claims as part of her audit.  Provider Consulting Solutions conducted the review onsite with access to Lee Health's billing systems and reviewed 110 paid Medicare claims representing a variety of outpatient services across three facilities: Lee Memorial Hospital, HealthPark Medical Center and Cape Coral Hospital, and reported their findings to Relator.  Exhibit 54.  Relator gained personal knowledge as to how each of the 110 paid Medicare claims was billed to and paid by Medicare.  Relator issued her Audit Report on Medicare outpatient coding and billing dated November 20, 2007 to Lee Health's System Director of Reimbursement, Ben Spence, and provided copies to other senior management at Lee Health, including the President. See Exhibit 53 hereto.  Relator then met with members of Lee Health's senior management to discuss her audit recommendations and a responsive action plan.

26.     In 2012, Relator led the Internal Audit Department in multiple audits of Evaluation & Management ("E&M") Services Coding and Inpatient Medical Records Coding for Neurosurgery.  E&M services are physicians' services so these examinations investigated Lee's preparation of claims to the Government and other payors for neurosurgeons' services specifically. Relator engaged MPA Consulting, a specialized coding audit firm, to perform the review of neurosurgery patient medical records as part of the audits.  In the course of the audits, Relator and her consultants used direct access to Lee Health's billing systems to generate spreadsheets showing particular information from actual Lee Health claims filed electronically with Medicare and other

payors for Neurosurgery services and inpatient hospital services (facility fees) for calendar year 2011. Relator prepared a "Narrative for Professional Services – Neurosurgery" that described how the neurosurgeons complete "encounter forms" for office visits and use 3x5 cards to record the surgical visits and consultations rendered at Lee Health, and how that information was entered into Lee Health's billing system so that claims for the neurosurgeons' services could be submitted electronically between 5:00 p.m. and 6:00 p.m. each night. See narrative, attached hereto as Exhibit 55. This process was used to bill Medicare and Medicaid for all "E&M" services.

27.     Relator issued an Audit Report dated October 9, 2012 on that examination of E&M Coding for Neurosurgery to Lee Health's System Director for Specialty Care Services, David Rybicki, and provided copies to other senior management at Lee Health, including the President. See Exhibit 56. Relator met with members of Lee Health's senior management to discuss her audit recommendations and management's responsive action plan. In her Audit Report, Relator specifies that her audit included a review of 43 unbilled Medicare claims for the month of April 2012. Eight of those claims (17%) did not have the required documentation to support the coding levels assigned for the claim. Since the E&M audit was conducted on a pre-billing basis, the claims were revised based on the audit findings and the claims were then subsequently billed to Medicare. *Id.*, at 4. Relator gained additional personal knowledge of Lee Health's Medicare billing practices as a result of her October 9, 2012 E&M services coding audit.

28.     Relator issued an Audit Report dated October 29, 2012 on her examination of Inpatient Medical Records Coding for Neurosurgery to Lee Health's System Director for Health Information Management, Lisa Whitacre, and provided copies to other senior management at Lee Health, including the President. See Exhibit 57. Relator met with members of senior management to discuss her audit recommendations and management's responsive action plan. Relator's Audit

12

Report describes that the audit included a review of 62 cases from Lee Memorial Hospital and 10 cases from Gulf Coast Medical Center involving inpatient hospital services that were actually billed to the payors (including Medicare) for the period January 1, 2011 through December 31, 2011. *Id.*, at 2. The Audit Report explains that a case may have many ICD-9 codes (ICD-9 is the commonly-used acronym for International Classification of Diseases, 9th Revision, Clinical Modification) that describe the patient's disease or physical state and explain why the treating physician referred the patient for inpatient hospital services. Relator explained in the Audit Report that the grouping of these ICD-9 codes yields a single DRG code (DRG is the commonly-used acronym for "Diagnosis Related Group") that Lee Health used to bill Medicare and other DRG-based payors for the audited claims. *Id.*, at 2. This document is further evidence of Relator's direct and thorough personal knowledge of Lee Health's processes for billing Medicare for inpatient hospital claims referred by the Neurosurgeons at issue in this case.

## STATUTORY AND REGULATORY PROVISIONS

**A.     The False Claims Act**

29.     The FCA provides for the award of treble damages and civil penalties for, *inter alia*, knowingly causing the submission of false or fraudulent claims for payment to the United States government. 31 U.S.C. § 3729(a)(1).[1]  Claims to government payers for reimbursement for

---

[1]     The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009. Defendant's fraudulent scheme includes false claims made prior to and after that date. The three pre-amendment subsections relevant to this action are 31 U.S.C. §§ 3729(a)(1), (a)(2), and (a)(7). The post-amendment sections relevant here are 3729(a)(1)(A), 3729(a)(1)(B) and 3729(a)(1)(G). Post-amendment section 3729(a)(1)(B) is applicable to all claims in this case by virtue of Section 4(f) of FERA, which makes the changes to that section applicable to all claims for payment pending on or after June 7, 2008.

healthcare services rendered to patients referred by physicians in violation of the Stark Law (as hereinafter described) are material false claims actionable under the FCA.

30.     The FCA provides, in pertinent part, that a person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

(a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains. . . .

31 U.S.C. § 3729.  For purposes of the False Claims Act, the term "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and require no proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1).  For purposes of the False Claims Act, the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

**B.     The Stark Law**

31.     Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Law"), the Stark Law prohibits a hospital from submitting claims for "designated health services" [as defined in 42 U.S.C. § 1395nn(h)(6)] to Medicare or Medicaid if

such claims resulted from referrals from physicians having a "financial relationship" (as defined in the Stark Law) with the hospital.

32.     The Stark Law was enacted to address overutilization of services, increased costs and corrupted medical decisions by physicians who stood to profit from referring patients to facilities or entities in which they had financial interests.

33.     The Stark Law explicitly states that an entity "may not present or cause to be presented a claim. . .  for designated health services furnished pursuant to or referral prohibited under subparagraph (A) [of this act]."  42 U.S.C. § 1395nn(a)(1)(b).  Neither Medicare nor Medicaid may pay for any designated health service provided in violation of the Stark Law. *See* 42 U.S.C. § 1395nn(g)(1); 42 U.S.C. § 1396(s).  The regulations implementing the Stark Law expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353(d) (2006).

34.     Compliance with the Stark Law is material to Medicare's and Medicaid's payment decisions because payment of Stark-tainted claims is statutorily prohibited and the financial relationships with physicians present a risk to federal healthcare programs and program beneficiaries of questionable or improper utilization of designated health services.  Medicare and Medicaid would not and could not legally pay for any designated health service provided in violation of the Stark Law.  42 U.S.C. § 1395nn(g)(1); 42 U.S.C. § 1396b(s).

C.     **The Medicare Program**

35.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of healthcare services for certain individuals. The United States Department of Health and Human Services ("HHS") is responsible for the administration

and supervision of the Medicare program, which it does through the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.

36.     Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A.  Part A of the Medicare Program authorizes payment for institutional care (including hospital, skilled nursing facility and home health care).  *See* 42 U.S.C. §§ 1395c-1395i-4. Part B of the Medicare program primarily covers physician and other ancillary services. *See* 42 U.S.C. § 1395k.

37.     Medicare Administrative Contractors ("MACs") act on behalf of CMS to process and pay Part A and Part B claims and perform administrative functions on a regional level. *See* 42 § C.F.R. 421.5(b).

38.     In Florida, First Coast Service Options, Inc. ("First Coast") acts as the MAC for the Florida region.

39.     Providers who wish to be eligible to participate in Medicare Part A must periodically sign an application to participate in the program. The application, which must be signed by an authorized representative of the provider, contains an express certification that states: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (*including but not limited to, the Federal anti-kickback statute and the Stark Law*), and on the provider's compliance with all applicable conditions of participation in Medicare."  (emphasis added.)

40.     Under the Medicare program, CMS makes payments after the services are rendered to hospitals for inpatient and outpatient services.

41.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits Medicare Part A claims for interim reimbursement for inpatient and outpatient items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. At all relevant times, Lee Health submitted claims to Medicare Part A electronically using the standard machine readable format developed by the American National Standards Institute (ANSI) Accredited Standards Committee (ASC) X12N and known as the 837 Institutional format, and was not allowed to submit claims to Medicare on paper forms UB-92 or UB-04 after the Administrative Simplification Compliance Act (Pub.L. 107-105, § 1, Dec. 27, 2001) became effective in 2003.

42.     As detailed below, at all relevant times, Defendants were each enrolled as a Medicare and Medicaid provider and submitted or caused to be submitted electronic claims to Medicare and Medicaid for both (i) specific inpatient and outpatient services provided to individual beneficiaries and (ii) general and administrative costs incurred in treating Medicare and Medicaid beneficiaries.

43.     As a prerequisite to payment under Medicare Part A, CMS requires hospitals to submit annually a CMS-2552 form, more commonly known as the hospital cost report. Cost reports are the final claim that a provider submits to the fiscal intermediary or MAC for items and services rendered to Medicare beneficiaries.

44.     After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary or MAC, stating the amount of Part A reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.F.R. § 405.1801(b)(1). Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the

provider has been overpaid and must reimburse Medicare. *See* 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

45.     Defendants were, at all times relevant to this case, required to submit annual hospital cost reports to First Coast.

46.     During the relevant time period, Medicare Part A payments for hospital services were determined by the claims submitted by the providers for particular patient discharges (specifically listed in electronic claims filed in 837 Institutional format) during the course of the fiscal year. On the hospital cost report, the Medicare Part A payments due to the hospital for services are totaled and compared with any Medicare Part A liabilities owed to Medicare from the hospital to determine whether Medicare or the hospital owes the other any funds related to treatment of Medicare Part A beneficiary patients during the course of a fiscal year.

47.     Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.  For all relevant years, Defendants were required to expressly certify, and did certify, in relevant part:

> to the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.
> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

48.     For the entire period at issue, the hospital cost report certification page also included the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

49.     Thus, a provider is required to certify that the filed hospital cost report is (1) truthful, i.e., that the cost information contained in the report is true and accurate; (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete (i.e., that the hospital cost report is based upon all information known to the provider); and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the Stark Law.

50.     For each of the years at issue, Defendants submitted cost reports to First Coast attesting, among other things, to the certifications quoted above.  Those certifications were false and Defendants knew they were false.

51.     A hospital is required to disclose all known errors and omissions in its claims for Medicare Part A reimbursement (including its cost reports) to its fiscal intermediary or MAC.

52.     In addition to Part A claims, hospitals, doctors or other providers submit Medicare Part B claims to the carrier or MAC for payment.

53.     Under Part B, Medicare will generally pay eighty percent (80%) of the "reasonable" charge for medically necessary items and services provided to beneficiaries. *See* 42 U.S.C. §§ 1395l(a)(1), 1395y(a)(1).  For most services, the reasonable charge has been defined as the lowest of (a) the actual billed charge, (b) the provider's customary charge, or (c) the prevailing charge for the service in the locality. *See* 42 C.F.R. §§ 405.502-504.

54.     A substantial portion of Lee Health's revenues are derived from Medicare.

55.     During the relevant time period, the Defendants electronically submitted claims to Medicare Part B for professional services in ANSI ASC X12N 837 Professional format.  The Defendants were required to certify, and did certify, by electronically signing each claim submitted to Medicare in 837 Professional format:

this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law).

**D.     The Medicaid Program**

56.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

57.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called "federal financial participation" (FFP).  42 U.S.C. §§ 1396 et seq.

58.     In order to qualify for FFP, each state's Medicaid program must meet certain minimum requirements, including the provision of hospital services to Medicaid beneficiaries. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

59.     In the State of Florida, provider hospitals participating in the Medicaid program submit claims for hospital services rendered to beneficiaries to the Florida Agency for Health Care Administration ("AHCA") for payment.

60.     In addition, AHCA requires hospitals participating in the Medicaid program to file a copy of their Medicare cost report with AHCA.

61.     AHCA uses Medicaid patient data and the Medicare cost report to determine the reimbursement to which the facility is entitled based in part on the number of Medicaid patients treated at the facility.

62.     A substantial portion of Lee Health's revenues are derived from Medicaid.

63.     During the relevant time period, Defendants electronically submitted claims to Medicaid for professional services in ANSI ASC X12N 837 Professional format.  Defendants were required to certify, and did certify, by electronically signing each claim submitted to Medicaid in 837 Professional format:

> this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law).

**E.     Medicare Reimbursement and Relative Value Units ("RVUs")**

64.     Medicare pays for a physician's services based on submission of a claim using one or more specific Current Procedural Terminology ("CPT$^{®}$") codes.  Each CPT$^{®}$ code has a Relative Value Unit (RVU) assigned to it by Medicare which when multiplied by the Medicare payment conversion factor (CF) and a geographical adjustment (GPCI), creates the total Medicare compensation level for a particular service.  As detailed below based on MGMA benchmarks, Lee Health paid total compensation paid to certain neurosurgeons, cardiologists and pulmonologists employed by Lee Health that exceeded fair market value and was commercially unreasonable in the absence of referrals.  Some of the components of financial incentives that resulted in  Lee Health paying total compensation above fair market value were based on RVUs worked by physicians and extenders, including:  (1) compensation for personally performed services based on rates per wRVU that increase with the annual total of work RVUs credited to each physician; (2) compensation for services performed by hospital-employed extenders (i.e., not personally performed by the physicians) but credited and paid to the physicians at the physicians' wRVU rates which do not reflect the lower cost of using physician extenders; (3) bonus pools based on production of physician extenders to the extent such production was not already added to the physicians wRVUs and paid at the physicians' wRVU rates.  In this case, when the various RVU-

based financial incentives were combined with additional compensation for on-call coverage and medical directorships, the total compensation of certain specialists exceeded fair market value, and was not commercially reasonable in the absence of referrals.  As a result, the compensation arrangements violate the Stark Law.

### THE SPECIFIC COMPONENTS OF DEFENDANTS' FRAUDULENT SCHEME

65.     Beginning October 1, 2005 and continuing at least until June 26, 2014, Lee Health devised and implemented a fraudulent scheme to unlawfully incentivize several groups of physician specialists as set forth below in violation of the Stark Law.

66.     The Stark Law prohibits hospitals from paying compensation to physicians that is in excess of fair market value and/or is commercially unreasonable in the absence of referrals.  42 U.S.C. §§ 1395nn(a)(1), 1395nn(e)(2)(B) and (C), and 1395nn(e)(3)(a)(v). The purpose of the Stark Law is to prevent the overutilization of health services through the payment of referral fees by one medical provider to another.  *U.S. ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 397 (4th Cir. 2012). The Stark Law is Congress' response to pay-to-play schemes such as Lee Health's arrangements with certain medical specialists that may lead to overutilization of federal healthcare services, increase costs to federal healthcare programs, and corrupt medical decision-making by physicians who stand to profit from referring patients to facilities or entities in which they have a financial interest.

67.     Lee Health violates the Stark Law by paying physicians illegal referral fees under compensation arrangements (collectively "Illegal Compensation Arrangements") that (i) exceed fair market value, and (ii) are commercially unreasonable in the absence of referrals.  Lee Health pays certain physicians a combination of financial incentives including: (1) compensation for personally performed services based on rates per work Relative Value Unit ("wRVU") that

increase as the annual total of wRVUs credited to each physician increases; (2) compensation for services performed by hospital-employed physician assistants and nurse practitioners (both of which are hereinafter referred to as "extenders") that are credited and paid to the physicians at the physicians' wRVU rates which do not reflect the lower cost of using physician extenders; (3) bonus pools that are based on production of physician extenders to the extent such production was not already added to the physicians wRVUs and paid at the physicians' wRVU rates; (4) payments for on-call coverage in addition to payments to the physicians for professional services rendered while on-call; and (5) payments for medical directorships.  In this case, the combination of all these financial incentives resulted in Lee Health paying certain medical specialists total compensation that exceeds fair market value and is commercially unreasonable in the absence of referrals.  The excessive financial compensation scheme incentivized the physicians to refer more inpatient and outpatient hospital services to Lee Health.  This conduct is a well-orchestrated pay-to-play scheme that violates the Stark Law.

68.    Each referral of a Medicare or Medicaid patient for a designated health service ("DHS") by a physician with Illegal Compensation Arrangements constitutes a violation of the Stark Law, 42 U.S.C. § 1395nn.

69.    Each claim submitted by Lee Health to a federally-funded health care program, including Medicare and Medicaid, for an inpatient or outpatient service provided to a patient referred by a physician with Illegal Compensation Arrangements constitutes a false claim under the False Claims Act.

70.    None of the exceptions to the Stark Law is applicable here, including the so-called "bona fide employment" and "personal service arrangement exceptions."

71.     The "bona fide employment" exception excludes amounts paid pursuant to a bona fide employment relationship if the compensation is (i) consistent with fair market value; and (ii) "not determined in a manner that takes into account (directly or indirectly), the volume or value of any referrals by the referring physician" [42 U.S.C. § 1395nn(e)(2)(B)], and (iii) "commercially reasonable even if no referrals were made by the employer." [42 U.S.C. § 1395nn(e)(2)(C)].

72.     The total compensation paid to certain physicians by Lee Health is not protected by the bona fide employment for two separate and distinct reasons: (1) it is not consistent with fair market value; and (2) it is not commercially reasonable.

73.     Outside of an employment relationship, the Stark Law also expressly excludes compensation paid pursuant to a personal service arrangement if the arrangement is set out in writing; the arrangement covers all the services to be provided by the physician; the aggregate services contracted for do not exceed those that are reasonable and necessary for the legitimate business purpose of the arrangement; the compensation does not exceed market value; and the compensation is "not determined in a manner that takes into account the volume or value of any referrals or the business generated between the parties." 42 U.S.C. § 1395nn(e)(3).

74.     The compensation paid by Lee Health to certain independent contractors outside of an employment relationship does not come within the terms of the personal service arrangement exception for four different and separately dispositive reasons:  (1) the arrangement has not always been set out in writing or the arrangement has been inconsistent with the writing; (2) the aggregate services contracted for exceed those that are reasonable and necessary for the legitimate business purpose of the arrangement; (3) the compensation exceeds fair market value; and (4) compensation paid to a physician for marketing services is determined in a manner that takes into account the volume and value of any referrals or other business generated between the parties.

A.    **Neurosurgeons**

75.    Lee Health violated the Stark Law and committed fraud with regard to the compensation paid to neurosurgeons because it had a financial relationship with the employed neurosurgeons and none of the exceptions to the Stark Law apply, including the bona fide employment exception.  Lee Health paid: (1) compensation for personally performed services based on rates per wRVU that steeply increase with the annual total of wRVUs credited to each neurosurgeon; (2) compensation for services performed by hospital-employed extenders (i.e., not personally performed by the neurosurgeons) but credited and paid to the neurosurgeons at the neurosurgeons' wRVU rates which do not reflect the lower cost of using physician extenders; (3) 100% shares of bonus pools based on production of physician extenders to the extent such production was not already added to the neurosurgeons' wRVUs and paid at the neurosurgeons' wRVU rates; and (4) lucrative payments for on-call coverage in addition to the payments to the neurosurgeons for professional services rendered while on-call.  By paying the neurosurgeons excessive total compensation, Lee Health gave the neurosurgeons significant and improper financial incentives to make more referrals to Lee Health for inpatient and outpatient hospital services in violation of the Stark Law.

76.    Specifically, for the period from at least 2005 to 2014, Lee Health paid four neurosurgeons under compensation arrangements that included financial incentives for RVUs worked by neurosurgeons and extenders resulting in total compensation that exceeded fair market value and was commercially unreasonable in the absence of referrals.

77.    Effective October 1, 2005, Lee Health entered into written Employment Agreements with three neurosurgeons – Dr. Jeffrey S. Henn, Dr. Sam P. Javedan and Dr. John J. Dusseau.   (the "2005 Neurosurgeon Employment Agreements").   The 2005 Neurosurgeon

Employment Agreements have been provided to the Government in advance of the filing of this Complaint.

78.     Effective August 7, 2007, Lee Health entered into a written Employment Agreement with another neurosurgeon – Dr. Dean D. Lin.  (the "2007 Neurosurgeon Employment Agreement").   The 2007 Neurosurgeon Employment Agreement has been provided to the Government in advance of the filing of this Complaint.

79.     Because the unlawful compensation agreements between Lee Health and each of Drs. Henn, Javedan, Dusseau and Lin are substantially the same, Henn, Javedan, Dusseau and Lin are collectively referred to herein as the "Neurosurgeons".  The 2005 Neurosurgeon Employment Agreements and the 2007 Neurosurgeon Employment Agreement are collectively referred to as the "Neurosurgeon Illegal Compensation Arrangements".

80.     For the fiscal years 2008 and 2009, Lee Health paid the Neurosurgeons the following:

| Neurosurgeon Cash Compensation | | |
|---|---|---|
| **Neurosurgeon** | **FY 2008** | **FY 2009** |
| Dr. Jeffrey S. Henn | $1,352,261 | $1,313,518 |
| Dr. Dean D. Lin | $400,000 | $1,143,612 |
| Dr. Sam P. Javedan | $1,121,772 | $1,095,759 |
| Dr. John J. Dusseau | $505,028 | $446,968 |

81.     As a result of these Neurosurgeon Illegal Compensation Arrangements, the total compensation Lee Health paid to the Neurosurgeons violated the Stark Law because it grossly exceeded fair market value and was not commercially reasonable in the absence of referrals.  The

compensation does not fit within the bona fide employment exception or any other exception to the Stark Law.

82.    Each claim submitted by Lee Health to a federally-funded health care program, including Medicare and Medicaid, for an inpatient or outpatient service provided to a patient referred by any of the Neurosurgeons with Neurosurgeon Illegal Compensation Arrangements constitutes a false claim under the False Claims Act.

83.    Lee Health knowingly submitted false claims to the Government each time it billed for services referred by any of the Neurosurgeons who was paid under a Neurosurgeon Illegal Compensation Arrangement.  31 U.S.C. § 3729(a)(1)(A); 42 U.S.C. § 1395nn(a)(1)(B).

84.    The Neurosurgeon Illegal Compensation Arrangements specifically provided that "work RVUs for physician assistance or advanced nurse practitioners will be added to the RVUs of the supervising physician," thus, memorializing in writing one component of the financial incentives that was not based on the Neurosurgeons' personally performed services.

85.    Lee Health's contracts with the Neurosurgeons also provided that they would be paid in an additional amount "determined by the medical director of trauma" for coverage related to on-call services for trauma patients.  Significantly, Lee Health still gave the Neurosurgeons full credit for work RVUs relating to their personally performed professional services during time for which they were also being paid to be on-call.

86.    In March 2009, Price Waterhouse Coopers, LLP ("PWC"), the independent certified public accounting firm that served as Lee Health's external auditors, prepared a draft report to Lee Health's senior management entitled, "Neurosurgery Compensation Contract Enhancement, March 2009" (the "Draft Report").  See PWC Contract Enhancement DRAFT 3-9-09 attached hereto as Exhibit 1.  In the Draft Report, the independent auditors confirmed for Lee

Health that it was paying the Neurosurgeons more than fair market value (FMV) based on the 90th percentile of Medical Group Management Association ("MGMA") benchmarks for Worked RVUs for Neurological Surgery.  Ex. 1 at 12.  PWC recommended to Lee Health that neurosurgery RVU compensation rates be lowered "due to FMV" and "capped at 110% of revised RVU target system compensation."  Ex. 1 at 6.

87.     In July 2009, Lee Health's independent auditors prepared a revised report to Lee Health's senior management entitled, "Neurosurgery Compensation Contract Enhancement, July 2009" (the "Revised Report").  See PWC Contract Enhancement Updated 7-27-09 attached hereto as Exhibit 2.  The Revised Report further illuminated the need to change the Neurosurgeons' compensation to comply with the Stark Law.   It recommended that neurosurgery RVU compensation rates be lowered.  Ex. 2, pp. 2-3.  This recommendation was received by top Lee Health executives and decision-makers.

88.     Lee Health unequivocally knew that the total compensation paid to the Neurosurgeons exceeded FMV and was illegal.  However, the hospitals received so many lucrative referrals for inpatient and outpatient hospital services from the Neurosurgeons that it made sense – at least from a purely financial standpoint – for Lee Health to do whatever it took to continue obtaining more referrals from the Neurosurgeons.

89.     The Neurosurgeon Illegal Compensation Arrangements also instituted an unusual and perverse sliding valuation scale whereby the amount paid per RVU for the Neurosurgeons' personally performed services steeply increased as the annual total number of RVUs increased for each physician.  This scheme made the pay-for-play scheme more lucrative for key referring physicians such as the Neurosurgeons.  This method of payment was not only unusual but resulted in payments to the Neurosurgeons that was above fair market value and not commercially

reasonable in the absence of referrals.  In a normal arm's length transaction, the price paid per RVU should decrease as the number of RVUs for each physician increases since fixed costs remain the same and only marginal costs change.

90.    Effective January 1, 2010, Lee Health entered into a new written Compensation Amendment to Employment Agreement with each Neurosurgeon, amending the 2005 Neurosurgery Employment Agreements and the 2007 Neurosurgery Employment Agreement.  (the "2010 Compensation Amendments").  The 2010 Compensation Amendments are attached hereto as Exhibits 3, 4, 5 and 6.

91.    For the fiscal years 2010, 2011, 2012 and 2013, Lee Health paid the Neurosurgeons the following:

| Neurosurgeon Cash Compensation | | | | |
|---|---|---|---|---|
| **Neurosurgeon** | **CY 2010** | **CY 2011** | **CY 2012** | **CY 2013** |
| Dr. Jeffrey S. Henn | $1,499,618 | $1,449,963 | Not available | $1,606,396 |
| Dr. Dean D. Lin | $1,463,317 | $1,544,935 | Not available | $1,526,947 |
| Dr. Sam P. Javedan | $1,111,633 | $1,066,875 | Not available | $835,347 |
| Dr. John J. Dusseau | $641,291 | $738,175 | Not available | $647,614 |

92.    In the 2010 Compensation Amendments, Lee Health retained the RVU-based compensation model, and modified the RVU formulas slightly, but retained the system by which the Neurosurgeons were compensated based upon a scale in which the rate at which RVUs were paid increased proportionately as the annual total number of each physician's RVUs increased.  As noted above, this method of compensation is commercially unreasonable and contributed to Lee

Health paying the Neurosurgeons total compensation in excess of fair market value.  The more play (more referrals) – the higher the pay (to the doctors).

93.     Lee Health demonstrated its knowledge that the prior compensation arrangements with the Neurosurgeons resulted in total compensation in excess of FMV, due in part because the Neurosurgeons were paid at the Neurosurgeons' wRVU rate for work performed by the physician extenders.  In the 2010 Compensation Amendments, Lee Health deleted the prior provisions in the Employment Agreement allowing wRVUs for physician extenders to be treated as if they were the wRVUs attributable to the personally performed services of the supervising physician (and payable to the physician at the physician rate) and added the statement, "Productivity-Based Compensation for any year shall be equal to the number of wRVUs *personally performed by the Physician*, with no minimum, during such year multiplied by the corresponding wRVU Conversion Factor as set forth below."  (emphasis added).  Exhibits 3 through 6 (Exhibit A-1 to each Compensation Amendment, p.1).

94.     This amended agreement was a sham and the practice of including extender production in physician compensation did not change after the 2010 Compensation Amendments. Lee Health continued to credit and pay the Neurosurgeons at their physician wRVU rates for wRVUs performed by physician extenders.  Not only did the Neurosurgeons get credit for wRVUs for services performed by extenders (i.e., not personally performed by the physicians), but Lee Health inflated the Neurosurgery bonus pool by only allocating a portion of Lee Health's expenses related to employing the physician extenders, so the physicians were receiving more funds than if they had employed the extenders themselves in private practice.  The referring doctors could not have profited in this way based upon the work of extenders if they had been in private practice.  In private practice, the physicians do not get to retain the benefits of work done by extenders while

passing the employment costs for the extenders to third parties.  The inclusion of extender production in the Neurosurgeons' compensation contributed, in part, to Lee Health paying total compensation to the Neurosurgeons in excess of FMV.

95.     The written 2010 Compensation Amendment also provided for on-call base coverage of $2,000 per shift, in addition to the work RVU-based compensation for any professional services rendered while on-call.  Lee Health thereby paid the physicians twice for services performed during on-call coverage.   Exhibits 3 through 6 (Exhibit A-1 to each Compensation Amendment, p. 2).  This financial incentive for on-call coverage, when added to the other RVU-based financial incentives, resulted in overall compensation that exceeded FMV and was commercially unreasonable in the absence of referrals.

96.     In 2014, Lee Health performed an analysis of the compensation paid to certain key physicians, including the Neurosurgeons, and found significant and redundant FMV problems. The 2014 analysis specifically determined that Lee Health paid total compensation to Dr. Henn and Dr. Lin in 2013 that exceeded fair market value based on the 90th percentile of MGMA benchmarks for Physician Compensation for Neurological Surgery for the year 2013 and could not be justified by wRVU productivity even assuming the physicians personally performed all wRVUs (which was not true because Drs. Henn and Lin were credited with wRVUs performed by physician extenders). See Compensation and Production Analysis for Dr. Henn and Dr. Lin attached hereto as Exhibits 7 and 8.  The Director of Physician Compensation and Practice Acquisitions at Lee Health performed the physician compensation and production analysis for Lee Health.  See Exhibits 7 and 8. This analysis applied industry standard FMV criteria to the Neurosurgeons' compensation and determined that it exceeded FMV.  This shows fraudulent scienter. This analysis referenced industry FMV standards.  *Id.*  In assessing FMV criteria, this analysis used Kaufman

Hall data (hospital financial data), MGMA survey data, and developed various graphics that tracked physician RVUs and collections against national data.  *Id.*  The Director of Physician Compensation and Practice Acquisitions confirmed to Relator that he advised Dr. Javedan, Medical Director of Neurosurgery, to reduce total compensation to the Neurosurgeons so that total compensation did not exceed FMV, but Dr. Javedan and Lee Health resisted the change.

97.     Further in 2014, as a part of her regular job duties as the System Director, Internal Audit, Relator was asked to perform an audit to assess the adequacy of internal controls surrounding certain employed physician arrangements.  See "Audit Report re: Compensation for Employed Physicians" ("2014 Audit Report") attached as Exhibit 9 at 1.  A secondary purpose was to ascertain compliance with Lee Health physician contracting policies and procedures.  *Id.*  As a part of the audit and within the express scope of her job duties, Relator performed a detailed review of arrangements involving neurosurgeons, cardiologists and pulmonologists.  *Id.*, at 5-13.  The stated objective of the audit report was to determine whether the physician payments were made in accordance with the contract terms and were supported by documentation.  *Id.*, at 1.  Additionally, the 2014 Audit Report was designed to determine whether the employment contracts were structured to comply with the Stark Law and federal Anti-Kickback Statute.  *Id.*  Like the other reports discussed above, the 2014 Audit Report notified Lee Health, again, that physician compensation in each of the physician practice disciplines referenced herein was in excess of fair market value.  It also exposed the sham nature of the written contracts.  For example, the conversion factor tiers in the Neurosurgeons' contracts were not applied in accordance with the contracts when computing the pay rates:  The physicians with the highest RVUs were "paid all production of wRVUs at the highest conversion factor resulting in increased compensation for the most productive physicians." *Id.*, at 6.  Moreover, the 2014 internal audit noted that documentation

supporting the Neurosurgeons' compensation was deficient and/or missing. *Id.* Their pay rate calculations could not be located for 2000 – 2009 or the years prior to that. *Id.* From the documents that could be located, the 2014 Audit Report noted that "procedures performed by the extenders and billed by the physicians were added to the wRVU productivity of the physicians for compensation purposes" and warned that "[p]roviding wRVUs to the physicians for services performed by extenders creates compliance risk since the services were not personally performed by the physicians as stated in the contracts." *Id.*, at 5-6. The 2014 Audit Report recommended an examination of the compensation arrangements in consultation with Legal Services to determine necessary "remediation actions". *Id.*, at 6.

98.     In June 2014, Relator discussed in great detail the findings of the 2014 Audit Report in a meeting with Lee Health's Chief Compliance Officer, Chief Administrative Officer, Chief Medical Officer, and other physician services management and staff. Relator also discussed the findings of the audit with the Director, Physician Compensation and Practice Acquisition in a separate meeting. Relator provided a draft of the 2014 Audit Report to Relator's direct report, the Chief Compliance Officer, who told Relator that she would provide a copy of it to the Chief Medical Officer, Physician Services, Scott Nygaard, M.D, for management's responses and the final report would be issued as usual and customary. The physician compensation problems relating to the neurosurgeons and other physician groups at issue herein (as discussed below) were thoroughly discussed in Relator's 2014 Audit Report and thus were specifically disclosed and made known to the aforementioned executives of Lee Health.

99.     Relator had extensive personal knowledge relating to the scienter of Lee Health because she discussed with Lee Health senior management and staff responsible for physician contracting the previously referenced problems related to the Neurosurgeons' compensation

arrangements prior to the effective date of her resignation.  Moreover, even though Relator's audit report was not totally finalized by her last day of employment at Lee Health, the specific issues and underlying conclusions of her audit report were well known by Relator and she had documented them and communicated them to Lee Health's Chief Compliance Officer and responsible staff prior to her departure.

100.   Given that one or more of the Neurosurgeons was paid total compensation that exceeded fair market value, Lee Health could not reasonably have concluded that the compensation arrangements in those contracts met fair market value for the Neurosurgeons' services or were commercially reasonable. Defendants knew they were in violation of the Stark Law yet Defendants knowingly submitted tainted illegal claims for reimbursement to the government in violation of the FCA for the designated health services furnished by Lee Health pursuant to prohibited referrals from the Neurosurgeons.

101.   Thus there is no doubt that Lee Health knew that it was paying key referring physicians in ways that violated the Stark Law but continued to submit false claims to the Government for inpatient and outpatient hospital services referred by those physicians.  Relator was directly involved in providing information and evidence to Lee Health establishing that Lee Health was submitting those false claims.  Lee Health ignored Relator and the 2014 Audit Report because reducing those physicians' compensation to make it compliant with the Stark Law would likely reduce Lee Health's referrals from those physician and resulting revenues from inpatient and outpatient hospital services. Relator learned that Lee Health was not willing to take the financial risk of getting less referrals despite the fact that Lee Health knew its compensation arrangements with referring physicians were explicitly unlawful.

**B.     Relator's Knowledge of Defendants' Billing Processes and Submission of False Claims to the Government**

102.    As the Director of Lee Health's Internal Audit Department for more than ten years, Relator had direct and extensive knowledge of Lee Health's billing processes.  She spent countless hours auditing Lee Health's physician and hospital billing and coding throughout her ten-year tenure.  She reviewed and discussed actual claims to Medicare and Medicaid from Lee Health for inpatient and outpatient hospital services (designated health services) referred to Lee Health by physicians Relator learned were being unlawfully compensated by Lee Health.  Relator and the billing consultants she retained to assist her in billing and coding audits had direct and unfettered access to Lee Health's billing systems, documents and claims data, including electronic hospital and physician claims submitted to Medicare and Medicaid.  Relator investigated Lee Health's billing systems and specific claims data on a regular basis as part of her day in and day out job duties.  See ¶¶ 17-28 above for a detailed description of Relator's direct and extensive knowledge of Lee Health's billing processes.

103.    Based on Relator's direct and extension knowledge of Lee Health's billing processes gained by auditing Lee Health's physician and hospital billing and coding throughout her tenure as Director of Lee Health's Internal Audit Department for more than ten years, Relator has direct and personal knowledge that Lee Health knowingly billed Medicare and Medicaid tens of millions of dollars for designated health services (including inpatient and outpatient hospital services and procedures) referred by the Neurosurgeons to Lee Health while Lee Health paid the Neurosurgeons total compensation that exceeded FMV and was commercially unreasonable in the absence of referrals in violation of the Stark Law. 42 U.S.C. § 1395nn(a)(1)(B). While the Stark Law requires commercial reasonableness is determined as if no referrals were made, Relator knows has direct and personal knowledge that the Neurosurgeons made referrals to Lee Health for designated health services in violation of the Stark Law. *See* Section D – Relator's Knowledge of

Physician Referrals below. All these claims are false claims under the FCA.   31 U.S.C. § 3729(a)(1)(A).

104.    For example, in fiscal year 2012 alone, Lee Health billed Medicare for inpatient services ("facility fees") for a total of 273 spine fusion surgeries under DRG 460 for a total receipt from Medicare of approximately $5.478 Million dollars.  See Exhibit 10 attached hereto.  Of those 273 actual claims submitted to Medicare, 51 claims were billed by Defendants under Lee Memorial Hospital's Provider ID Number, 134 claims were billed under Gulf Coast Medical Center's Provider ID Number, and 88 claims were billed under Cape Coral Hospital's Provider ID Number. Relator knows based on her knowledge of Lee Health's billing processes, her knowledge of the particular surgical procedures billed and her knowledge of the basis of the Neurosurgeons' compensation that the Neurosurgeons performed many of these inpatient procedures and thus referred to Lee Health the inpatient service ("facility fee") that Lee Health billed to Medicare. Those Lee Health claims to Medicare referred by the Neurosurgeons are false claims under FCA because at the time Lee Health billed them, Lee Health knew it was paying the referring Neurosurgeons in violation of the Stark law and that the claim was, as a result, not reimbursable by Medicare as a matter of law.

## C.    Representative False Claims

105.   In the course of the 2012 audits of Neurosurgery E&M and Inpatient Medical Records Coding described in ¶¶ 26-28 above, Relator and the consultants used direct access to Lee Health's billing systems to generate extensive spreadsheets summarizing specific information from actual Lee Health claims filed electronically with Medicare and other payors for professional services and inpatient hospital services in calendar year 2011.  Relator and the consultants prepared a spreadsheet summarizing a sample of actual claims for inpatient hospital services performed at

Lee Memorial Hospital submitted by Lee Health to Medicare and paid by Medicare in 2011.  That spreadsheet contains the particular information on four electronic claims submitted to Medicare in 2011 for services to patients referred by one of the Neurosurgeons in violation of the Stark Law, which are false claims under FCA.  See Exhibit 58 (patient information redacted).  The claims submitted to Medicare are identified by the "M" symbol in the FC (Financial Classes) column of the spreadsheet.  See Exhibit 59 for key to codes.  Relator stands ready to submit the unredacted spreadsheet (Ex. 58) in native format to the Court under seal as the Court may order.   Because Lee Health knew it was paying the referring Neurosurgeon in violation of the Stark Law, Lee Health's claims to Medicare for those referred services (facility fees) are false claims.

106.   In the course of the 2012 audits of Neurosurgery E&M and Inpatient Medical Records Coding described in ¶¶ 26-28 above, Relator and the consultants used direct access to Lee Health's billing systems to generate extensive spreadsheets summarizing particular information from actual Lee Health claims filed electronically with Medicare and other payors for professional services furnished by all providers in the Neurosurgery Department, including the Neurosurgeons and their physician extenders in calendar year 2011.  Exhibit 60 (patient information redacted) is an excerpt of the claims information in those spreadsheets that shows the claims for the professional services of each referring Neurosurgeon relating to the four patients identified in the claims that Lee Health submitted to Medicare for inpatient hospital services as described above in Exhibit 58.  Relator stands ready to submit the unredacted spreadsheet (Ex. 60) in native format to the Court under seal as the Court may order.

107.   Using the information in these two spreadsheets (Exs. 58 and 60) which include actual electronic claim information Lee Health submitted to Medicare for its inpatient hospital services and for the referring Neurosurgeon's professional services, Relator shows the particular

Medicare claim and billing details for four representative false claims that Lee Health submitted to Medicare.

108.   **Representative False Claim #1** -   Lee Health electronically billed Medicare for inpatient hospital services performed at Lee Memorial Hospital on June 1, 2011 for Redacted Patient Name #1 under DRG 473 - CERVICAL SPINAL FUSION WITHOUT MAJOR COMPLICATION OR COMORBIDITY.   Dr. Henn (Physician Code 2437) is shown on the electronic claim form as the attending physician – see column ATDR on Ex. 58.  Lee Health billed Medicare total charges of $37,220.90 on this claim, and Medicare paid $11,971.00.   The procedures that Dr. Henn performed on Redacted Patient Number #1 in connection with the inpatient hospital services that Lee Health billed to Medicare are described by three Current Procedural Terminology ("CPT") codes set forth on Exhibit 60: CPT 22551 (Fusion of spine bones with removal of disc at upper spinal column, anterior approach), CPT 22845 (Insertion of anterior spinal instrumentation for spinal stabilization, 2 to 3 vertebral segments), and CPT 22851 (Insertion of spinal instrumentation for spinal stabilization).  Relator has direct knowledge that Lee Health submitted Representative False Claim #1 to Medicare.

109.   **Representative False Claim #2** -   Lee Health electronically billed Medicare for inpatient hospital services performed at Lee Memorial Hospital on March 2, 2011 for Redacted Patient Name #2 under DRG 460 - SPINAL FUSION EXCEPT CERVICAL WITHOUT MAJOR COMPLICATION OR COMORBIDITY.   Dr. Lin (Physician Code 2750) is shown on the electronic claim form as the attending physician – see column ATDR on Ex. 58.  Lee Health billed Medicare total charges of $146,894.45 on this claim, and Medicare paid $20,806.00.   The procedures that Dr. Lin performed on Redacted Patient Number #2 in connection with the inpatient hospital services that Lee Health billed to Medicare are described by six CPT codes set forth on

Exhibit 60: CPT 22612 (Fusion of lower spine bones, posterior or posterolateral approach), CPT 22630 (Arthrodesis, posterior interbody technique, including laminectomy and/or discectomy to prepare interspace (other than for decompression), single interspace; lumbar), CPT 63056 (Release of lower spinal cord or nerves), CPT 22851 (Insertion of spinal instrumentation for spinal stabilization), 20936 (Application of bone graft - Autograft, local) and 20930 (Application of bone graft - Allograft, morselized, or placement of osteopromotive material).   Relator has direct knowledge that Lee Health submitted Representative False Claim #2 to Medicare.

110.   **Representative False Claim #3** -   Lee Health electronically billed Medicare for inpatient hospital services performed at Lee Memorial Hospital on August 1, 2011 for Redacted Patient Name #3 under DRG 460 - SPINAL FUSION EXCEPT CERVICAL WITHOUT MAJOR COMPLICATION OR COMORBIDITY.   Dr. Henn (Physician Code 2437) is shown on the electronic claim form as the attending physician – see column ATDR on Ex. 58.  Lee Health billed Medicare total charges of $96,826.15 on this claim, and Medicare paid $96,826.00.   The procedures that Dr. Henn performed on Redacted Patient Number #3 in connection with the inpatient hospital services that Lee Health billed to Medicare are described by six CPT codes set forth on Exhibit 60: CPT 22612 (Fusion of lower spine bones, posterior or posterolateral approach), CPT 22630 (Arthrodesis, posterior interbody technique, including laminectomy and/or discectomy to prepare interspace (other than for decompression), single interspace; lumbar), CPT 63267 (Laminectomy for excision or evacuation of intraspinal lesion other than neoplasm, extradural; lumbar), CPT 22840 (Posterior non-segmental instrumentation), 22851 (Insertion of spinal instrumentation for spinal stabilization) and 20936 (Application of bone graft - Autograft, local).  Relator has direct knowledge that Lee Health submitted Representative False Claim #3 to Medicare.

111.   **Representative False Claim #4** -   Lee Health electronically billed Medicare for inpatient hospital services performed at Lee Memorial Hospital on March 8, 2011 for Redacted Patient Name #4 under DRG 460 - SPINAL FUSION EXCEPT CERVICAL WITHOUT MAJOR COMPLICATION OR COMORBIDITY.   Dr. Dusseau (Physician Code 539) is shown on the electronic claim form as the attending physician – see column ATDR on Ex. 58.  Lee Health billed Medicare total charges of $60,699.20 on this claim, and Medicare paid $23,387.00.   The procedures that Dr. Dusseau performed on Redacted Patient Number #4 in connection with the inpatient hospital services that Lee Health billed to Medicare are described by four CPT codes set forth on Exhibit 60: CPT 63047 (Partial removal of middle spine bone with release of spinal cord or nerves), CPT 22899 (Other Procedures on the Spine Vertebral Column), CPT 22840 (Posterior non-segmental instrumentation), and 20936 (Application of bone graft - Autograft, local).  Relator has direct knowledge that Lee Health submitted Representative False Claim #4 to Medicare.

112.   In addition to the examples of specific false billed claims in Exhibits 58 and 60, Relator instructed MPA Consulting to conduct a very limited review of pre-billed inpatient charges during their field work on the 2012 audit of Neurosurgery Inpatient Medical Records Coding.  As a result of the consultant's review of patient medical records and physician documentation on certain unbilled claims, the consultant created the spreadsheet attached as Exhibit 11.   The spreadsheet describes specific Lee Health Medicare pre-billed claims that the consultant reviewed and made recommendations on to the Relator and Neurosurgery billing personnel prior to billing. Relator knows based on her direct involvement in the audit and her discussions with the Neurosurgery billers that these pre-billed claims were in fact modified according to the consultant's and Relator's coding suggestions and then were promptly billed to Medicare.

Accordingly, Relator shows the particular details relating to a fifth representative false claim that Lee Health submitted to Medicare in March 2012 on a patient referred by Neurosurgeon Dr. Henn.

113.   **Representative False Claim #5** -   Lee Health electronically billed Medicare for inpatient hospital services performed at Lee Memorial Hospital on March 23, 2012 for Redacted Patient Name #5 under DRG 25 - CRANIOTOMY WITH MAJOR COMPLICATION OR COMORBIDITY.  Dr. Henn was shown on the electronic claim form as the attending physician. The procedures that Dr. Henn performed on Redacted Patient Number #5 in connection with the inpatient hospital services that Lee Health billed to Medicare are described by five CPT codes set forth on Exhibit 11.  Those codes are CPT 99223 (Initial hospital care), CPT 99232 (Subsequent hospital care with expanded problem with a -57 modifier (decision to perform major surgery)), CPT 61510 (Craniotomy), CPT 69990 (use of an operating microscope during a surgical procedure) and CPT 61781 (stereotactic computer assisted procedure).  The comments on Exhibit 11 explain that MPA Consulting recommended to Relator that Lee Health add an MCC (major complication or comorbidity) due to a CT scan that showed the patient had a herniation in the brain.  Adding the MCC would double the payment to Lee Health from Medicare (the difference between DRG 27 (Craniotomy without MCC) and DRG 25 (Craniotomy with MCC)).  Relator knows that Lee Health followed her consultant's coding recommendation and billed Medicare under DRG 25 for this inpatient hospital service (a designated health service).  Because at the time Lee Health billed the service Lee Health knew it was paying the referring Neurosurgeon in violation of the Stark Law, this is a false claim.  Relator has direct knowledge that Lee Health submitted Representative False Claim #5 to Medicare.

**D.     Relator's Knowledge of Physician Referrals**

114.    "Referral," for purposes of the Stark Law, is defined as "the request or establishment of a plan of care by a physician which includes the provision of designated health services." 42 U.S.C. § 1395nn(h)(5)(B).   The term "designated health services" is defined to include inpatient and outpatient hospital services.   42 U.S.C. § 1395nn(h)(6). The regulations interpreting the statute also broadly define "referral" as, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of such a designated health service, or the certifying or recertifying of the need for such a designated health service."   42 C.F.R § 411.351.   A referring physician is defined in the same regulation as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity."  *Id.*

115.    Relator knows that on each of Representative False Claims #1-#4, one of the Neurosurgeons was identified as the attending physician in the electronic claim submitted to Medicare - see column ATDR on Ex. 58.   The physicians identified on Medicare claims are referring physicians as a matter of law.  *See U.S. ex rel. Kunz v. Halifax Hosp. Med. Ctr., No. 6:09-CV-1002-ORL-31,* 2013 WL 6017329, at *5 (M.D. Fla. Nov. 13, 2013); *U.S. ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.,*  675 F.3d 394, 406-07 (4th Cir. 2012); *U.S. v. Rogan*, 459 F. Supp 2d 692, 713-714 & n. 11, 722 (N.D. Ill. 2006), *aff'd* 517 F.3d 449 (7th Cir. 2008); *U.S. ex rel. Singh v. Bradford Reg. Med. Center*, 752 F. Supp. 2d 602, 639-40 (W.D. Pa. 2010).  *See also* 42 U.S.C. § 1395l(q) (providing that "[e]ach request for payment, or bill submitted, for an item or service furnished by an entity for which payment may be made under this part and for which the entity knows or has reason to believe there has been a referral by a referring physician (within the

meaning of section 1395nn of this title) shall include the name and unique physician identification number for the referring physician.").

116.    In addition, the claims for professional fees (Ex. 60) relating to Representative Claims #1-#4 show one of the Neurosurgeons as personally performing professional services relating to the facility fees that Lee Health billed to Medicare.  Where a physician personally performs a service, the resulting facility fee is a referral as a matter of law for Stark purposes. *Tuomey Healthcare Sys., Inc.*, 675 F3d at 407.

117.    Relator knows that the Neurosurgeons made referrals to Lee Health based on identification of the Neurosurgeons on Lee Health's actual Medicare electronic claims for inpatient services (Ex. 58) and the description of professional services personally performed by the Neurosurgeons relating to the services (facility fees) that Lee Health billed to Medicare (Ex. 60). This evidence of referrals is determinative as a matter of law.

**E.    Representative False Statements**

118.    In the course of her 2012 audit of Neurosurgery E&M Coding described in ¶¶ 26-27 above, Relator and the consultants used data directly downloaded from Lee Health's billing systems by Lee Health's Information Systems personnel to generate spreadsheets with particular information from actual claims filed electronically by Lee Health with Medicare for professional services personally performed by the Neurosurgeons in calendar year 2011.  See Exhibits 61, 62 and 63 (patient information redacted).  Relator stands ready to submit the unredacted spreadsheets (Exs. 61, 62 and 63) in native format to the Court under seal as the Court may order.  These spreadsheets summarize professional services provided by the Neurosurgeons by certain CPT codes that would generate resulting facility fees to Lee Health for inpatient and outpatient hospital services.  Based on her access to Lee Health's billing systems, Relator knows that these

spreadsheets detail professional services provided by the Neurosurgeons to over 500 Medicare patients that Lee Health actually billed to Medicare in 2011.

119.    With each claim that Lee Health electronically submitted to Medicare, Lee Health electronically signed the claim and thereby certified as follows:

> this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law).

120.    In fact, Lee Health knew or should have known that these certifications were false because its financial arrangements with the Neurosurgeons violated the Stark Law by exceeding fair market value and because each was commercially unreasonable in the absence of referrals and thus prohibited by the Stark Law.  Although the claims for the professional fees personally performed by the Neurosurgeons do not violate Stark Law because physician services are excluded from the definition of designated health services, the facility fees (hospital inpatient and outpatient services) charged to Medicare by Lee Health are clearly designated health services under the Stark Law.  Lee Health's certifications are material to the Government's decision to pay Lee Health's claims for facility fees because the Government is statutorily prohibited from paying claims for services referred in violation of the Stark Law. 42 U.S.C. § 1395nn(a)(1)(B).  Thus  the Government would not have paid Lee Health's claims for facility fees if the Government had known the certifications were false.  As detailed above, Relator observed a pattern of Lee Health submitting false certifications to Medicare via electronic claims for years.

121.    The representative false certifications on the claims listed on Exhibits 61, 62 and 63 include more than 500 instances of false certifications in electronic claims sent by Lee Health to Medicare about Stark Law compliance in connection with services referred by the Neurosurgeons.  Those certifications are false and Lee is in violation of the FCA, 31 U.S.C. §

3729(a)(1)(B).  Relator has direct knowledge of the systemic utilization of such false statements to gain prohibited payments from Medicare.

### F.    Cardiologists

122.    Lee Health paid cardiologists compensation (collectively "Cardiologist Illegal Compensation Arrangement") that violated the Stark Law because it paid:  (i) compensation for personally performed services based on rates per wRVU that increase as the annual total of wRVUs credited to each cardiologist increases; (ii) compensation for services performed by hospital-employed extenders (i.e., not personally performed by the cardiologists) but credited and paid to the cardiologists at the cardiologists' wRVU rates which do not reflect the lower cost of using physician extenders; (iii) financial incentives based on production of physician extenders to the extent such production was not already added to the cardiologists' wRVUs and paid at the cardiologists' wRVU rates, in arrangements where the cardiologists were allocated 50% or less of the associated costs of extenders; and (iv) compensation for on-call coverage in addition to the payments to the cardiologists for professional services rendered while on-call.  By paying the cardiologists excessive total compensation, Lee Health gave the cardiologists significant and improper financial incentives to make more referrals to Lee Health for cardiac procedures and surgeries in violation of the Stark Law.

123.    Effective October 1, 2010, Lee Health entered into written Employment Agreements (the "2010 Cardiologist Employment Agreements") with four cardiologists – Dr. Murali M. Muppala, Dr. Vladimir Ilic, Dr. Brian K. Arcement and Dr. James F. Butler.  See Exhibits 12, 13, 14 and 15 attached hereto.  Prior to October 1, 2010, those cardiologists were in private practice and not employed by Lee Health.  Lee Health had similar financial arrangements that violated the Stark Law with other cardiologists including, without limitation, Dr. Robert M.

Grohowski, Dr. Brian C. Taschner, Dr. Steven T. Lee, Dr. Subhash Kshetrapal, Dr. James A. Conrad, Dr. Lynne C. Einbinder, Dr. Erick M. Burton, Dr. Michael A. Corbellini, Dr. Roshan K Vatthyam, Dr. Richard A. Chazal, Dr. Michael D. Danzig and Dr. Edward A. Palank (these cardiologists and Drs. Muppala, Ilic, Arcement and Butler are collectively referred to herein as the "Cardiologists"). See EPIC All Groups Summary – Service Provider Procedures Quantity – May 2014 attached hereto as Exhibit 16.

124.    While knowing that the Cardiologists were being paid in violation of the Stark Law, Lee Health included sham provisions that were not enforced in each of the 2010 Cardiologist Employment Agreements: "Physician's compensation paid pursuant to this Agreement shall be consistent with fair market value at all times.   Physician's compensation pursuant to this amendment [sic] will be reviewed and possibly adjusted annually after the Initial Term [36 months] to comply with fair market value determination and to ensure compliance with applicable state and federal laws and regulations governing physician compensation." Ex. 12 at 5-6.  In fact, the compensation payable under the 2010 Cardiologist Employment Agreements substantially exceeded fair market value and was not commercially reasonable.  Moreover, the compensation was not reviewed annually to ensure compliance with state and federal laws and regulations governing physician compensation.   Contractual terms in the employment agreements to the contrary were ignored.

125.    Lee Health credited the Cardiologists for work RVUs actually performed by extenders in cardiac procedures at Lee Health.    The inclusion of extender production in the Cardiologists' compensation contributed, in part, to Lee Health paying total compensation to the Cardiologists in excess of FMV.  Not only did the Cardiologists get credit at the physicians' wRVU rates for wRVUs performed by extenders (i.e., not personally performed by the physicians), but

Lee Health inflated the Cardiology bonus pool by only allocating a portion of Lee Health's expenses related to employing the physician extenders, so the physicians were receiving more funds than if they had employed the extenders themselves in private practice. This cost-shift to the hospital increased the profitability of the pay-to-play scheme for the referring physicians, and was commercially unreasonable in the absence of referrals.

126.    Additionally, Lee Health provided to the Cardiologists at least one extender, nurse practitioner ("NP") Vicki Hayes, **at no cost** to the Cardiologists. See attached Exhibit 17 at 7. The inclusion of Vicki Hayes' production in the Cardiologists' compensation contributed, in part, to Lee Health paying total compensation to the Cardiologists in excess of FMV. Lee Health paying all of the costs associated with Vicki Hayes while paying the Cardiologists compensation relating to Vicki Hayes' production was commercially unreasonable in the absence of referrals.

127.    Many of the Cardiology NPs' services were billed to Medicare as "incident to" a physician service with the physician identified as the "Bill Provider." Although the physician was identified as the Bill Provider (and no other service provider was identified when the services were billed to Medicare on an "incident to" basis), in many instances the physician was not the actual service provider because the service was performed solely by the NP. Ex. 16. Lee Health employed the Cardiology NPs and was the entity entitled to reimbursement from the Government for the services actually performed by the NPs employed by the hospital. However, Lee Health was paying the Cardiologists as the "Bill Provider" for services actually performed by the NPs and not personally performed by the physicians. Ex. 16. Given the compensation scheme, the amounts paid to the Cardiologists were up to $53.00 per work RVU for services actually performed by the NPs. Exhibits 12 through 15 (Exhibit A thereto). The inclusion of extender production in the Cardiologists' compensation at the Cardiologists' wRVU rates did not reflect the lower cost of

extender production and contributed, in part, to Lee Health paying total compensation to the Cardiologists in excess of FMV.

128.   In the course of the 2014 audit, Relator obtained spreadsheets (Exhibits 16 and 18) that analyze Cardiology Clinical Activity and categorically distinguish between Service Provider and Bill Provider for the month of May 2014.  The summary spreadsheet shows unequivocally that Lee Health paid the Cardiologists for services actually performed by PAs and NPs who were Lee Health employees.  Ex. 34.  For example, Lee Health included all wRVUs for services actually performed by hospital-employed nurse practitioner Vicki Hayes in the Cardiologists' compensation, and paid the physicians compensation for those extender-performed wRVUs at the physicians' wRVU rates.  The summary spreadsheet calculates that NP Vicki Hayes actually performed 412 procedures in May 2014, but fully 362 of these procedures were billed under and credited to a Cardiologist who did not personally perform the procedure, thereby increasing the physicians' wRVUs and ultimately the compensation paid to them. *Id.,* at 1.  The spreadsheet also shows that Dr. Muppala billed and received wRVU compensation credit for 289 procedures in May 2014 that he did not personally perform; rather, the procedures were personally performed by the Cardiology NPs.  *Id.*  The inclusion of extender production in the Cardiologists' compensation contributed, in part, to Lee Health paying total compensation to the Cardiologists in excess of FMV.

129.   A temporal comparison between the work RVUs of four of the Cardiologists before Lee Health hired them, and after Lee Health hired them, demonstrates the effect on the Cardiologists' wRVUs.  After the Cardiologists became employed by Lee Health in October 2010, the work RVUs reported by each Cardiologist dramatically increased far above and beyond what

the Cardiologists had reported while working in private practice.  The dramatic increase in RVU production for the Cardiologists was quantified by Lee Health as follows:

| Cardiologist Work RVUs | | | | |
|---|---|---|---|---|
| **Cardiologist** | **CY 2009** <br> Private Practice | **FYE Oct. 2010** <br> Private Practice | **FYE Oct. 2011** <br> Hosp. Employed | **FYE Oct. 2012** <br> Hosp. Employed |
| Dr. Muppala | 15,088 | 17,477 | 27,195 | 26,906 |
| Dr. Ilic | 12,589 | 13,246 | 20,423 | 23,718 |
| Dr. Arcement | 12,001 | 12,459 | 19,633 | 22,400 |
| Dr. Butler | 11,292 | 12,434 | 18,541 | 22,858 |

Dr. Arcement's, Dr. Ilic's and Dr. Muppala's wRVUs all went up 64% in the first year after Lee Health hired them.  Dr. Butler's wRVUs went up even more, 67%.  Obviously, these four cardiologists did not all simultaneously increase their productivity by 64% or more just because Lee Health hired them.  When Lee Health paid the Cardiologists compensation at the rate of $53.00 per wRVU on these dramatically increased wRVU totals, the Cardiologists' total compensation exceeded FMV.

130.    Lee Health knew the scheme was working and that it was paying Cardiologists total compensation exceeding FMV in violation of the Stark Law and then submitting false claims to the Government for services referred  by the Cardiologists.

131.    Each claim submitted by Lee Health to a federally-funded health care program, including Medicare and Medicaid, for an inpatient or outpatient service that was provided to a patient referred by a Cardiologist who was paid by a Cardiologist Illegal Compensation Arrangement constitutes a false claim under the False Claims Act.

132.   As System Director for Internal Audit at Lee Health, part of the Relator's job was to review physician compensation arrangements with Cardiologists Muppala, Ilic, Arcement, and Butler.  Relator's 2014 Audit Report pointed out to Lee Health that procedures performed by physician extenders and auxiliary staff were added to the wRVU productivity of the Cardiologists and that increased those physicians' compensation.  Ex. 9 at 7.  This fact was highlighted and flagged to Lee Health management as creating a "compliance risk" since the services were not personally performed by the physicians as required per the contracts [the 2010 Cardiologist Employment Agreements]."  *Id.*

133.   Relator's 2014 Audit Report to management raised yet an additional compliance risk:   Lee Health was only allocating to the physician compensation pool 50% of Lee Health's costs (salaries and benefits) for the three physician extenders assisting the Cardiologists despite the fact that nurse practitioner Vicki Hayes was being provided to the physicians at <u>no cost</u> at all. *Id.*  That meant Lee Health was giving away - at no cost to the physicians  - 50% of the costs of the extenders.  These facts were referenced as an additional "compliance risk" because the reduced extender cost and providing an extender at no cost represented revenues that were derived from the physicians' referrals of DHS to Lee Health.   *Id.*   The Report recommended that these compensation arrangements be reviewed with Legal Services.  *Id.*

134.   Lee Health's total compensation paid to the referring cardiologists was grossly in excess of fair market value and thus in violation of the Stark Law, and Lee Health knew it.  By way of example, Lee Health paid each of four Cardiologists total cash compensation for the calendar year 2013 as follows:

<div style="border: 1px solid black; text-align: center;">

**Cardiologist Cash Compensation**

</div>

| **Cardiologist** | **CY 2013** |
|------------------|-------------|
| Dr. Murali M. Muppala | $1,420,721 |
| Dr. Vladimir Ilic | $1,526,947 |
| Dr. Brian K. Arcement | $1,201,474 |
| Dr. James F. Butler | $1,184,533 |

Source:  Employee paystubs and Form W-2's for 2013.

135.    In 2014, Lee Health conducted an analysis of the total compensation paid to those four Cardiologists in the same fashion applicable to the Neurosurgeons discussed above.  Lee Health's Director of Physician Compensation and Practice Acquisitions determined that Lee Health paid total compensation to each of four Cardiologists in 2013 (Muppala, Ilic, Arcement and Butler) that exceeded fair market value compensation.  The 2014 analysis specifically determined that Lee Health paid total compensation to Drs. Muppala, Ilic, Arcement and Butler in 2013 that exceeded fair market value based on the 90th percentile of MGMA benchmarks for Physician Compensation for Cardiology: Invasive-Interventional for the year 2013 and could not be justified by wRVU productivity even assuming the physicians personally performed all wRVUs (which was not true because Drs. Muppala, Ilic, Arcement and Butler were credited with wRVUs performed by physician extenders). See Lee Health's Compensation and Production Analyses attached as Exhibits 19, 20, 21 and 22. Importantly, Lee Health took **no** steps to reduce the compensation of those cardiologists (or any of the Cardiologists) in order to comply with the Stark Law.  Lee Health continued submitting claims to the Government for inpatient cardiology procedures referred by the Cardiologists making them false claims.  Lee did so because those procedures were so lucrative to Lee Health.

136.    Based on Relator's direct extensive knowledge of Lee Health's billing processes gained by auditing Lee Health's physician and hospital billing and coding throughout her tenure as Director of Lee Health's Internal Audit Department for more than ten years, Relator knows that Lee Health billed Medicare and Medicaid tens of millions of dollars for designated health services (including inpatient and outpatient hospital services and procedures) referred by the Cardiologists to Lee Health while Lee Health paid the Cardiologists total compensation that exceeded FMV and was commercially unreasonable in the absence of referrals in violation of the Stark Law. 42 U.S.C. § 1395nn(a)(1)(B). While the Stark Law requires that commercial reasonableness is determined as if no referrals were made, Relator knows that the Cardiologists made referrals to Lee Health for designated health services in violation of the Stark Law. *See* ¶¶ 17-28, 114-117 above. All Lee's claims to the Government for services referred by the Cardiologists while knowingly paying them in violation of the Stark Law are  false claims under the FCA, 31 U.S.C. § 3729(a)(1)(A).

137.    As an example, in fiscal year 2014, Lee Health billed Medicare for facility fees relating to 349 stent insertions under DRG 247 and Lee Health received $3.624 Million dollars from Medicare for those claims.  Exhibit 23**.**  Of those 349 actual claims submitted to Medicare, 193 claims were billed under Lee Memorial Hospital's Provider ID Number, and 156 claims were billed under Gulf Coast Medical Center's Provider ID Number.   Relator knows based on her knowledge of Lee Health's billing processes and her knowledge of the particular surgical procedures that the Cardiologists performed that many of these Medicare claims are for inpatient hospital services referred by the Cardiologists in violation of the Stark Law.  Thus the claims are false claims under FCA.  The value of the facility fee on an inpatient stent insertion was much greater than the associated professional fees, providing Lee Health with a strong financial incentive to reward the Cardiologists for referrals of these procedures.

138.     All these payments were made pursuant to false express certifications submitted by Lee Health in claims submitted by Lee Health to Medicare for professional services performed by the Cardiologists to the effect that Lee Health complied with the Stark Law.  All such claims were materially false because federal law prohibits payment of any claims from Medicare or Medicaid services provided in violation of the Stark Law.

## G.     Pulmonologists

139.     Lee Health's pulmonology compensation arrangements ("Pulmonologist Illegal Compensation Agreements") also violated the Stark Law because Lee Health paid:   (1) compensation for personally performed services based on rates per wRVU that vary with the annual total of wRVUs credited to each pulmonologist; (2) compensation for services performed by hospital-employed extenders (i.e., not personally performed by the pulmonologists) but credited and paid to the pulmonologists at the pulmonologists' wRVU rates which do not reflect the lower cost of using physician extenders; (3) 50% shares of bonus pools based on production of physician extenders to the extent such production was not already added to the pulmonologists' wRVUs and paid at the pulmonologists' wRVU rates; (4) $12,000 per year per physician allegedly to supervise extenders; and (5) compensation for unnecessary and duplicative medical directorships.  By paying the pulmonologists excessive total compensation, Lee Health gave the pulmonologists significant and improper financial incentives to make more referrals to Lee Health of inpatient and outpatient hospital services (designated health services) in violation of the Stark Law.

140.     Lee Health entered into a written Employment Agreement with pulmonologist Dr. Rich Juda effective July 23, 2007.  Such Employment Agreement provided: "While physician is on the productivity based comp plan, office-based physician extender salary and benefit costs (net of collections) will be factored into RVU/salary calculations between the physicians that utilize or

supervise their care and *receive RVU value for their work*." *Id. (*emphasis added.)  Thus Lee Health was crediting Dr. Juda with the extenders' work RVUs and paying him for work that he did not personally perform.  Dr. Juda also received compensation for call coverage under the ICU Night Pilot Program, in addition to his wRVU-based compensation.

141.   Relator prepared an audit report dated March 29, 2011 reviewing physician compensation of certain pulmonary critical care physicians at a Lee Health hospital known as Gulf Coast Medical Center (the "2011 Audit Report"), a copy of which is attached as Exhibit 24**.**  In the 2011 Audit Report, focusing on Dr. Juda's compensation arrangements, Relator warned Lee Health that the cumulative compensation (including extenders' work production and call coverage) "may potentially exceed fair market." Ex. 24 at 2.

142.   In 2012, Lee Health entered into written Employment Agreements with three additional pulmonologists, Dr. Razak A. Dosani, Dr. Abusayeed M. Feroz, and Dr. Sagar K. Naik (the "Pulmonologists"), each effective as of March 26, 2012 (the "2012 Pulmonary Employment Agreements").  Exhibits 25, 26 and 27.

143.   Each of the 2012 Pulmonary Employment Agreements expressly provided that "When the physicians are on the productivity based compensation plan, any impact of Physician extender salary and benefit cost net of their collections will be split between the number of physicians utilizing the extender and will be factored into RVU/salary calculations.  When the collections attributable to the midlevel are more than the expenses attributable to the midlevel, the difference will be split between the employed physicians who oversee the midlevel and LMHS equally (50% each)." Ex. 25 at 12.  Thus, each of the 2012 Pulmonary Employment Agreements split the profits *Lee Health made* on using extenders with the Pulmonologists.   The inclusion of

a 50% share of extender production in the Pulmonologists' compensation contributed to Lee Health paying total compensation to the Pulmonologists in excess of FMV.

144.   In addition to the 50/50 split of hospital profit made on using extenders, Lee Health entered into an Addendum with each Pulmonologist providing $12,000 per year, per physician, "to train, mentor and supervise critical care advanced providers so that they can properly perform medical procedures."  See Addendum to Employment Agreement for Drs. Dosani, Feroz and Naik attached as Exhibits 28, 29 and 30.

145.   Lee Health also entered into various Addenda with Dr. Dosani and Dr. Feroz providing for hourly-based compensation for various medical directorships, including duplicative and unnecessary agreements with both Dr. Dosani and Dr. Feroz to serve as the Medical Director of the Intensive Care Unit.  See Addendum to Employment Agreement for Drs. Dosani and Feroz attached as Exhibits 31 and 32.

146.   Each of the 2012 Pulmonary Employment Agreements specified that "Physician's compensation paid pursuant to this Agreement shall be consistent with fair market value at all times.  Physician's compensation pursuant to this amendment [sic] will be reviewed and amended annually to ensure compliance with applicable state and federal laws and regulations governing physician compensation."  Ex. 25 at 11 (page 2 of Exhibit A).  In fact, the total compensation paid by Lee Health to the Pulmonologists exceeded fair market value and was not reviewed annually to ensure compliance with state and federal laws and regulations governing physician compensation.  These contractual terms were conveniently ignored by Lee Health.

147.   Indeed, after the Pulmonologists became employed by Lee Health in March 2012, the work RVUs reported by and attributable to each Pulmonologist was substantially greater than the work RVUs previously documented in the 2011 Audit Report.  See Exhibits 24 and 33 for

previously documented work RVUs.   The post-employment work RVUs for fiscal year ended February 2013 were as follows: Dr. Razak A. Dosani, 20,200; Dr. Abusayeed Feroz, 22,122; Dr. Sagar Naik, 14,476.   See Exhibits 34, 35 and 36.   When Lee Health paid the Pulmonologists compensation at the rate of $45.00 per wRVU on these dramatically increased wRVU totals, the Pulmonologists' total compensation exceeded FMV.

148.   Lee Health paid the Pulmonologists additional compensation based on services actually performed by the following PAs and NPs:  Janice M. Kirk, Eric A. Jordan, Ira Saunders, Dolan K. Abu Aouf and Debra L. Berry.   The inclusion of extender production in the Pulmonologists' wRVUs at the physicians' wRVU rates contributed, in part, to Lee Health paying total compensation to the Pulmonologists in excess of FMV.

149.   Lee Health paid each Pulmonologist total cash compensation in excess of FMV for the calendar year 2013 as follows:

| **Pulmonologist Cash Compensation** | |
|---|---|
| **Pulmonologist** | **CY 2013** |
| Dr. Razak A. Dosani | $  991,189 |
| Dr. Abusayeed M. Feroz | $1,014,997 |
| Dr. Sagar K. Naik | $  630,361 |

Source:  Employee paystubs and Form W-2's for 2013.

150. In the 2011 Audit Report, Relator warned Lee Health's management as follows:

> Although the individual compensation arrangements may be at fair market value, the cumulative compensation paid to the physicians may potentially exceed fair market given that the physicians are (1) high productivity physicians and (2) each individual compensation arrangement is at the high end of the market survey data.

> Additionally, the high number of hours worked by these physicians on a consistent basis creates the potential for patient safety and quality issues.

Ex. 24 at 2.

151.   Moreover, in the course of an audit conducted by Relator on behalf of the hospital in 2014, Relator obtained spreadsheets that analyze pulmonary clinical activity that show unequivocally that Lee Health included extender production in the wRVUs of the Pulmonologists, contributing to Lee Health paying total compensation to the Pulmonologists in excess of FMV. Ex. 16 at 2-3.   Relator's 2014 audit report contained a preliminary report of audit findings regarding the Stark Law problems with the Pulmonologists' compensation arrangements (the "2014 Audit Report").  Ex. 9 at 13.  Relator's Report documented that extenders were regularly and improperly documenting certain work as if the physicians were the service providers.  "The procedures performed by the extenders and billed by the physicians were added to the wRVU production of the physicians for compensation purposes."  *Id.*  As was the case with the Neurosurgeons and Cardiologists, in her audit report, Relator recommended that, "Management should examine the compensation arrangements and consult with Legal Services to determine necessary remediation actions." *Id.*

152.   Additionally, in 2014, Lee Health's Director of Physician Compensation and Practice Acquisitions personally conducted an analysis of the compensation paid to the Pulmonologists and determined that Lee Health paid total compensation to each of Dr. Dosani and Dr. Feroz in 2013 that exceeded fair market value.    The 2014 analysis specifically determined that Lee Health paid total compensation to Dr. Dosani and Dr. Feroz in 2013 that exceeded fair market value based on being above the 90th percentile of MGMA benchmarks for "Physician Compensation for Pulmonary Medicine: General and Critical Care for the year 2013" and could not be justified by wRVU productivity even assuming the physicians personally performed all

wRVUs (which was not true because Drs. Dosani and Feroz were credited with wRVUs performed by physician extenders). See Compensation and Production Analysis for Drs. Dosani and Feroz attached as Exhibits 37 and 38.  Lee Health took no remedial action to modify or reduce the compensation and falsely submitted bills for its services referred by Drs. Dosani and Feroz to Medicare and Medicaid.

153.   Relator discussed the internal compensation analysis relating to excessive pulmonology compensation and the findings of the 2014 Audit Report with The Director of Physician Compensation and Practice Acquisitions and other key Lee Health executives in June 2014.  Lee Health knew it was violating the Stark Law but was willing to do so because of the revenues Lee Health made from these Pulmonologists' referrals.

154.   Based on Relator's direct, extensive knowledge of Lee Health's billing processes gained by auditing Lee Health's physician and hospital billing and coding throughout her tenure as Director of Lee Health's Internal Audit Department for more than ten years, Relator knows that Lee Health billed Medicare and Medicaid millions of dollars for designated health services (including inpatient and outpatient hospital services and procedures) referred by the Pulmonologists to Lee Health while Lee Health paid the Pulmonologists total compensation that exceeded FMV and was commercially unreasonable in the absence of referrals in violation of the Stark Law.  42 U.S.C. § 1395nn(a)(1)(B).  While the Stark Law requires that commercial reasonableness is determined as if no referrals were made, Relator knows that the Pulmonologists made referrals to Lee Health for designated health services in violation of the Stark Law. *See* ¶¶ 17-28, 114-117 above. All these claims are false claims under the FCA. 31 U.S.C. § 3729(a)(1)(A).

155.   As an example, in fiscal year 2014, Lee Health billed Medicare for facility fees relating to 181 instances of respiratory system diagnosis with ventilator support under DRG 208

and Lee Health received $2.284 Million dollars from Medicare.  Exhibit 39.  Of those 181 actual claims submitted to Medicare, 90 claims were billed under Lee Memorial Hospital's Provider ID Number, 51 claims were billed under Gulf Coast Medical Center's Provider ID Number, and 40 claims were billed under Cape Coral Hospital's Provider ID Number.  Relator knows based on her knowledge of Lee Health's billing processes and her knowledge of the particular professional services that some of these Lee Health Medicare claims are for inpatient hospital services referred by the Pulmonologists in violation of the Stark Law.  Because Lee Health knew it was paying the referring Pulmonologist in violation of the Stark Law when it submitted such claims to Medicare, the claims are false claims under FCA.  The value of the facility fee under DRG 208 was much greater than the associated professional fees, providing Lee Health with a strong incentive to reward the Pulmonologists for such referrals.

156.   All these payments were made pursuant to false express certifications of compliance with the Stark Law submitted by Lee Health in claims to Medicare for professional services performed by the Pulmonologists. All Lee's claims for services submitted pursuant to referrals from the Pulmonologists while knowingly paying them compensation that violated the Stark Law were materially false because federal law prohibits payment of any claims by Medicare or Medicaid for services provided in violation of the Stark Law.

157.   Each claim submitted by Lee Health to a federally-funded health care program, including Medicare and Medicaid, for an inpatient or outpatient service provided to a patient referred by a physician with Pulmonary Illegal Compensation Arrangements constitutes a false claim under the False Claims Act.

H.      **Medical Directorships**

158.    The allegations above relate to physicians employed by Lee Health.  Lee Health also paid unlawful compensation to physicians it did not employ.  In addition to illegally incentivizing employed physicians as described above, Lee Health violated the Stark Law by paying excessive  compensation to physicians it did *not* employ under the guise of medical directorship agreements.

159.    Lee Health entered into an agreement for medical director services beginning January 1, 2004 with Dr. James W. Orr, Jr., a gynecologic oncologist in private practice with 21st Century Oncology, to act as Medical Director of the Lee Cancer Care Program (the "Orr Director Agreement").  The Agreement for Medical Director Services was renewed effective January 1, 2009, and that agreement is attached as Exhibit 40**.**  The Orr Director Agreement provides for an annual fee of $450,000 for administrative work that is increased annually by the greater of 2% or the published increase in the Consumer Price Index.  *Id.,* at 2.  During the term of this Agreement, Dr. Orr has maintained and actively operated his private medical practice separate and distinct from Lee Health.  He made referrals to Lee Health for the provision of designated health services, including without limitation the administration of cancer drugs and the facility fees relating to inpatient and outpatient hospital services such as endoscopies.

160.    Lee Health and Dr. Orr amended the Orr Director Agreement to as of January 1, 2013 to add the following provision:

> Physician agrees to provide a minimum of thirty (30) hours of service per week.  Should Physician provide less than the required minimum of hours, Physician's compensation will be adjusted to a prorated amount based upon the hours during which Physician actually provided services.  Physician's hours will be reviewed on a monthly basis and a monthly average will be utilized in calculating whether Physician has provided the minimum number of hours of service.

*See* First Amendment to Agreement for Medical Director Services attached as Exhibit 41, p. 1.

The aggregate services contracted for under the Orr Director Agreement, as amended, exceed those that are reasonable and necessary for the legitimate business purpose of the arrangement and the compensation exceeds fair market value in violation of the Stark Law.

161.    Relator reviewed supporting documentation for services rendered by Dr. Orr and other physicians receiving compensation from Lee Health pursuant to medical directorship agreements.  Relator prepared and issued an audit report dated November 6, 2013 with the results of this review.  See Audit Report re: Supporting Documentation for Services Rendered by Medical Directors attached as Exhibit 42.  Relator's Report recommended "immediate attention" to Dr. Orr's medical directorship and challenged the value of the marketing services supposedly performed by Dr. Orr as a basis for the excessive compensation.  *Id.,* at 2-3.  Relator also had repeatedly reported medical directorship compliance issues to the former Chief Compliance Officer, Charles Swain, and other Lee Health senior management.  Relator noted in a 2011 Audit Report on medical directorships that Dr. Orr's compensation for his medical directorship exceeded a reasonable fair market value for a work week of 30 hours based on benchmarks in the Physician Executive Compensation Survey (published by the American College of Healthcare Executives) for administrative compensation of physician executives in a medical director position. Lee Health deliberately ignored and recklessly disregarded the medical directorship compliance issues, just as Lee Health deliberately ignored and recklessly disregarded the many other compliance issues that Relator identified and reported during her 10-year tenure. See, for example, Exhibits 9, 24 and 42.

162.    Relator's 2013 audit report found 453 hours of Dr. Orr time documented as relating to marketing services, such as "letters to community physicians who are treating these patients (i.e. Obstetrics/Gynecology, Internal Medicine) to remind them of the various Lee Cancer programs." *Id.,* at 4. The 2013 Report estimated that Lee Health had paid Dr. Orr $128,000 for such marketing

services and not for any administrative services described and required in the Agreement.  Ex. 42 at 3.  As a result, the compensation paid to Dr. Orr for marketing services was determined in a manner that took into account the volume and value of referrals or other business generated by Dr. Orr by performing marketing services for the benefit Lee Health, in violation of the Stark Law. Based on Relator's direct, extensive knowledge of Lee Health's billing processes gained by auditing Lee Health's physician and hospital billing and coding throughout her tenure as Director of Lee Health's Internal Audit Department for more than ten years, Relator knows that Lee Health submitted claims to Medicare for designated health services (including inpatient and outpatient hospital services and procedures) referred by Dr. Orr while Lee Health knowingly paid Dr. Orr compensation that varied with the volume or value of referrals, exceeded FMV and was commercially unreasonable in the absence of referrals in violation of the Stark Law. 42 U.S.C. § 1395nn(a)(1)(B). While the Stark Law requires that commercial reasonableness is determined as if no referrals were made, Relator knows that Dr. Orr made referrals to Lee Health for designated health services in violation of the Stark Law. *See* ¶¶ 17-28, 114-117 above. 31 U.S.C. § 3729(a)(1)(A).

163.    No Stark Law exception applies to render Lee Health's compensation of Dr. Orr compliant with the Stark Law.  Given that Dr. Orr was paid total compensation that exceeded fair market value for the services described in his Agreement, Lee Health could not reasonably have concluded that the compensation arrangements in that contract were fair market value for Dr. Orr's services as described in the Orr Director Agreement or were reasonable and necessary for the legitimate business purpose of the arrangement.  Lee Health knew it was in violation of the Stark Law and knowingly submitted false claims for services referred by Dr. Orr to the Government in violation of the FCA.

164.    Given that Dr. Orr received compensation that took into account his services in marketing to other physicians to induce referrals to Lee Health, and therefore the compensation was determined in a manner that took into account the volume or value of referrals or other business generated by the referring physician, Lee Health could not reasonably have concluded that Dr. Orr's compensation arrangements did not violate the Stark Law.  Lee Health knew it was in violation of the Stark Law and knowingly submitted false claims for reimbursement to the Government in violation of the FCA.

## LEGAL CLAIMS FOR RELIEF

### COUNT ONE

### (False Claims Act: Presentation of False Claims)

### (31 U.S.C. § 3729(a)(1) now § 3729(a)(1)(A))

165.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

166.    Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States, including those claims for reimbursement identified above, for designated health services furnished pursuant to referrals prohibited by the Stark Law.

167.    Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were true.

168.    Defendants' noncompliance with the Stark Law was material to the United States' decision to pay the false claims submitted by Defendants discussed above and material to the United States' ultimate legal authority to make payments to Defendants for those designated health services because the financial relationships with physicians present a risk of federal healthcare

programs and program beneficiaries of questionable or improper utilization of designated health care services.

## COUNT TWO

### (False Claims Act: Using False Statements to Get False Claims Paid)

### (31 U.S.C. § 3729(a)(2), now § 3729(a)(1)(B))

169.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

170.    Defendants made or used, or caused to be made or used, false records or statements regarding compliance with the Stark Law to get false or fraudulent claims paid and approved by the United States.   The false records or statements include the false certifications and representations made or caused to be made by Defendants when initially submitting the false claims for payments and the false certifications made by Defendants in submitting the cost reports.

171.    Defendants' false certifications and representations were made for the purpose of getting false or fraudulent claims paid and payment of the false or fraudulent claims was a reasonable and foreseeable consequence of Defendants' statements and actions.

172.    The false certifications and representations regarding compliance with the Stark Law made and caused to be made by Defendants were material to the United States' payment of the false claims because such payment is prohibited by statute due to the Congressional decision that these financial relationships with physicians present a risk of federal healthcare programs and program beneficiaries of questionable or improper utilization of designated health care services.

173.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## COUNT THREE

**(False Claims Act: False Record Material to Obligation to Pay)**

**(31 U.S.C. § 3729(a)(7), now § (a)(1)(G))**

174.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

175.    Defendants made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

176.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

177.    Defendants' noncompliance with the Stark Law was material to the United States' decision to pay the false claims submitted by Defendants discussed above and refrain from recovering overpayments and material to the United States' ultimate legal authority to make payments to Defendants for those designated health services because such payments are prohibited by statute due to the Congressional decision that these financial relationships with physicians present a risk to federal healthcare programs and program beneficiaries of questionable or improper utilization of designated health care services.

## <u>PRAYER</u>

**WHEREFORE**, Relator prays for judgment against Defendants as follows:

(a)    On Count One under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper; and

(b)    On Count Two under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together

with all such further relief as may be just and proper; and

(c)     On Count Three under the False Claims Act, for the amount of the United States'
damages, trebled as required by law, and such civil penalties as are authorized by law, together
with all such further relief as may be just and proper; and

(d)     That Relator be awarded the maximum Relator share amount permissible according
to 31 U.S.C. § 3730(d); and

(e)     That judgment be granted for Relator against Defendants for any costs, including,
but not limited to, court costs, expert fees, and all attorneys' fees incurred by Relator in the
prosecution of this case, including, but not limited to, all attorney fees and costs available pursuant
to 31 U.S.C. § 3730(d); and

(f)     That the United States and Relator be granted such other and further relief as the
Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator-Plaintiff hereby
demands trial by jury on all claims alleged herein.


Dated: March 20, 2019

<div style="text-align:center"><strong>ATTORNEYS FOR RELATOR-PLAINTIFF</strong></div>

By:     /s/ Karen C. Dyer_____
        Karen C. Dyer
        Florida Bar No. 716324
        Boies Schiller Flexner LLP
        121 South Orange Avenue
        Suite 840N
        Orlando, FL 32801
        Ph: (407) 425-7118
        Fax: (407) 425-7047
        kdyer@bsfllp.com

George F. Carpinello
New York Bar No. 1652684
(Admitted *Pro Hac Vice*)
Teresa A. Monroe
New York Bar No. 4427779
(Admitted *Pro Hac Vice* Admission)
Boies Schiller Flexner LLP
30 South Pearl Street, 11th Floor
Albany, NY 12207
Ph: (518) 434-0600
Fax: (518) 434-0665
gcarpinello@bsfllp.com
tmonroe@bsfllp.com

Marlan B. Wilbanks
Georgia Bar No. 758223
(Admitted *Pro Hac Vice*)
Susan S. Gouinlock
Georgia Bar No. 303217
(Admitted *Pro Hac Vice*)
Wilbanks & Gouinlock, LLP
3414 Peachtree Road, NE
Suite 725
Atlanta, GA 30326
Ph: (404) 842-1075
Fax: (404) 842-0559
mbw@wilbanksgouinlock.com
ssg@wilbanksgouinlock.com

Scott C. Withrow
Georgia Bar No. 772330
(Admitted *Pro Hac Vice*)
Withrow, McQuade & Olsen, LLP
3379 Peachtree Road, NE
Suite 970
Atlanta, GA 30326
Ph: (404) 814-0200
Fax: (404) 814-0009
swithrow@wmolaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing has this 20th

day of March 2019 been furnished by Certified Mail, Return Receipt Requested to the following:


The Honorable William Pelham Barr
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Civil Process Clerk
United States Attorney's Office
Middle District of Florida
400 North Tampa Street
Suite 3200
Tampa, FL 33602

Civil Process
United States Attorney's Office
Middle District of Florida
2110 First Street
Suite 3-137
Fort Myers, FL 32902

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States District Court for the Middle District of Florida using the CM/ECF system, which will automatically serve a copy to counsel for all other parties in this case.


    /s/ Karen C. Dyer
        Karen C. Dyer