UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA and
ANGELA D'ANNA, ex rel.

      Plaintiffs,

v.                             Case No.:  2:14-cv-437-FtM-38NPM

LEE MEMORIAL HEALTH SYSTEM
and CAPE MEMORIAL HOSPITAL,
INC.,

      Defendants.
_____/

## OPINION AND ORDER[1]

      Before the Court is Defendants Lee Memorial Health System and Cape Memorial Hospital's Motion to Dismiss (Doc. 123).[2]  Relator Angela D'Anna responded in opposition (Doc. 127).  Lee Health replied (Doc. 131); D'Anna surreplied (Doc. 136); and Lee Health sur-surreplied (Doc. 140).  For these reasons, the motion to dismiss the Second Amended Complaint (the "Complaint") (Doc. 118) is granted in part and denied in part.  Specifically, the claims about the neurosurgeons can go forward, but not the other doctors.  Also, the requests for oral argument are denied (Docs. 124; 128).

---

[1] Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or websites.  These hyperlinks are provided only for users' convenience.  Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees.  By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites. Likewise, the Court has no agreements with any of these third parties or their websites. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

[2] Defendants are collectively called "Lee Health" below.

## BACKGROUND[3]

This is a *qui tam* case about Medicare and Medicaid fraud.[4]  Lee Health runs several hospitals in Lee County, Florida.  (Doc. 118 at 5-6).  And D'Anna worked at Lee Health for about eleven years until 2014.  (Doc. 118 at 4).  During that time, she was the System Director of Internal Audit.  (Doc. 118 at 4).  D'Anna's duties included auditing Lee Health's doctor compensation, along with the billing and coding for doctors and hospitals. (Doc. 118 at 4, 6-13).  So D'Anna had direct access to Lee Health's billing system and claims data, such as hospital and doctor claims submitted to Medicare.  (Doc. 118 at 7). In fact, she reviewed Medicare claims that Lee Health submitted for inpatient and outpatient hospital services referred to Lee Health by unlawfully compensated neurosurgeons.  (Docs. 118 at 11-13; 118-56; 118-57).  That unlawful pay is where this case begins.

The Complaint outlines a nine-year pay-to-play compensation scheme, by which Lee Health funneled improper referral fees and financial incentives to certain doctors. (Doc. 118 at 22-24).  This occurred between 2005 and 2014.  (Doc. 118 at 22).  There were four parts of the scheme, each concerning a separate group of doctors— neurosurgeons, cardiologists, pulmonologists, and a medical director.  (Doc. 118 at 25-63).  Every group had different compensation agreements with distinct allegations on their financial incentives.  (Doc. 118 at 25, 45, 53, 60).  The neurosurgeons, cardiologists, and pulmonologists' pay schemes partially overlapped because they were based on annual

---

[3] These are the allegations in the Complaint accepted as true and construed, along with any reasonable inferences, in a light most favorable to D'Anna.  *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).

[4] For these purposes, there is no meaningful distinction between Medicare and Medicaid, so Medicare is used as shorthand.

work relative value units ("wRVUs") that increased and credited the doctors with services performed by "extenders," like nurse practitioners.  (Doc. 118 at 25, 45, 53).  And they each had bonus pools, entitling them to different percentages of extender production.  (Doc. 118 at 25, 45, 53).  The neurosurgeons and cardiologists also received double payments for on-call coverage.  (Doc. 118 at 25, 45).  And the pulmonologists earned an extender supervision fee, along with duplicative medical directorships.  (Doc. 118 at 53).  Finally, the medical director collected an unreasonable salary for minimal work in exchange for referrals.  (Doc. 118 at 60-61).  The medical director was an oncologist in private practice, who Lee Health contracted with for nominal marketing services.  (Doc. 118 at 60-61).  But in reality, this was a sham to compensate the medical director for patient referrals.  (Doc. 118 at 60-61).

All these payments ran afoul the federal Stark Law, 42 U.S.C. § 1395nn, because they exceeded fair market value and were commercially unreasonable absent referrals.  (Doc. 118 at 22-24).  Every Medicare referral from those doctors for designated health services ("DHS") was a Stark violation.  (Doc. 118 at 23-24).  The DHS at issue are facility fees for inpatient and outpatient hospital services.  (Docs. 118 at 23, 37, 52, 58-59, 62; 127 at 5-6).  Later, Lee Health submitted those claims to Medicare for reimbursement, which violated the False Claims Act ("FCA").  (Doc. 118 at 23-24).  When submitting the initial reimbursement, known as an "interim claim," Lee Health certified compliance with Stark.  (Doc. 118 at 17-20).  At the end of a fiscal year, Medicare requires hospitals to file a "hospital cost report."  (Doc. 118 at 17-18).  Each hospital cost report contains a certification, which a hospital's chief administrator must sign, certifying that the hospital

complied with all laws and regulations, like the Stark Law.  (Doc. 118 at 18-19).  Lee Health's certifications were false statements under the FCA.  (Doc. 118 at 43-45, 53, 59).

D'Anna sued Lee Health under the *qui tam* provisions of the FCA.  (Doc. 118). After the Government declined to intervene (Doc. 48), D'Anna proceeded in the Government's name, 31 U.S.C. § 3730(c)(3).  Three FCA claims are at issue: Count 1 is a presentment count; Count 2 is a make or use count; and Count 3 is a reverse false claim.  (Doc. 118 at 63-65).  The Complaint alleges every Count against Lee Health for FCA violations related to each group of doctors.[5]  (Doc. 118 at 63-65).  A few months ago, Lee Health moved to dismiss, which the Court granted in full with leave to amend. (Doc. 117).  Now, Lee Health moves to dismiss again.  (Doc. 123).

## LEGAL STANDARD

An FCA pleading must satisfy Rules 8 and 9(b).  *Urquilla-Diaz*, 780 F.3d at 1051. Under Rule 8, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Rule 9(b), on the other hand, requires a party to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  To meet this heightened pleading standard, relators typically must "allege 'facts as to time, place, and substance of the defendant's alleged fraud,' particularly, 'the details of the defendants' allegedly fraudulent acts, when they occurred, and who

---

[5] It is unclear whether D'Anna alleges Count 2 against the medical director.

engaged in them.'" *Urquilla-Diaz*, 780 F.3d at 1051 (quoting *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1309 (11th Cir. 2002)).

## BACKGROUND LAW

Preliminarily, it is necessary to introduce the two statutes at issue—the FCA and Stark Law.

Under the FCA, private individuals can sue those who filed false claims for payment with the Government. 31 U.S.C. §§ 3729(a); 3730(b). Liability "arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal policies." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005). It is not enough for a relator to "describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Clausen*, 290 F.3d at 1311. "[S]ome indicia of reliability must be given in the complaint to support the allegation of *an actual false claim* for payment being made to the Government." *Id.*

D'Anna's FCA claims are based on violations of the Stark Law. At bottom, the Stark Law "prohibits doctors from referring Medicare patients to a hospital if those doctors have certain specified types of 'financial relationships' with that hospital." *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 698 (11th Cir. 2014) (quoting 42 U.S.C. § 1395nn(a)(1)(A)). Stark and its corresponding regulations define referrals broadly as a doctor's request of, or order for, DHS payable under Medicare. *See* 42 U.S.C. § 1395nn(h)(5)(A); 42 C.F.R. § 411.351. DHS includes patient and outpatient hospital services, like facility fees. 42 U.S.C. § 1395nn(h)(6)(K). Yet the Stark Law allows

certain referrals, such as those personally performed by the referring doctor.  42 C.F.R. § 411.351.  A Stark "financial relationship" includes compensation arrangements between doctors and hospitals.  42 U.S.C. § 1395nn(a)(2)(B).  But some compensation arrangements are not prohibited.  For instance, bona fide employment relationships and personal service arrangements are not financial relationships that preclude referrals.  42 U.S.C. § 1395nn(e)(2)-(3).  To meet those exceptions, a compensation agreement must be for "fair market value" without considering "the volume or value of any referrals," among other requirements.  *Id.*

## DISCUSSION

The Complaint meets Rule 9(b)'s pleading requirements for the neurosurgeons, but not three other groups of doctors.  So the neurosurgeons and other doctors are analyzed separately below.

### A.  Counts 1 and 2 Against the Neurosurgeons

For the neurosurgeons, the Court first addresses Counts 1 and 2 separately before discussing the two elements common to both.

#### 1.  *Count 1: Presentment Count*

In Count 1, the Complaint alleges a presentment count.  A presentment count arises for an FCA violation by a person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).  To state Count 1 with particularity, D'Anna "must allege the actual submission of a false claim."  *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1275 (11th Cir. 2018) (alteration accepted) (internal quotation marks and citation omitted).  "The key inquiry is whether the complaint includes 'some indicia of reliability' to support

the allegation that an actual false claim was submitted." *United States ex rel. Chase v. HPC Healthcare, Inc.*, 723 F. App'x 783, 789 (11th Cir. 2018) (quoting *Clausen*, 290 F.3d at 1311). "One way to satisfy this requirement is by alleging the details of false claims by providing specific billing information—such as dates, times, and amounts of actual false claims or copies of bills." *Id.* (citing *Hopper*, 588 F.3d at 1326). In the *qui tam* context, a relator provides a "representative claim" by supplying a sample false claim that the defendant submitted to the Government. *Mastej*, 591 F. App'x at 704.

Lee Health moves to dismiss the neurosurgeon presentment count for failure to plead the submission of false claims. (Doc. 123 at 14-18). D'Anna responds that the Complaint alleges several representative claims. (Doc. 127 at 3-14). Even without representative claims, relators need not allege specific billing data to survive a motion to dismiss when there are indicia of reliability. (Doc. 127 at 14-22). In the reply, surreply, and sur-surreply, the parties dispute the significance of the exhibits purporting to show actual false claims. (Docs. 131; 136; 140).

Unlike its previous iterations, the Complaint now provides four representative claims that show the submission of false claims for the neurosurgeons. (Docs. 118-58; 118-60). Reading two exhibits together, D'Anna explains four instances when Medicare paid for DHS referred by neurosurgeons with Stark-prohibited compensation. (Docs. 118 at 36-40; 118-58; 118-60). According to D'Anna, one exhibit contains actual claims for facility fees submitted by Lee Health and paid by Medicare in 2011. (Docs. 118 at 36-40; 118-58). A consultant prepared the exhibit during an audit—with D'Anna's help—after accessing patient billing and medical data. (Docs. 118 at 11-13, 36-37; 118-56; 118-57). Crucially, one column purportedly states the amount Medicare actually paid for the facility

fees, ranging from about $12,000 to $97,000.  (Doc. 118-58).  Looking at the other exhibit, D'Anna explains how it details the services performed by three Lee Health neurosurgeons.  (Doc. 118-60).  Those services are not the false claims at issue; rather, it is the resulting facility fee reflected in Doc. 118-58 that prompts FCA liability.  (Doc. 118 at 36-40).  These representative claims, taken with the allegations, show four actual false claims that Lee Health submitted to the Government, who paid the claims.  *See, e.g.*, *Mastej*, 591 F. App'x at 704 ("Providing exact billing data—name, date, amount, and services rendered—or attaching a representative sample claim is one way a complaint can establish the necessary indicia of reliability that a false claim was actually submitted.").

Lee Health argues neither exhibit shows the submission of false claims.  (Docs. 123 at 14-17; 131 at 4-7; 140 at 2-3).  It challenges the veracity of the exhibits through an alleged inconsistency between the exhibits and pleading.  Specifically, Lee Health argues that Exhibit 60 shows private insurers paying for physician services, so Exhibit 58 cannot be for Medicare Part A facility fee claims.  Yet D'Anna explains how patients can have Medicare Part A along with private insurance instead of Medicare Part B.  (Doc. 136).  Much of Lee Health's position asks the Court to weigh the evidence and make inferences, which is improper at this stage.  *See Clausen*, 290 F.3d at 1313 ("When Rule 9(b) applies to a complaint, a plaintiff is not expected to actually *prove* his allegations, and we defer to the properly pleaded allegations of the complaint.").  For instance, one patient has Medicare Part B listed as payor of physician services in Exhibit 60.  (Doc. 118-60).  This dovetails with D'Anna's theory that Exhibit 58 shows actual Medicare Part A payments on behalf of the patient.  While Lee Health notes Exhibit 60 also lists a private insurer for that

patient, resolving disputed facts is a matter left for another day.  Lee Health's additional claim that D'Anna alleged no basis of knowledge flops as well.  The Complaint details how D'Anna audited the neurosurgeons and reviewed these false claims.  (Docs. 118 at 11-13, 36-37; 118-56; 118-57).

In sum, the exhibits specifically identify the patients, doctors, procedures, and dates associated with allegedly false claims.  (Docs. 118-58; 118-60).  Along with that identification, these exhibits show facility fees submitted to and paid by Medicare, listing the exact amount Lee Health received.  (Docs. 118 at 36-40; 118-58; 118-60).  And the Complaint describes why these claims are false and the basis for D'Anna's direct knowledge of reviewing these claims.  (Docs. 118 at 11-13, 36-40; 118-56; 118-57).  Accepting the well-pled allegations as true, these exhibits show the who, what, where, when, and how of false neurosurgery claims submitted to Medicare.  *See Corsello*, 428 F.3d at 1013-14.  The cases Lee Health relies on are all distinguishable because those relators failed to plead submission with particularity.  *See id.*; *Carrel*, 898 F.3d at 1276-77; *Atkins*, 470 F.3d at 1359.  Given this conclusion, it is unnecessary to consider D'Anna's fifth representative claim, which the Court discussed in the last order.  (Doc. 117 at 11-12).

Thus, Count 1 is sufficient on the FCA violations for neurosurgeon claims.

*2. Count 2: Make or Use Count*

In Count 2, the Complaint alleges a make or use count.  A make or use count creates FCA liability when someone "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).  To succeed, D'Anna must show "(1) the defendant made (or caused to

be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim." *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017).  Like the submission of false claims above, the false statement element must be pled with particularity.  *See Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1329 (11th Cir. 2009).

Lee Health moves to dismiss the neurosurgeon make or use count because the Complaint fails to allege false statements to the Government.  (Doc. 123 at 18-21). Unsurprisingly, D'Anna disagrees, arguing the Complaint pleads several false statements through certifications of compliance.  (Doc. 127 at 25-28).

Here, the representative claims described above show Lee Health submitted claims that the Government paid.  (Docs. 118-58; 118-60).  As the Complaint explains, Lee Health certified compliance with the Stark Law when it submitted claims.  (Doc. 118 at 16-20, 43-45).  D'Anna also offers several exhibits detailing hundreds of actual neurosurgery claims that Lee Health billed Medicare for professional services.  (Docs. 118-61; 118-62; 118-63).  Without more, these professional services claims may not be enough to show false certifications for resulting facility fees.  But when considered alongside the representative claims and the alleged basis of her knowledge, D'Anna provides enough indicia of reliability that Lee Health made false statements material to false claims.  Even if D'Anna could not point to a specific false certification, the Complaint explains her involvement in an audit of neurosurgery claims billed to Medicare where D'Anna accessed billing data.  (Doc. 118 at 43-45).  And the Complaint alleges each claim generated facility fees Lee Health billed after falsely certifying compliance with Stark. (Doc. 118 at 43-44).  So the Complaint "provide[s] the required indicia of reliability by

showing that [D'Anna] personally was in a position to know" that Lee Health made false statements "and had a factual basis for [her] alleged personal knowledge."   *Mastej*, 591 F. App'x at 707-10 (holding that relator pled indicia of reliability in part for the make or use count based on a false certification theory).   Thus, the Complaint pleads false statements with the particularity Rule 9(b) requires.   *See United States ex rel. Stepe v. RS Compounding LLC*, 325 F.R.D. 699, 708 (M.D. Fla. 2017).

So Count 2 survives on the FCA violations for neurosurgeon claims.

*3. Stark Violations Underlying Neurosurgeon Claims*

Next, it is necessary to address the underlying Stark violations, which render the neurosurgeon claims and certifications in Counts 1 and 2 false.   The Complaint relies on the following theory: Lee Health paid neurosurgeons in violation of the Stark Law, so any referrals the doctors made flouted Stark; and when Lee Health submitted Medicare claims for facility fees, those were false claims.   (Docs. 118 at 2; 127 at 5-6).   Critical to this theory is the contention that the compensation agreements between the doctors and Lee Health violated the Stark Law.   Specifically, the Complaint alleges that Lee Health contracted with neurosurgeons to pay them more than fair market value in a non-commercially reasonable fashion.

Many allegations focus on this issue.   While Lee Health contends the Complaint does not allege D'Anna's expertise on fair market value of doctor compensation, that argument lacks merit.   One of D'Anna's central duties as an auditor was to review and analyze those compensation issues.   (Doc. 118 at 4 ("D'Anna is an expert in physician compensation issues . . . [who] audited all critical processes of Lee Health's healthcare system, including physician compensation.").   In detail, the Complaint provides the

neurosurgeons' compensation agreements with Lee Health, outlines the Stark violations, and explains why submission of Medicare claims for facility fees generated by the doctors constitute false claims.  (Doc. 118 at 22-45).  At this stage, that is enough to plead these false claims with particularity under Rule 9(b).

Lee Health also points at several cases to argue relators "must allege a benchmark of fair market value against which Defendants' compensation arrangements with physicians can be tested."  (Doc. 123 at 29 (alterations accepted) (quoting *United States ex rel. Schaengold v. Mem'l Health Inc.*, No. 4:11-cv-58, 2014 WL 7272598, at *11 (S.D. Ga. Dec. 18, 2014)).  While that requirement is somewhat unsettled in the Eleventh Circuit, *see Schaengold*, 2014 WL 7272598, at *11, the Complaint nevertheless alleges the compensation agreements exceed fair market value based on a national benchmark. For neurosurgeons, the Complaint describes how salaries exceeded the benchmark, providing reports to support the allegations.  (Docs. 118 at 25-34; 118-1; 118-7; 118-8; 118-9).  Lee Health's focuses on whether this is a reliable or comprehensive benchmark, but that is a factual dispute not decided on a motion to dismiss.  *United States ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 09-22253-CIV, 2013 WL 1289260, at *8 (S.D. Fla. Mar. 27, 2013) ("[T]he Court's role is only to determine whether Relator plausibly alleges that [defendant] was charging [fees] inconsistent with fair market value—not to determine definitely whether the figure Relator advances, in fact, represents fair market value.").

Finally, Lee Health argues that the Complaint fails to allege an excessive compensation scheme occurring simultaneously with the representative false claims from 2011.  (Doc. 123 at 27-28).  But that is exactly what D'Anna pleads.  The Complaint

outlines excessive neurosurgeon pay from 2005 to 2014.  (Doc. 118 at 25-34).  And the Complaint describes ways the compensation scheme exceeded fair market value after an amendment in 2010, including paying neurosurgeons twice for on-call coverage and crediting them for work done by extenders.  (Doc. 118 at 29-31).  On those allegations, the pay-to-play scheme was underway when Lee Health submitted the neurosurgeons' representative claims in 2011.  (Doc. 118 at 29).

Thus, the Complaint alleges false claims under Stark.

*4.  Knowledge of False Neurosurgeon Claims*

Finally, Counts 1 and 2 have a knowledge element.  31 U.S.C. § 3729(a)(1)(A)-(B).  Unlike the other elements of a *qui tam* case, relators can plead scienter generally.  *Urquilla-Diaz*, 780 F.3d at 1051.  "For liability to attach, the relator must show that the defendant acted 'knowingly,' which the Act defines as either 'actual knowledge,' 'deliberate ignorance,' or 'reckless disregard.'"  *Id.* at 1058 (quoting 31 U.S.C. § 3729(b)(1)).  When analyzed under the familiar Rule 8 framework, the Complaint satisfies the pleading requirements on Lee Health's knowing violations of the FCA.  *See United States ex rel. McFarland v. Fla. Pharmacy Sols.*, 358 F. Supp. 3d 1316, 1329 (M.D. Fla. 2017).  D'Anna alleges Lee Health's senior executives were repeatedly warned of the various issues with doctor compensation, explaining how they could violate the Stark Law.  (Doc. 118 at 27-28, 32-34, 58).  In fact, D'Anna pleads that the director of neurosurgery knew salaries exceeded fair market value but resisted bringing pay into compliance with Stark.  (Doc. 118 at 31-32).  Accepted as true, the Complaint depicts Lee Health's awareness of the violations and decision to continue submitting false claims and certifications.

So the Complaint alleges knowing FCA violations.

**B. Counts 1 and 2 Against the Cardiologists, Pulmonologists, and Medical Director**

Where Counts 1 and 2 succeed on neurosurgeon claims, they each fall flat for the other doctors. Again, Rule 9(b) requires pleading with particularity on the submission of false claims and false statements for the presentment and make or use counts. Because neither Count 1 nor Count 2 meet this standard, they are addressed together. *See United States ex rel. Klusmeier v. Bell Constructors, Inc.*, 469 F. App'x 718, 721 n.5 (11th Cir. 2012).

D'Anna asserts Lee Health submitted false Medicare claims for facility fees generated by the cardiologists, pulmonologists, and medical director then made false compliance certifications. (Doc. 118 at 45-63). Lee Health moves to dismiss as to these doctors because the Complaint does not plead the submission of false claims or statements. (Docs. 123 at 11-13; 131 at 2-4). In response, D'Anna contends representative claims are not necessary for each referring doctor, relying on her knowledge of Lee Health's billing process. (Doc. 127 at 11-12, 14-22).

For the cardiologists, pulmonologists, and medical director, Count 1 does not present the requisite indicia of reliability on the submission of false claims. About those doctors, the Complaint repeats almost cut-and-paste allegations on submission of claims to Medicare. These are the allegations for the cardiologists' false claims:

> Based on Relator's direct extensive knowledge of Lee Health's billing processes gained by auditing Lee Health's physician and hospital billing and coding throughout her tenure as Director of Lee Health's Internal Audit Department for more than ten years, *Relator knows that Lee Health billed Medicare* and Medicaid tens of millions of dollars for designated health services (including inpatient and outpatient hospital services and procedures) referred by the

> Cardiologists to Lee Health while Lee Health paid the
> Cardiologists total compensation that exceeded [fair market
> value] and was commercially unreasonable in the absence of
> referrals in violation of the Stark Law.

(Doc. 118 at 52) (emphasis added); *see also* (Doc. 118 at 58) (the pulmonologists); (Doc. 118 at 62) (the medical director).  Yet in that paragraph, D'Anna never states what Rule 9(b) requires from relators—the actual submission of false claims.  *E.g.*, *Clausen*, 290 F.3d at 1311.  Instead, the Complaint alleges that D'Anna "knows" Lee Health submitted false claims by billing Medicare because she had general knowledge of Lee Health's billing process.  (Doc. 118 at 52-53, 58-59, 62).  But standing alone, the Eleventh Circuit explained, that cannot satisfy Rule 9(b)'s particularity requirement on the submission of false claims.  *Carrel*, 898 F.3d at 1275 ("Indeed, even if the relator is an insider who alleges awareness of general billing practices, an accusation of 'underlying improper practices alone is insufficient absent allegations that a *specific fraudulent claim was in fact submitted* to the government.'" (alterations accepted) (quoting *Corsello*, 428 F.3d at 1014)).

The allegations of false statements for the cardiologists, pulmonologists, and medical director in Count 2 fare no better.  Here is the description of Lee Health's false certifications for cardiologists:

> All these [facility fee] payments were made pursuant to
> false express certifications submitted by Lee Health in claims
> submitted by Lee Health to Medicare for professional services
> performed by the Cardiologists to the effect that Lee Health
> complied with the Stark Law.

(Doc. 118 at 53); *see also* (Doc. 118 at 59).  Nothing in the Complaint provides any specific examples of Lee Health making false statements by improperly certifying compliance with the Stark Law for these doctors.  So Count 2 also falls short of Rule 9(b)'s

particularity requirement.  *See McFarland*, 358 F. Supp. 3d at 1330 (dismissing because relator failed to identify a specific false record or statement).

It is "clear that even if a relator 'asserts direct knowledge of a defendant's billing and patient records,' she still must allege 'specific details' about false claims to establish 'the indicia of reliability necessary under Rule 9(b).'"  *Carrel*, 898 F.3d at 1276 (alterations accepted) (quoting *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1302 (11th Cir. 2010)).  Here, D'Anna fails to allege specific false claims or statements related to the cardiologists, pulmonologists, or medical director.  That flaw is usually fatal in the Eleventh Circuit.  *E.g.*, *Clausen*, 290 F.3d at 1311-12 (agreeing that "failure to allege with any specificity if—or when—any actual improper claims were submitted to the Government is indeed fatal to [relator's] complaints").

Even leaving that aside, the Complaint still fails to allege with any particularity the basis for D'Anna's knowledge of false claims or statements related to these doctors.  *See Mastej*, 591 F. App'x at 704 ("[A] relator with *direct, first-hand knowledge of the defendants' submission of false claims* gained through her employment with the defendants may have a sufficient basis for asserting that the defendants actually submitted false claims." (emphasis added)).  The Complaint never describes how D'Anna knows Lee Health submitted false claims or made false statements.  Rather, the Complaint outlines the various pay-to-play schemes for these three groups of doctors before making conclusory accusations on false claims and statements.  *See* (Doc. 118 at 52, 58, 62).  But a detailed description of the fraudulent scheme, accompanied by a general, unsupported allegation that defendant submitted claims, is not enough.  *Clausen*, 290 F.3d at 1311-12.  D'Anna was the System Director of Internal Audit with access to

billing information.  (Doc. 118 at 4, 6-13).  Yet there are no allegations on the basis for D'Anna's knowledge that Lee Health submitted false claims and made false statements for these three doctors.  *See Mastej*, 591 F. App'x at 704 ("At a minimum, a plaintiff-relator [relying on personal knowledge] must explain the basis for her assertion that fraudulent claims were actually submitted.").  In short, the Compliant cannot meet the indicia of reliability required by Rule 9(b) from pleading that D'Anna "knows" FCA violations occurred because she had access to general billing data.  *See Carrel*, 898 F.3d at 1277-78 ("[R]elators failed to explain how their access to possibly relevant information translated to knowledge of actual tainted claims presented to the government.").

For support, D'Anna points to several exhibits.  Two exhibits were found lacking on the last motion to dismiss.  (Docs. 118-23; 118-39).  They show total Medicare facility fees that Lee Health billed for certain cardiology and pulmonology procedures in two years.  But as explained a few months ago, the exhibits do not specify the doctors, patients, dates, or amounts of false claims.  So "these exhibits fail to demonstrate 'the who, what, where, when, and how of fraudulent submissions to the government.'"  (Doc. 117 at 12 (quoting *Corsello*, 428 F.3d at 1014)).  Nor do the relevant audit reports help because they either predated these doctors' employment or show no review of submitted Medicare claims or compliance certifications.  At most, these documents relate to Stark violations—showing that unlawfully compensated doctors made referrals—but Stark violations do not create FCA liability without more.  *E.g.*, *Mastej*, 591 F. App'x at 706.

As explained above, the allegations for the neurosurgeons are enough.  And D'Anna hangs her hat on the argument that relators need not plead representative claims for every doctor who made unlawful referrals, so the claims against these doctors can

proceed.  (Doc. 127 at 11-12).  D'Anna cites two non-binding cases most relevant to that proposition, which held relators' sufficient pleadings on parts of fraudulent schemes could support other alleged schemes.  *United States ex rel. Longest v. Dyncorp*, No. 603CV816ORL31JGG, 2006 WL 47791, at *4-5 (M.D. Fla. Jan. 9, 2006); *United States ex rel. Heater v. Holy Cross Hosp., Inc.*, 510 F. Supp. 2d 1027, 1036 (S.D. Fla. 2007).  These cases are distinguishable as the relators there provided more information to support their allegations.  *See Longest*, 2006 WL 47791, at *4-5 (providing "sufficient indicia of reliability to satisfy Rule 9(b) as to every scheme alleged"); *Heater*, 510 F. Supp. 2d at 1036.  And the controlling authority D'Anna cites is inapposite.  *See United States ex rel. Matheny v. Medco Health Sols. Inc.*, 671 F.3d 1217, 1226-27 (11th Cir. 2012) (noting that only some representative claims are necessary for a single scheme); *Clausen*, 290 F.3d at 1312 n.21 (expressing that some information must be pled "for at least some of the claims"); *see also United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (stating that relator must show "defendants *actually submitted* reimbursement claims for the services he describes").

Moreover, later Eleventh Circuit precedent cautions against applying that non-binding principle here.  *See Carrel*, 898 F.3d at 1278-79 ("The relators cannot rely on their sweeping accusations that lack the 'who, what, where, when, and how' of the supposedly fraudulent submissions." (quoting Corsello, 428 F.3d at 1014)).  There are no representative claims relating to these doctors.  This is not dispositive.  *Mastej*, 591 F. App'x at 707.  But relators without specific claims must still "establish 'some indicia of reliability to support the allegation of *an actual false claim* for payment being made to the Government.'"  *Id.* (alteration accepted) (quoting *Clausen*, 290 F.3d at 1311).  Each group

of doctors had distinct compensation agreements and allegedly accepted different forms of unlawful compensation.  Some of those pay-to-play schemes overlapped in part; whereas others—like the medical director—diverged from the others in every way.  (Doc. 118 at 60-62).  Because these schemes involved distinct practice groups of doctors, D'Anna must offer some indicia of reliability that each was involved in the broader scheme and Lee Health submitted false claims and made false statements about them.  *See Mastej*, 591 F. App'x at 704; *see also United States ex rel. Silva v. VICI Mktg., LLC*, 361 F. Supp. 3d 1245, 1255 (M.D. Fla. 2019) ("[D]ismissal of an FCA claim is proper under Rule 9(b) when a complaint is 'devoid of specific allegations with respect to each defendant' and 'lumps together all of the defendants in its allegations of fraud.'" (alterations accepted) (quoting *Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007)).  Although a representative claim for each practice group may not be necessary, D'Anna fails to offer indicia of reliability that Lee Health ever submitted false claims or made false statements related to the cardiologists, pulmonologists, and medical director.  *Cf. United States ex rel. Walker v. R&F Props. of Lake Cty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005) (holding that the "allegations [were] sufficient to explain why [relator] believed [defendant] submitted false or fraudulent claims for services rendered by nurse practitioners and physician assistants 'incident to the service of a physician'").  A contrary conclusion requires the inferential leap that Lee Health's submission of false claims for one distinct group of doctors taints every doctor earning excessive compensation.  *But see Clausen*, 290 F.3d at 1312 n.21 ("We cannot make assumptions about a [FCA] defendant's submission of actual claims to the Government without stripping all meaning from Rule 9(b)'s requirement of specificity.");

*Corsello*, 428 F.3d at 1013 ("Although we construe all facts in favor of the plaintiff when reviewing a motion to dismiss, we decline to make inferences about the submission of fraudulent claims.").

In *Mastej*, a relator provided indicia of reliability on part of an alleged scheme. 591 F. App'x at 707-09.  At issue there was a three-year scheme, with a separate improper trip in the second year.  *Id.* at 709.  But relator's employment with defendant ended after the first year.  *Id.*  The Eleventh Circuit held that relator's indicia of reliability evaporated after his job ended and limited the scheme to the first year.  *Id.* at 709-10.  For the other years and the trip, relator was left with "generalized and conclusory" allegations on the submission and payment of false claims, which "do not satisfy Rule 9(b)'s particularity requirement" alone.  *Id.* at 709.  Likewise, here, D'Anna's allegations over the submission of false claims and false statements for the cardiologists, pulmonologists, and medical director are generalized and conclusory.  Any overlap between the discrete parts of the scheme relates to how excessive salaries were calculated—not the submission of false claims or statements.  Without any indication that D'Anna had a basis to know Lee Health submitted false claims or statements, these claims fail in part like the relator's claims in *Mastej*.  *See id.*; *see also Carrel*, 898 F.3d at 1277-78.

After detailing the fraudulent scheme, relators must "provide the next link in the FCA liability chain: showing that the defendants" submitted false claims or made false statements.  *Atkins*, 470 F.3d at 1359; *see also Carrel*, 898 F.3d at 1276; *Clausen*, 290 F.3d at 1313.  For these doctors, the Complaint is insufficient.  To the extent that Counts 1 and 2 allege FCA violations for claims of the cardiologists, pulmonologists, and medical director, those are dismissed with prejudice.

**C. Count 3: Reverse False Claim**

Finally, the Complaint pleads a reverse false claim under 31 U.S.C. § 3729(a)(1)(G) in Count 3.  As amended, a reverse false claim lies when a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  *Id.*  So "relators must show that the defendants owed an obligation to pay money to the United States at the time of the allegedly false statements."  *See Matheny*, 671 F.3d at 1223.  An obligation "means an established duty, whether or not fixed, arising from . . . statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).

Like above, the Complaint alleges a sufficient reverse false claim over the neurosurgeons, but not the other doctors.  Because Counts 1 and 2 were insufficient for the cardiologists, pulmonologists, and medical director, the Complaint failed to allege an obligation to repay the Government.  *See Mastej*, 591 F. App'x at 706 n.20; *see also Matheny*, 671 F.3d at 1223; *United States ex rel. Parker v. Space Coast Med. Assocs., L.L.P.*, 94 F. Supp. 3d 1250, 1263-64 (M.D. Fla. 2015).

As for the neurosurgeons, Lee Health challenges the Complaint's sufficiency on three elements of a reverse false claim.  First, it contends D'Anna fails to allege a false record or statement.  (Doc. 123 at 22).  The parties dispute whether a false statement is necessary under the amended statute.  Regardless, as discussed above, there were false statements relating to the neurosurgeons.  Second, Lee Health asserts there are insufficient facts on the obligation to repay the Government.  (Doc. 123 at 23-24).  But if

the neurosurgeons' claims violated FCA, then Lee Health had an obligation to repay.  *See Stepe*, 325 F.R.D. at 709.  So this point fails.  And third, Lee Health questions the pleading surrounding its knowing retention of overpayments.  (Doc. 123 at 24).  Again, relators can allege scienter generally, and the Complaint plausibly explains how Lee Health knew about overpayments and did not repay the funds.

As with Counts 1 and 2, Count 3 is dismissed with prejudice to the extent that it concerns the cardiologists, pulmonologists, and medical director.  And Count 3 can proceed for the neurosurgeons.

### D.  Conclusion

In sum, Counts 1, 2, and 3 survive in part.  As they relate to the neurosurgeons, these claims are enough for this stage.  But for the cardiologists, pulmonologists, and medical director, the claims are dismissed with prejudice.  The motions for oral argument are denied.  (Docs. 124; 128).  *See Roberts v. FNB S. of Alma, Ga.*, 716 F. App'x 854, 857 (11th Cir. 2017).  Because of the dismissal in part and complex nature of the case, within fourteen days D'Anna must file an amended complaint consistent with this Order.  Specifically, D'Anna must remove the allegations related to the partially dismissed Counts about the cardiologists, pulmonologists, and medical director.  Then, Lee Health must file its answer within fourteen days.

Accordingly, it is now

**ORDERED:**

(1)  The Motion to Dismiss (Doc. 123) is **GRANTED and DENIED in part**.

(2)  The Requests for Oral Argument (Docs. 124; 128) are **DENIED**.

(3) Relator must **FILE** a Third Amended Complaint **on or before August 13, 2019**, consistent with this Order by removing the allegations on the dismissed claims.  Defendants shall **FILE** their answers to the Third Amended Complaint **on or before August 27, 2019**.

**DONE** and **ORDERED** in Fort Myers, Florida this 30th day of July, 2019.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record