**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

UNITED STATES OF AMERICA
*ex rel.*, ANGELA D'ANNA,

      Plaintiff,

v.

                              Case No. 2:14-cv-00437-JLB-NPM

LEE MEMORIAL HEALTH SYSTEM
et al.,

      Defendants.

_____/

**THE UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION AND BRIEF FOR JUDGMENT ON THE PLEADINGS DISMISSING THE THIRD AMENDED COMPLAINT (ECF 142) AND CHALLENGE TO THE CONSTITUTIONALITY OF THE FALSE CLAIMS ACT (DKT. NO. 268), CORRECTED[1]**

In accordance with its Notice of Intervention under 28 U.S.C. § 2403(a) for the purpose of defending the constitutionality of the *qui tam* provisions of the False Claims Act filed contemporaneously herewith, the United States submits this Opposition to Defendants' Motion and Brief for Judgment on the Pleadings Dismissing the Third Amended Complaint (ECF 142) and Challenge to the Constitutionality of the False Claims Act (Defendants' Motion) (Dkt. No. 268) filed on April 30, 2024.

Defendants contend that the *qui tam* provisions of the False Claims Act – a statute that has been the United States' primary tool for fighting fraud for 160 years –violate the Appointments Clause, the Executive Vesting Clause, and the Take Care Clause of the U.S.

---

[1] After filing this brief earlier today, the United States discovered an error in footnote six and files this corrected version with the new text of footnote six.

Constitution.   This Court should leave decades of precedent intact and – like every federal circuit to consider these arguments and numerous courts in this district – hold that the *qui tam* provisions of the False Claims Act do not violate the Constitution.

## I.      Background of this *Qui Tam* Action

This case involves allegations that Defendants violated the False Claims Act (FCA), 31 U.S.C. §§ 3729–3733, by submitting claims to Medicare for designated health services that were referred by certain hospital-employed physicians with whom Defendants had financial arrangements that violated the Stark Law, 42 U.S.C. § 1395n.   Dkt. No. 36.   Specifically, the Relator alleges that these financial arrangements violated the Stark Law because the compensation that Defendants paid to the physicians exceeded fair market value and therefore did not meet a Stark Law exception, rendering the referrals from the physicians to the Defendant hospitals unlawful.   *Id.*

The United States notified the Court on August 15, 2018, that it was declining to intervene.   Dkt. No. 48.   The Government's Notice apprised the Court of the requirement set forth in Section 3730(b)(1) of the FCA that the "action [may] be dismissed only if the Court and the Attorney General give written consent to the dismissal and their reasons for consenting," and requested, therefore, that the Court solicit the written consent of the United States before granting approval of any dismissal, settlement, or termination of the action.

In addition, the United States' Notice reserved its right to seek dismissal of the Relator's action or claim pursuant to 31 U.S.C. § 3730(c)(2)(A); noted its right to intervene in the action at a later date for good cause pursuant to 31 U.S.C. § 3730(c)(3); requested that it be served with all pleadings in the action as provided for by 31 U.S.C. § 3730(c)(3) and all notices of appeal; and

reserved its right under 31 U.S.C. § 3730(c)(3) to order deposition transcripts.
Dkt. No. 48.

The Relator thereafter proceeded to litigate the action as a private party on behalf of the government, as provided for by the statute.   *See* 31 U.S.C. § 3730(b)(4)(B) (when the United States "declines to take over the action . . . the person bringing the action shall have the right to conduct the action.").

Defendants filed a motion to dismiss on November 12, 2018.   Dkt. No. 86.   The Court granted the motion, Dkt No. 117, and on March 20, 2019, the Relator filed her Second Amended Complaint.   Dkt. No. 118.   On April 19, 2019, Defendants filed a motion to dismiss the Second Amended Complaint.   Dkt. No. 123.   On July 30, 2019, the Court granted in part and denied in part that motion.   Dkt. No. 141.   On August 8, 2019, the Relator filed her Third Amended Complaint, which is the operative complaint in the case.   Dkt. No. 142.

This case is currently in discovery.   On April 30, 2024, Defendants filed the instant motion challenging the constitutionality of the *qui tam* provisions of the FCA.   Dkt. No. 268. On May 17, 2024, the Court issued an order (Dkt. No. 273) "certify[ing] to the Attorney General of the United States that the constitutionality of the *qui tam* provision of the False Claims Act, 31 U.S.C. § 3730, has been called into question in this case."   The order directs the Attorney General to notify the Court if the United States intends to intervene pursuant to 28 U.S.C. § 2403(a) no later than July 1, 2024.   *Id.*   Under 28 U.S.C. § 2403(a), the United States has an unconditional right to intervene in "any action . . . wherein the constitutionality of any Act of Congress affecting the public interest is drawn into question . . . ."   As noted above, the United States has filed its Notice of Intervention under section 2403(a) contemporaneously with this

Opposition.[2]

## II.    History of *Qui Tam* Provisions and Statutory Framework

The essence of the *qui tam* mechanism is that a private party may bring suit because of a wrong done to the sovereign and is entitled to a share of the recovery if the action is successful. This mechanism has deep historical roots in English and American law.   The Supreme Court observed, for example, that "[s]tatutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our [G]overnment."   *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.4 (1943) (quoting *Marvin v. Trout*, 199 U.S. 212, 225 (1905)).   The Court has since reiterated the "long tradition of *qui tam* actions in England and the American Colonies," as well as the "considerable number" of such statutes that the First Congress itself enacted.   *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774, 776–77 (2000).

*Qui tam* statutes were among the first category of legislation enacted in our Nation's history.   The First Congress passed, and President George Washington signed, a "considerable number" of such statutes, *see Stevens*, 529 U.S. at 776–77 & nn.5–7, and subsequent early Congresses and Presidents did the same.   *See* Claire M. Sylvia, *The False Claims Act: Fraud Against the Government* § 2:5 (Aug. 2023); Act of Feb. 20, 1792, ch. 7, § 25, 1 Stat. 232, 239 (2d Cong.; Post Office); Act of Mar. 1, 1793, ch. 19, § 12, 1 Stat. 329, 331 (2d Cong.; trading with Indians); Act of Mar. 22, 1794, ch. 11, §§ 1–2, 4, 1 Stat. 347, 349 (3d Cong.; international

---

[2]    The United States is intervening pursuant to 28 U.S.C § 2403(a) for the limited purpose of defending the constitutionality of the FCA's *qui tam* provisions.   The United States is not intervening under 31 U.S.C. § 3730(c)(3) of the FCA to take over the litigation.

slave trade); Act of May 19, 1796, ch. 30, § 18, 1 Stat. 469, 474 (4th Cong.; trading with

Indians); Act of Apr. 2, 1802, ch. 13, § 18, 2 Stat. 139, 145 (7th Cong.; trading with Indians);

Act of Apr. 29, 1802, ch. 36, §§ 3–4, 2 Stat. 171, 172 (7th Cong.; copyright); Act of May 3,

1802, ch. 48, § 4, 2 stat. 189, 191 (7th Cong.; mail carriers); Act of Mar. 26, 1804, ch. 38, § 10, 2

Stat. 283, 286 (8th Cong.; La. slave trade); Act of Mar. 2, 1807, ch. 22, § 3, 2 stat. 426 (9th

Cong.; slave trade).   The Second Congress also enacted a law providing generally for the award

of costs in *qui tam* cases, Act of May 8, 1792, ch. 36, § 5, 1 Stat. 277–78, suggesting that the *qui*

*tam* mechanism was a well-established feature of federal law.   "These early congressional

enactments 'provid[e] contemporaneous and weighty evidence of the Constitution's meaning.'"

*Haaland v. Brackeen*, 143 S. Ct. 1609, 1637 (2023) (quoting *Bowsher v. Synar*, 478 U.S. 714,

723 (1986)); *see also Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n*, No. 22-448, 2024

WL 2193873, at *8 (U.S. May 16, 2024).   Indeed, the enactment of *qui tam* statutes

immediately after the Founding clearly indicates that the framers viewed them as fully compliant

with Article II.

Thus, *qui tam* suits were not novel when Congress enacted the FCA in 1863.   *See* Act of

Mar. 2, 1863, Ch. 67, 12 Stat. 696 (1863).   The FCA was originally designed to "stop[] the

massive frauds perpetrated by large contractors during the Civil War."   *United States v.*

*Bornstein*, 423 U.S. 303, 309 (1976).   It authorized *qui tam* suits to "be brought and carried on

by any person, as well for himself as for the United States," and provided that the action "shall

be at the sole cost and charge of such person, and shall be in the name of the United States."

Act of March 2, 1863, § 4, 12 Stat. at 698 (1863).

The contemporary version of the FCA retains the basic structure of the *qui tam*

mechanism.   Under the current statute, the Attorney General may bring a civil action to recover treble damages and civil penalties for a violation of the FCA.   *See* 31 U.S.C. § 3730(a). Alternatively, a private person known as a "relator" may bring suit "for the person and for the United States Government."   *Id*. § 3730(b)(1).   The relator's complaint must be filed under seal and served upon the United States.   *Id.* § 3730(b)(2).   The government then has 60 days, subject to extension, to decide whether to intervene and take over the suit.   *Id.* § 3730(b)(2), (3).

If the United States intervenes, "the action shall be conducted by the Government."   *Id.* § 3730(b)(4)(A).   In that circumstance, the government "shall have the primary responsibility for prosecuting the action."   *Id*. § 3730(c)(1).   The government may intervene either initially or "at a later date upon a showing of good cause," *id*. § 3730(c)(3), and, upon doing so, may file its own complaint or amend the relator's complaint to add or clarify claims, *id*. § 3731(c).

If the United States declines to intervene, "the person bringing the action [*i.e.*, the relator] shall have the right to conduct the action."   *Id*. § 3730(b)(4)(B).   The relator, however, is neither the government nor its legal representative.   The relator does not appear on behalf of the United States, nor are his legal and factual representations those of the United States.   As the Supreme Court explained, he is a "private part[y]" seeking to vindicate his independent interest, which arises by virtue of the statute's "partial assignment of the Government's damages claim" to him.   *Stevens*, 529 U.S. at 773, 786 n.17; *see also* 31 U.S.C. § 3730(d) (entitling a relator to a share of the award if his action results in a financial recovery).   The government is not liable for any expenses the relator incurs in bringing suit.   31 U.S.C. § 3730(f).

Under the current version of the FCA, the United States retains substantial control over *qui tam* suits in which the Attorney General has declined to intervene.   For example, the United

States can veto a relator's proposed dismissal or settlement of an action or, conversely, dismiss or settle the action over the relator's objection.   *Id.* § 3730(b)(1), (c)(2)(A), (B); *see United States ex rel. Polansky v. Exec. Health Res., Inc.*, 143 S. Ct. 1720 (2023) (finding United States has power to dismiss *qui tam* actions over the relator's objection after intervention); *see also* U.S. Dep't of Just., Just. Manual § 4-4.111 (2021) (noting that the government's ability to dismiss *qui tam* actions "provide[s] an important tool to advance the government's interests, preserve limited resources, and avoid adverse precedent").   The United States is also entitled to copies of all pleadings and deposition transcripts, can limit discovery to avoid interference with a government investigation or prosecution, and can pursue alternate remedies against the defendant.   31 U.S.C. § 3730(c)(3)–(5).   Thus, the statute gives ultimate control of a *qui tam* action to the United States.

## III.   The FCA *Qui Tam* Provisions Are Constitutional.

Defendants' sprawling Motion essentially makes two arguments.   First, they contend that the *qui tam* provisions of the FCA violate the Appointments Clause, and the separation of powers doctrine embodied therein, by vesting relators with significant executive power without requiring them to be appointed as "Officers of the United States."   Second, they assert that these provisions interfere with the Executive's responsibility to take care that federal law is faithfully executed, as required by the Take Care and Vesting Clauses.   *See* Dkt. No. 268.

Neither of Defendants' arguments has merit.   Every federal court of appeals faced with these arguments has rejected them and recognized that the FCA's *qui tam* provisions are consistent with Article II of the Constitution.   *See United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir.

2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032

(6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993).   Moreover,

district courts within this circuit have reached the same conclusion.   *See United States ex rel.*

*Wallace v. Exactech, Inc.*, No. 7:18-cv-01010-LSC, 2023 WL 8027309, at *4 (N.D. Ala. Nov.

20, 2023); *United States v. Halifax Hosp. Med. Ctr.*, 997 F. Supp. 2d 1272, 1278 (M.D. Fla.

2014); *United States ex rel. Butler v. Magellan Health Servs., Inc.*, 74 F. Supp. 2d 1201, 1212

(M.D. Fla. 1999).[3]   For the reasons that follow, this Court should likewise hold that the *qui tam*

provisions of the FCA are constitutional.

      a.      **The FCA's *Qui Tam* Provisions Do Not Violate the Appointments Clause or the Separation of Powers Doctrine Embodied Therein.**

Defendants argue that the *qui tam* provisions of the FCA are unconstitutional because the

Relator is not an "officer of the United States," and under the Appointments Clause and

separation of powers principles Congress may not delegate "significant" executive power,

including the ability to litigate on behalf of the Government, to non-officers.   *See* Dkt. No. 268

at 17-19.   As explained below, Defendants' argument should be rejected.

The Appointments Clause specifies the permissible means of appointing "Officers of the

United States" to public offices "established by Law."   U.S. Const. art. II, § 2, cl. 2.

Defendants argue that the FCA's *qui tam* provisions are inconsistent with that clause.   Yet every

court of appeals faced with that argument has rejected it.   *See Stone,* 282 F.3d at 804–05; *Riley*,

252 F.3d at 757–58; *Taxpayers Against Fraud,* 41 F.3d at 1041; *Kelly*, 9 F.3d at 757–59.   *See*

*also Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1312 (11th Cir. 2021)

---

[3]     Defendants' 50-page Motion makes no mention of these cases, despite their direct relevance to the issues presented here.

8

(relying on the rationale of this authority in a case where Article II arguments were not presented).   As explained below, those decisions are correct.

The Supreme Court's reasoning in the *Stevens* case is dispositive of Defendants' Appointments Clause challenge.   In *Stevens*, the Supreme Court held that *qui tam* relators have Article III standing to pursue actions under the FCA.   *See Stevens*, 529 U.S. at 771–78.   While the Court did not decide whether the FCA's *qui tam* provisions are consistent with the Appointments Clause, *id*. at 778 n.8, the Court's analysis indicates that Defendants' Appointments Clause argument has no merit.

*First*, in holding that the FCA's *qui tam* provisions are consistent with Article III, the *Stevens* Court expressly declined to rely on a theory that a private relator sues as an "agent of the United States."   *Id.* at 772.   The Court observed instead that the relator's statutory entitlement to a share of any ultimate recovery gives him a concrete *personal* stake in the disposition of the suit, and concluded that "[t]he FCA can reasonably be regarded as effecting a partial assignment of the Government's damages claim."   *Id*. at 772–73.   After addressing standing, the Court held that the FCA does not authorize relators to pursue *qui tam* actions against States because, among other things, actions pursued by relators are "private suit[s]" brought by "private parties."   *Id*. at 780–81 n.9, 786 n.17.

The *Stevens* opinion leaves no room for Defendants' proposition that a relator in an FCA action operates as an officer of the United States.   The premise of Defendants' Appointments Clause argument—that the FCA's *qui tam* provisions authorize a Relator to "wield[] the authority to enforce the laws of the United States for an injury exclusively to the Government," Dkt. No. 268 at 22, simply cannot be squared with *Stevens*' rejection of the notion of the relator

as an "agent" of the United States and its explicit endorsement of the view that the relator acts a

private party pursuing his own claim, one that has been partially assigned by the United States.

*Second*, *Stevens* observed that, "immediately after the framing, the First Congress enacted

a considerable number of informer statutes," some of which (like the FCA) "provided both a

bounty and an express cause of action."   *Stevens*, 529 U.S. at 776–77.   Legislation "passed by

the first Congress assembled under the Constitution, many of whose members had taken part in

framing that instrument, is contemporaneous and weighty evidence of its true meaning."   *Marsh*

*v. Chambers*, 463 U.S. 783, 790 (1983) (quoting *Wisconsin v. Pelican Ins. Co*., 127 U.S. 265,

297 (1888)) (ellipsis omitted); *see Bowsher,* 478 U.S. at 723–24 (giving weight to the conclusion

of the First Congress that the Legislative Branch should have no role in the removal of Executive

officers); *Mistretta v. United States*, 488 U.S. 361, 401 (1989) (explaining that "'traditional ways

of conducting government give meaning' to the Constitution") (quoting *Youngstown Sheet &*

*Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)) (ellipsis omitted);

*Riley*, 252 F.3d at 752 (finding it "logically inescapable that the same history that was conclusive

on the Article III question in *Stevens* with respect to *qui tam* lawsuits initiated under the FCA is

similarly conclusive with respect to the Article II question concerning this statute"); *see also*

*NLRB v. Noel Canning*, 573 U.S. 513, 524–25 (2014) (putting "significant weight upon historical

practice" in interpreting the Recess Appointments Clause in Article II).

In addition to the guidance that *Stevens* provides, *qui tam* relators do not possess the

practical indicia of service as federal officers subject to the Appointments Clause.   The concept

of an "office" "embraces the ideas of tenure, duration, emolument, and duties."   *United States v.*

*Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1867); *see Auffmordt v. Hedden*, 137 U.S. 310, 327 (1890)

(merchant appraiser did not hold an office where his position was "without tenure, duration, continuing emolument, or continuous duties, and he act[ed] only occasionally and temporarily"); *United States v. Germaine*, 99 U.S. 508, 511–12 (1878) (surgeon did not hold an office where he was "only to act when called on by the Commissioner of Pensions in some special case").   An office is also not personal; rather, its "duties continue, though the person be changed."   *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747) (Marshall, C.J.).

The relator is instead a "private part[y]" pursuing civil litigation in his own personal interest.   *Stevens*, 529 U.S. at 786 n.17; *see Taxpayers Against Fraud*, 41 F.3d at 1041 ("Although a relator may sue in the government's name, the relator is not vested with governmental power.").   A relator is not empowered to "administ[er] and enforce[] . . . public law" in the constitutional sense.   *Id.* at 141 (1976).   By contrast, the government's own conduct in *qui tam* litigation is entrusted solely to officials within the Executive Branch.   A *qui tam* relator is more aptly analogized, not to an agency official who "exercis[es] powers reserved for Article II Officers," *see* Dkt. No. 268 at 18, but to a plaintiff who asserts a private right of action under a federal statute, such as Title VII or the Sherman Act.   Congress's decision to authorize private lawsuits may often rest in part on its belief that such actions will vindicate a societal interest in deterring and remedying violations of federal law.   As with plaintiffs who sue under other federal statutes, the potential for *qui tam* relators to furnish practical assistance in the enforcement of federal law does not transform them into "Officers of the United States" whose selection is governed by the Appointments Clause.

Further, the role of relators is limited in time and scope, confined to a particular case, and fundamentally personal in nature, stemming from the relator's capacity as a plaintiff pursuing

11

what is in essence a partially assigned claim.   *See Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018)

("[A]n individual must occupy a 'continuing' position established by law to qualify as an

officer.") (citing *Germaine*, 99 U.S. at 511).   In addition, "[r]elators are not entitled to the

benefits of officeholders, such as drawing a government salary."   *Stone*, 282 F.3d at 805; *see*

*Riley*, 252 F.3d at 757–58 (noting that relators "are not subject to either the benefits or the

requirements associated with offices of the United States").

        And neither a relator nor their attorney has any duty to subordinate the relator's interest

to that of the government if a conflict arises between those interests.   Rather, the task of

representing the United States in FCA litigation is entrusted to attorneys within the Department

of Justice, who can and do contest legal and factual representations made by relators in *qui tam*

actions.

        Moreover, although a statutory designation is not dispositive of the constitutional

question, *cf. Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 392–93 (1995); *Mistretta*,

488 U.S. at 393, it is notable that the FCA does not purport to "establish[] by Law" an "Office[]"

of informer or relator, U.S. Const. art. II, § 2, cl. 2.   Nor does the statute otherwise express an

intent that relators should be treated as federal officers.   To the contrary, the FCA provision that

authorizes *qui tam* suits is entitled "ACTIONS BY PRIVATE PERSONS."   31 U.S.C.

§ 3730(b).   *See Almendarez–Torres v. United States*, 523 U.S. 224, 234, 118 S.Ct. 1219, 1226,

140 L.Ed.2d 350 (1998) (noting that "the title of a statute and the heading of a section" are "tools

available for the resolution of a doubt" about the meaning of a statute).

        In addition, under the FCA's *qui tam* provisions, a relator's filing suit (or not filing suit)

does not limit the ability of the Department of Justice to decide whether a claim should be

pursued on behalf of the United States.   As the Eleventh Circuit has recognized, the United

States has "considerable authority over intervened and non–intervened *qui tam* actions."   *Yates*,

21 F.4th at 1312.   As explained in Section II. above, the FCA specifies that every *qui tam*

complaint must be filed under seal and served on the government precisely to ensure that the

United States can investigate the matter and determine whether it wishes to "intervene and

proceed with the action."   31 U.S.C. § 3730(b)(2).   If the government chooses to intervene, "the

action shall be conducted by the Government," *id*. § 3730(b)(4)(A), which "shall have the

primary responsibility for prosecuting the action, and shall not be bound by an act of the" relator.

*Id*. § 3730(c)(1); *see Polansky*, 143 S. Ct. at 1728 (noting that if the government intervenes, "the

relator loses control" and the action is "'conducted by the Government'").   The United States

can also "elect to pursue its claim through any alternate remedy available to the Government,

including any administrative proceeding to determine a civil money penalty," rather than

litigating the FCA suit.   *Id*. § 3730(c)(5).   And even if the United States declines to intervene or

to elect an alternate remedy, the FCA's statutory framework ensures that the government retains

a great deal of control over a *qui tam* suit.   This important aspect of the statutory structure was

underscored by the Supreme Court's *Polansky* decision.   In that case, the Court first held that

the government may intervene at any point in a *qui tam* case, agreeing with the lower court that

the "good cause" standard for intervention is "neither a burdensome nor unfamiliar obligation,"

but simply requires the government to proffer a "legally sufficient reason," such as intervention

for the purpose of moving to dismiss.   *Polansky*, 143 S. Ct. at 1729 n. 2.   The Court then

confirmed that, once the government has intervened, it assumes "primary responsibility" for the

suit, rejecting the relator's (and dissent's) argument that the government "take[s] a back seat" to

the relator.  *Id.* at 1732–33.   Lastly, the Court held that when the government moves to dismiss a *qui tam* suit, a district court should grant the motion "in all but the most exceptional cases." *Id.* at 1734.   The Court explained that the government's views on dismissal "are entitled to substantial deference" and dismissal is appropriate "even if a relator presents a credible assessment to the contrary."  *Id.*   Thus, any concerns that the *qui tam* mechanism "prevents the Executive Branch from accomplishing its constitutionally assigned functions" are diminished, not heightened, by the holding in *Polansky*.[4]

Defendants rely principally on *Buckley v. Valeo,* 424 U.S. 1 (1976), which they assert should govern here.   Based on the Supreme Court's analysis in that case, Defendants contend the *qui tam* provisions of the FCA run afoul of the Appointments Clause.   Dkt. No. 268 at 17. The pertinent issue in *Buckley* was whether a provision in the Presidential Election Campaign Fund Act, which provided that members of the Federal Election Commission (FEC) would be appointed by the President, the Speaker of the House of Representatives, and the President *pro tempore* of the Senate, violated the Appointments Clause.  *Buckley*, 424 U.S. at 1.   The Supreme Court determined that the functions of the FEC were executive, rather than legislative, and therefore that the Appointments Clause permitted only the President to appoint FEC members, with advice and consent of the Senate.  *Id.* at 138-141.   Thus, the Supreme Court struck down the provision in question.

---

[4]      The only constitutional question presented at this juncture is whether subjecting Defendants to suit at Relator's behest is consistent with Article II.   Any consideration of whether the statutory limits on the government's dismissal authority could create an Article II problem would be premature because the government has not sought to exercise that authority in this case.   Further, should the Court conclude that the FCA improperly constrains the government from exercising that authority, the appropriate remedy would be to declare the limits unconstitutional, not to invalidate the FCA's *qui tam* provisions in their entirety.

Defendants' reliance on *Buckley* is misplaced, as there are fundamental differences between members of the FEC and a *qui tam* relator.   The FEC positions in *Buckley* were ongoing offices endowed with "primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights."   *Buckley*, 424 U.S. at 140.   A *qui tam* relator, by contrast, is merely a "private part[y]" pursuing civil litigation in his own personal interest; he does not exercise governmental power, and he is assigned a share of the government's recovery only in a single case.   *Stevens*, 529 U.S. at 786 n.17; *see Taxpayers Against Fraud*, 41 F.3d at 1041.   The Supreme Court's analysis in *Buckley* emphasized the FEC's "extensive rulemaking and adjudicative powers."   424 U.S. at 110.   In particular, the Court noted that the Commission could bring civil enforcement actions without any "concurrence of or participation by the Attorney General," and "the decision not to seek judicial relief . . . appear[ed] to rest solely with the Commission."   *Id.* at 111.   Under the FCA's *qui tam* provisions, by contrast, a relator's filing suit (or not filing suit) does not limit the ability of the Department of Justice to decide whether to pursue a claim on behalf of the United States.   To the contrary, as the Eleventh Circuit has recognized, the United States maintains "considerable authority over intervened and non-intervened *qui tam* actions."   *Yates*, 21 F.4th at 1312.   Thus, the stark differences between the FEC members in *Buckley* and a *qui tam* relator renders that case irrelevant to the question at hand.

In sum, *qui tam* relators do not exercise the United States' prosecutorial authority, as argued by Defendants.   And, as noted above, private parties' pursuit of *qui tam* litigation is perfectly consistent with longstanding historical practice, which is strong evidence that the Framers did not view *qui tam* relators as "Officers" who must be appointed pursuant to the

Appointments Clause.

> **b.    The FCA's *Qui Tam* Provisions Do Not Violate the Take Care or Executive Vesting Clauses.**

Defendants' contention that *qui tam* actions violate the Take Care or Executive Vesting Clauses of Article II is also meritless.   Under the Take Care Clause, the President "shall take Care that the laws be faithfully executed."   U.S. Const. art. II, § 3.   The Vesting Clause states that "The executive power shall be vested in a President of the United States."   *Id*.   In assessing whether legislation "disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions."   *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977).   Defendants' primary contention is that the FCA's *qui tam* provisions "impermissibly infringe[] on the Executive's authority."   Dkt. No. 268 at 24.   Courts have long recognized, however, that *qui tam* litigation does no such thing.   *See Stone*, 282 F.3d at 805–07; *Riley*, 252 F.3d at 752–57; *Taxpayers Against Fraud*, 41 F.3d at 1041; *Kelly*, 9 F.3d at 749–57; *see also United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1154–55 (2d Cir. 1993).

> **i.    *Qui Tam* Litigation Does Not Infringe on Executive Authority**

Most fundamentally, regardless of whether the United States intervenes in a given suit, relators' conduct of *qui tam* litigation does not prevent the President from carrying out his constitutional functions—a point on which courts have long agreed.   As discussed above, the Supreme Court made clear in *Stevens* that *qui tam* relators are private litigants.   *Stevens*, 529 U.S. at, 772.   Expressly declining to adopt the theory that a private relator sues as an "agent of the United States," the Court held that, although it is the United States whose injury underlies an FCA suit, the relator has Article III standing because of his independent stake:   he has a

"concrete private interest in the outcome of the suit" that arises from Congress's "partial assignment of the Government's damages claim" to him.   *Id.* at 772-73.

That a relator brings a *qui tam* action "in the name of the Government," 31 U.S.C. § 3730(b)(1), is a procedural practice that does not alter this conclusion, and the merits analysis in *Stevens* further underscores the point.   After addressing standing, the Supreme Court held that the FCA does not authorize relators to pursue *qui tam* actions against states because actions pursued by relators are "private suit[s]" brought by "private parties."   *Stevens*, 529 U.S. at 780-81 n.9, 786 n.17; *see also United States ex rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 1167 (10th Cir. 2009).

That a relator's suit may also vindicate a federal interest in remedying and deterring fraud on the United States does not change the analysis.   As the *en banc* Fifth Circuit explained when it rejected a claim analogous to Defendants', the Take Care Clause "does not require Congress to prescribe litigation by the Executive as the exclusive means of enforcing federal law."   *Riley*, 252 F.3d at 753.   Instead, as the Sixth Circuit noted, "[o]ur current statutory framework includes many laws that authorize individuals to act as 'private attorneys-general,' bringing causes of action for the common weal," *Taxpayers Against Fraud*, 41 F.3d at 1041, such as Title VII and the Sherman Act.

Courts have also correctly recognized that historical evidence helps establish the validity of the *qui tam* provisions.   "Statutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our government."   *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.4 (1943).   In *Stevens*,

the Supreme Court reviewed this "long tradition of *qui tam* actions in England and the American Colonies," as well as the "considerable number" of such statutes that the First Congress itself enacted,[5] and found the evidence "well nigh conclusive with respect to the question . . . whether *qui tam* actions were cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process."   529 U.S. at 774, 776-77 (quotation marks omitted), *see also Wallace*, 2023 WL 8027309, at *6.

The historical evidence is also highly relevant to the constitutional question presented here.   *See, e.g., Riley*, 252 F.3d at 752-53.   That the First Congress enacted numerous *qui tam* provisions makes clear that the Framers did not believe relators were performing functions that only federal officers could properly perform.   *See Bowsher*, 478 U.S. at 723-24 (explaining that acts of the First Congress "provide[] contemporaneous and weighty evidence of the Constitution's meaning since many of the Members of the First Congress had taken part in framing that instrument") (quotation marks omitted).   And the long tradition of *qui tam* actions in the United States after the Framing provides "additional evidence that the doctrine of separated powers does not prohibit" this unique practice, given that "'traditional ways of conducting government . . . give meaning' to the Constitution."   *Mistretta*, 488 U.S. at 401 (quoting *Youngstown Sheet & Tube*, 343 U.S. at 610 (Frankfurter, J., concurring)); *see also NLRB*, 134 S. Ct. at 2559-60.

---

[5]     *See, e.g.*, Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. 101, 102 (census); Act of July 5, 1790, ch. 25, § 1, 1 Stat. 129, 129 (extending census provisions to Rhode Island); Act of July 20, 1790, ch. 29, §§ 1, 4, 1 Stat. 131, 133 (regulation of seamen); Act of July 22, 1790, ch. 33, § 3, 1 Stat. 137, 137-38 (trade with Indians); Act of Mar. 3, 1791, ch. 15, § 44, 1 Stat. 199, 209 (duties on liquor); see also Act of Feb. 20, 1792, ch. 7, § 25, 1 Stat. 232, 239 (Post Office); Act of Mar. 1, 1793, ch. 19, § 12, 1 Stat. 329, 331 (trade with Indians); Act of Mar. 22, 1794, ch. 11, §§ 2, 4, 1 Stat. 347, 349 (slave trade).

Defendants rely primarily on *Morrison v. Olson*, 487 U.S. 654 (1988) to argue that the *qui tam* provisions of the FCA violate the Take Care and Executive Vesting Clauses of the Constitution because these provisions "take away the executive's litigatory autonomy and authority and vest it in private citizens." *See* Dkt. No. 268 at 23.   In *Morrison*, the Court upheld restrictions on the President's ability to remove an independent counsel who possessed "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice." *Id.* at 662.   *Morrison* is inapposite. *Kelly*, 9 F.3d at 752–53; Riley, 252 F.3d at 754–55.   First, in that case there was no question that the independent prosecutor was an officer of the United States.   And as explained above, the relator is merely a private party.   *See Stevens*, 529 U.S. at 780–81 n.9, 786 n.17.   Second, in *Morrison*, the prosecutor at issue was assigned to represent the United States exclusively and to bring criminal prosecutions—a "function [that] cuts . . . to the heart of the Executive's constitutional duty to take care that the laws are faithfully executed." *Riley*, 252 F.3d at 755.   Therefore, Congress could not—without raising serious separation of powers questions—have assigned that responsibility to a private party outside the Executive and not subject to Executive control, such as a relator.

Further, unlike the independent counsel in *Morrison*, a relator is not empowered to exercise the vast prosecutorial authority of the United States.   The government's own conduct in *qui tam* litigation remains entrusted solely to officials within the Executive Branch.   As noted above, a *qui tam* relator is more aptly analogized, not to an independent counsel of the Justice Department who represents the United State in litigation, but rather to a plaintiff who asserts a private right of action under a federal statute.   Congress' decision to authorize private lawsuits

often rests in part on its belief that such actions will vindicate a societal interest in deterring and remedying violations of federal law.   As with plaintiffs who sue under other federal statutes, the potential for *qui tam* relators to furnish practical assistance in the enforcement of federal law does not transform them into the constitutional equivalent of a Justice Department attorney or any other federal officer.

*Qui tam* relators are simply civil litigants; they are not government officials, and they do not represent the United States.   *See id.*; *Wallace*, 2023 WL 8027309, at *5.   And as discussed below, a relator's case is subject to substantial control by the Executive Branch, thereby ensuring it does not infringe on the constitutional limitations set by *Morrison*.   *See, e.g.*, *Kelly*, 9 F.3d at 752–53.

### ii.      The FCA's Control Mechanisms Sufficiently Limit Relators' Powers.

As discussed above in Section III.a., the FCA includes several significant control mechanisms.   *See id.* at 753–57; *Taxpayers Against Fraud*, 41 F.3d at 1041; *Kelly*, 9 F.3d at 753–55; *Kreindler & Kreindler*, 985 F.2d at 1155.   From the outset, every *qui tam* complaint must be filed under seal and served on the government precisely to ensure that the United States can investigate the matter and determine whether it wishes to "intervene and proceed with the action" or potentially move to dismiss it.   31 U.S.C. §§ 3730(b)(2); (c)(2)(A).   If the government chooses to intervene, "the relator loses control" and the action is "'conducted by the Government.'"   *See Polansky*, 143 S. Ct. at 1728 (quoting 31 U.S.C. § 3730(b)(4)(A)). In that circumstance, the government "shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the" relator.   31 U.S.C. § 3730(c)(1); *Polansky*, 143 S. Ct. at 1728.   The government can also "elect to pursue its claim through any alternate

20

remedy available to the Government, including any administrative proceeding to determine a civil money penalty," rather than litigating the FCA suit.   31 U.S.C. § 3730(c)(5).

And if the government initially declines to intervene, it may still intervene at a later time for good cause and move to dismiss the relator's claims.   *See Polansky*, 143 S. Ct. at 1732, 1734.   Such motions are subject to highly deferential review under Federal Rule of Civil Procedure 41(a); indeed, the Supreme Court emphasized that district courts must grant dismissal "in all but the most exceptional cases"—"even if the relator presents a credible assessment to the contrary." *Polansky*, 143 S. Ct. at 1734.   And even where the government declines to intervene, it retains a great deal of control over a *qui tam* suit.   The government can settle a pending suit, *see* 31 U.S.C. § 3730(c)(2)(B), and it can veto a relator's proposed settlement or voluntary dismissal of his action, *see id.* § 3730(b)(1).[6]   Further, after declining to intervene, the United States is entitled to receive copies of all pleadings and transcripts, *id.* § 3730(c)(3), and to stay any discovery by the relator that "would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts," *id.* § 3730(c)(4).

These control mechanisms have been fully available here.   In fact, the United States has closely monitored the docket in this case, received filings, and entered its own filing.   S*ee* Dkt. No. 48.   Further, the FCA provides that the United States could, upon a showing of good

---

[6]      For example, in *United States ex rel. Dimartino v. Intelligent Decisions, Inc.*, 308 F. Supp. 2d 1318 (M.D. Fla. 2004), a declined *qui tam* action filed in this District, the United States objected to relator's attempt to voluntarily dismiss his case without the Government's consent. The court held that the FCA is clear that the Attorney General's consent is required and further stated that "Relator's position would leave this Court impotent to deal with relators who 'manipulate settlements in ways that unfairly enrich them and reduce benefits to the government.'"   *Id.* (citations omitted).

cause, move to intervene, settle, or dismiss this case if it chose to do so.   31 U.S.C. § 3720(c).

Notwithstanding the many statutory mechanisms that place substantial checks on the relator's authority, Defendants argue that the FCA insufficiently safeguards Executive Branch prerogatives.   They contend, for example, that the "FCA impermissibly infringes on the Executive's authority because the Executive cannot remove the relator from the action." Dkt. No. 268 at 24.   This contention is baseless.   First, the "concept of removal does not make sense in the *qui tam* context, [where] there is no 'office' from which to remove the relator and subsequently fill with someone else."   *See Kelly*, 9 F.3d at 755.   The Court should reject Defendants' removal argument for that reason alone.   Second, as explained above, under the *qui tam* provisions, the Executive Branch retains the power to intervene and dismiss *qui tam* actions, thereby displacing the relator's authority to litigate a case.   *See Polansky v. Exec. Health Res. Inc.*, 17 F.4th 376, 387 (3d Cir. 2021), *cert. granted sub nom. United States ex rel. Polansky v. Exec. Health Res., Inc.*, 142 S. Ct. 2834 (2022), and *aff'd sub nom. Polansky*, 143 S. Ct. 1720.   These powers bolster the conclusion that *qui tam* litigation does not offend the separation of powers.

Defendants argue further that the *qui tam* provisions vest a relator with prosecutorial discretion as the relator need not seek approval to initiate a suit.   Dkt. No. 268 at 24.   This argument is meritless.   Article II does not require that Executive Branch officials be able to prevent private litigants from suing to vindicate their "private interest[s]," *Stevens*, 529 U.S. at 772, even if those private interests overlap with public ones.   Tellingly, Defendants do not contend that the Constitution would require the Executive Branch to approve private suits under Title VII or the Sherman Act, for example, before they are filed—even though plaintiffs

22

bringing such actions may vindicate public rights.   The FCA fully empowers the Executive to take those measures it deems appropriate, up to and including intervention and dismissal of the case, to protect its prerogatives and authority.   *Polansky*, 143 S. Ct. at 1732, 1734.   That is all the Constitution requires.

For these reasons, the FCA's *qui tam* provisions are consistent with the Take Care Clause and the Vesting Clause and Defendants' argument to the contrary should be rejected.

### c.      The constitutionality of Founding era *Qui Tam* statutes is strong evidence that the *Qui Tam* provisions of the FCA are also constitutional.

As explained in Section II. above, during the Founding era, the First and Second Congresses passed numerous *qui tam* statutes.   Enactment of those statutes "'provid[es] contemporaneous and weighty evidence of the Constitution's meaning.'"   *Haaland*, 143 S. Ct. at 1637 (quoting *Bowsher*, 478 U.S. at 723).   Defendants attempt to discredit that evidence by arguing that those early statutes are too dissimilar to the FCA to matter here.   As explained below, Defendants' attempt is unavailing.

The Slave Trade Act of 1794 ("1794 Act"), passed by the Third Congress and signed by President Washington, is directly analogous to the *qui tam* provisions of the FCA.   It authorized a bounty for private citizens who sued those engaged in the international slave trade. Slave Trade Act of 1794, ch. 11, §§ 1–2, 4, 1 Stat. 347, 349.   The 1794 Act prohibited the modification of vessels in United States ports for the purpose of transporting enslaved people. As amended in 1800, the Act imposed the following penalties:   (1) forfeiture of the vessel, (2) a fine of $2,000, to be divided equally between the United States and the informer, and (3) for every enslaved person carried, an additional fine of $200, also to be divided equally between the United States and the informer.   *See id.* at §§ 2, 4.   Thus, the 1794 Act provided informers who

had no independent injury with "both a bounty and an express cause of action," *see Stevens*, 529

U.S. at 776–77, just like the FCA's *qui tam* provisions.   Defendants' Motion offers little

explanation for why they contend the constitutionality of the 1794 Act is not highly probative of

the constitutionality of the FCA.   While the 1794 Act does "relate to actions aboard ships and

upon entry," as Defendants point out, that fact does not diminish its relevance with respect to the

constitutional question at hand.   Dkt. No. 268 at 46.[7]   Admiralty laws, like civil laws, must

comport with the Constitution.

    Copyright laws are another line of *qui tam* cases from the early to mid-19th century that

provide strong evidence of the constitutionality of the *qui tam* provisions in the FCA.   These

cases involved private plaintiffs suing for copyright violations.   As the Court noted in *Stevens*,

529 U.S. at 776 n.5, the Act of May 31, 1790, ch. 15, 1 Stat. 124–25, § 2, allowed an author or

proprietor to sue for and receive half of the penalty for a violation of copyright*, see Clayton v.

Stone*, 5 F. Cas. 999 (C.C.S.D.N.Y. 1829)   Similarly, *qui tam* actions arose under subsequent

copyright statutes, normally brought by an aggrieved party, though not necessarily so.   *See Blunt

v. Patten*, 3 F. Cas. 762 (C.C.S.D.N.Y. 1828); *Dwight v. Appleton*, 8 F. Cas. 183 (C.C.S.D.N.Y.

1843); *Reed v. Carusi*, 20 F. Cas. 431 (C.C.D. Md. 1845); *Ferrett v. Atwill*, 8 F. Cas. 1161

(C.C.S.D.N.Y. 1846); *Backus v. Gould*, 48 U.S. 798 (1849); *Stevens v. Gladding*, 60 U.S. 64

(1856).

---

[7]    Defendants question whether "actions [under the 1794 Act] were historically brought by
private citizens or by public officials."   *Id.* at 49.   It was private plaintiffs, in fact, who sued
under the statute in the name of the United States in return for a bounty.   *See* James E. Pfander,
*Public Law Litigation in Eighteenth Century America: Diffuse Law Enforcement for a Partisan
World*, 92 Fordham L. Rev. 469, 472 (2023) (detailing private enforcement by the Providence
Society for Abolishing the Slave-Trade in Rhode Island).

Defendants argue that these statutes are not proper analogues because they "only permit[] an injured party to bring an action on behalf of themselves for their own injury" but do "not allow an uninjured party to bring an action on behalf of the Government."   Dkt. No. 268 at 42. *Stevens*, however, forecloses Defendants' argument.   Although FCA relators are not personally harmed by the conduct that violates the FCA, *Stevens* held that they acquire a concrete stake in the suit—no less concrete or personal than a copyright-holder's interest in a copyright infringement suit—through Congress's partial assignment of the government's claim.   529 U.S. at 773.   The fact that FCA relators lack a personal injury is fundamentally an Article III issue, rather than a distinction relevant to this Article II inquiry.   And, again, the Court in *Stevens* resolved the Article III question by holding that the private financial interest acquired by an FCA relator is a constitutionally valid predicate for suing in federal court.   529 U.S. at 773.   The FCA, like early copyright laws, channels the self-interest of private parties to service of the public good, by incentivizing litigation that will enforce federal law.   Thus, *qui tam* plaintiffs who brought copyright actions are indeed analogous to FCA plaintiffs for purposes of the Article II analysis.

## IV.   Conclusion

As set forth above, the FCA's *qui tam* provisions are consistent with the Constitution's Appointments Clause, separation of powers principles, Take Care Clause, and Vesting Clause. Accordingly, the Court should reject Defendants' arguments – as every federal Circuit Court to address these issues has done – and deny Defendants' Motion.

Dated: July 1, 2024

**Respectfully submitted,**

ROGER B. HANDBERG
United States Attorney

By:     /s/*Chad C. Spraker*                    
CHAD C. SPRAKER
Assistant United States Attorney
USA NO. 198
2110 First Street, Suite 3-137
Fort Myers, Florida 33901
Telephone: (239) 461-2200
Email: Chad.Spraker@usdoj.gov

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on July 1, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the Service List below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*<u>/s/ Chad C. Spraker</u>*
By: Chad Spraker
Assistant United States Attorney